UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
Case No.: 1:03 CV 00127

FILED
FEB 1 6 2005

SIMAAN, INC. and
SIMAAN MARKET STREET, LLC,

Plaintiffs,

v.

BP PRODUCTS NORTH AMERICA INC. and BP OIL
AND EXPLORATION INC.,

Defendants.

**DEFENDANTS' MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS
OR, IN THE ALTERNATIVE, MOTION
FOR JUDGMENT ON THE
PLEADINGS AND MOTION TO
STRIKE OR, IN THE ALTERNATIVE,
MOTION TO MAKE MORE DEFINITE
AND CERTAIN**

Defendants BP Products North America Inc. and BP Oil & Exploration Inc. (collectively "BP"),

by their undersigned counsel, submit the following Memorandum in Support of Motion to Dismiss or, in

the Alternative, Motion for Judgment on the Pleadings and Motion to Strike or, in the Alternative, Motion

to Make More Definite and Certain.

<u>NATURE OF THE MATTER BEFORE THE COURT</u>

The Third Amended Complaint represents Plaintiffs' third attempt to articulate claims against BP

arising out of Plaintiff Simaan Market Street, LLC's ("SMS") purchase of BP's interest in the motor fuel

service station located at 801 East Market Street, Greensboro, North Carolina. This latest attempt fails

entirely with respect to Simaan, Inc. ("Simaan, Inc.") because the well-pleaded allegations demonstrate

that Simaan, Inc. has suffered no injury caused by BP's alleged misconduct. The attempt likewise fails on

the part of both plaintiffs because all of the claims asserted in the Third Amended Complaint are

precluded by the merger and integration clause in the parties' Purchase and Sale Contract. Finally, the

Third Amended Complaint contains a number of allegations that are immaterial to Plaintiffs' claims and,

therefore, should be stricken, or, in the alternative, made more definite and certain.

<u>STATEMENT OF FACTS</u>

BP is engaged in the business of refining, marketing and selling of petroleum and other products. (See 3rd Am. Compl. ¶ 3.) At all times relevant to this case, BP marketed its petroleum products in the Greensboro, North Carolina area in part through a franchise distribution system. (3rd Am. Compl. ¶ 3.) Under that system, BP entered into franchises with independent retail dealers through Dealer Lease and Service Agreements that required BP to lease retail station premises to the independent dealers, or "franchisees," who then purchased motor fuel from BP for resale to the motoring public under the "BP" or "Amoco" trademark. (3rd Am. Compl. ¶ 3.) BP also operated its own retail service stations in the Greensboro area. (3rd Am. Compl. ¶ 4.)

Simaan, Inc. leased and operated the BP-branded service station located at 801 East Market Street, Greensboro, North Carolina ("Marketing Premises") as an independent dealer from 1996 through April 17, 2002. (3rd Am. Compl. ¶ 5). On February 7, 2002, BP sent a letter to Simaan, Inc. advising that BP had decided to sell its interest in the Marketing Premises and had received an offer of $1,052,684 for the same from jobber M.M. Fowler, Inc. (3rd Am. Compl. ¶ 7). M.M. Fowler, Inc.'s offer for BP's interest in the Marketing Premises was part of a package deal for BP's interest in eleven retail station properties in the Greensboro area. (3rd Am. Compl. at ¶ 14.) The February 7, 2002 letter offered Simaan, Inc. a right of first refusal to purchase BP's interest in the Marketing Premises at the same price and on the same terms as offered by M.M. Fowler, Inc. (3rd Am. Compl. ¶ 7).

On March 15, 2002, BP forwarded to Simaan, Inc. a proposed Purchase and Sale Contract, and provided Simaan, Inc. with a copy of its appraisal for the Marketing Premises. (3rd Am. Compl. ¶ 9). On April 3, 2002, and despite its complaint that the sale price was unfair, Simaan, Inc. executed the Purchase and Sale Contract and forwarded it to BP. (3rd Am. Compl. ¶ 10). A true and correct copy of the fully-executed Purchase and Sale Contract between BP and Simaan, Inc. is attached hereto as **Exhibit A**[1]. On

---

[1] BP's reliance on these documents does not require that the Court go outside the pleadings to resolve the motion or to treat the motion as a summary judgment motion. "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." <u>Venture Assoc. v. Zenith Data Systems</u>, 987 F.2d 429, 431 (7th Cir. 1993).

April 8, 2002, the Simaan family formed Plaintiff SMS. (3rd Am. Compl. ¶ 10). With BP's consent under paragraph 17 of the Purchase and Sale Contract, Simaan, Inc. assigned all of its interests in the Contract to SMS. (3rd Am. Compl. ¶ 10). On April 17, 2002, BP and SMS closed on the Purchase and Sale Contract, and SMS acquired BP's interest in the Marketing Premises for the price offered in the right of first refusal and stipulated in the Contract. (3rd Am. Compl. ¶ 13).

Plaintiffs originally filed a Complaint alleging claims under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801-2806. This Court granted BP's Motion for Summary Judgment on Plaintiffs' PMPA claims on January 20, 2005. (Jan. 20, 2005 Memorandum Order at 2-3.) On February 2, 2005, with leave of Court, Plaintiffs filed their Third Amended Complaint, alleging claims under the North Carolina unfair and deceptive trade practices statute (Count 3) and for common law fraud (Count 4). Plaintiffs allege that BP's February 7, 2002 letter to Simaan, Inc. was false, misleading and deceptive because BP had not received an offer from M.M. Fowler, Inc. to purchase BP's interest in the Marketing Premises for $1,052,684, and the right of first refusal to Simaan, Inc. was not offered on the same terms and conditions as M.M. Fowler, Inc.'s offer. (3rd Am. Compl. ¶¶ 34, 39). As ordered by the Court on January 5, 2005, BP answered the Third Amended Complaint on February 9, 2005 and now presents its objections to that pleading as allowed by the Court.

<u>QUESTIONS PRESENTED</u>

1.      Whether Simaan, Inc.'s claims fail as a matter of law because the well-pleaded allegations clearly demonstrate that it has suffered no injury as a result of BP's alleged misleading and deceptive acts.

2.      Whether Plaintiffs' claims are barred by the merger and integration clause contained in the parties' Purchase and Sale Contract.

3.      Whether this Court should strike allegations in paragraphs 17, 18, and 31 of the Third Amended Complaint that refer or relate to BP's intent or motive in offering Plaintiff Simaan a right of

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 3 of 122

first refusal on the grounds that such allegations are immaterial and impertinent to Plaintiffs' claims and are prejudicial to BP.

4.      Whether this Court should strike allegations in paragraphs 14, 16, 18, 19, and 35 of the Third Amended Complaint that relate to BP's offer of rights of first refusal to dealers other than Simaan, Inc. on the grounds that such allegations are immaterial and impertinent to Plaintiffs' claims and are prejudicial to BP.

5.      Whether this Court should strike paragraph 35 of the Third Amended Complaint as immaterial and impertinent to Plaintiffs' claims based on BP's alleged intentional misrepresentations, which are the only claims for which Plaintiffs have been granted leave to amend, or, in the alternative, whether the allegations of paragraph 35 should be made more definite and certain and whether the allegations of paragraph 36 should be made more definite and certain.

**ARGUMENT**

**I.      Simaan, Inc.'s claims fail as a matter of law because it has suffered no injury as a result of BP's alleged misrepresentations.**

BP moves to dismiss under Fed. R. Civ. P. 12(b)(6), or, in the alternative for judgment on the pleadings under Fed. R. Civ. P. 12(c), as to all claims asserted by Simaan, Inc. because the allegations of the Third Amended Complaint, when taken as true, demonstrate that Simaan, Inc. can prove no set of facts that would entitle it to relief because Simaan, Inc. has suffered no injury as a result of BP's alleged misrepresentations regarding the terms of the right of first refusal. Dismissal under Rule 12(b)(6) is proper if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." In re Duke Energy ERISA Litig., 281 F. Supp. 2d 786, 790 (W.D.N.C. 2003) (internal quotations omitted). Similarly, "[a] motion for judgment on the pleadings is intended to test the legal sufficiency of the complaint and will operate to dispose of claims where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noted facts." Continental Cleaning Srvc. v. United Parcel Srvc., Inc.,

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 4 of 122

1:98CV1056, 1999 U.S.Dist. LEXIS 9721 at *3-4 (M.D.N.C. 1999) (unpublished opinion attached). The court must view the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded allegations. Id.

The gravamen of Simaan, Inc.'s claims for deceptive and unfair trade practices under N.C. Gen. Stat. § 75-1.1 and common law fraud is that BP misrepresented the price and terms of the offer it received from M.M. Fowler, Inc. when extending a right of first refusal of that offer to Simaan, Inc. Under both the deceptive trade practices statute and principles of common law fraud, a plaintiff must show that the wrongful act resulted in injury to the plaintiff. Pleasant Valley Promenade v. Lechmere, Inc., 120 N.C. App. 650, 664, 464 S.E.2d 47, 58 (1995); Ragsdale v. Kennedy, 286 N.C. 130, 138 209 S.E.2d 494, 500 (1974). As discussed below, Simaan, Inc. cannot state a claim based on the alleged misrepresentations because it was not the purchaser of the Marketing Premises who actually paid an allegedly inflated price on differing terms. It is undisputed that the only person with standing to make the claim of a purchaser is SMS.

Taking the well-pleaded allegations as true, Simaan, Inc. cannot establish that it suffered injury as a result of BP's alleged misrepresentations regarding the terms and conditions of the offer by M.M. Fowler, Inc. After Simaan, Inc. accepted the right of first refusal, it assigned all of its interest in the Purchase and Sale Contract with BP to Plaintiff SMS, a separate and distinct entity. (3rd Am. Compl. ¶¶ 5-6, 10.) Thereafter, Plaintiff SMS closed the purchase and sale transaction with BP and acquired BP's interest in the Marketing Premises at a price of $1,052,684. (3rd Am. Compl. ¶¶ 6, 13.) These allegations demonstrate conclusively that Simaan, Inc. suffered no damage as a result of any alleged misrepresentation by BP because Simaan, Inc. never purchased the Marketing Premises or agreed to terms that differed from the offer by M.M. Fowler, Inc. Because Simaan, Inc. cannot establish injury, it fails as a matter of law to state a claim for unfair or deceptive trade practices or for common law fraud. See Ellis v. Smith-Broadhurst, Inc., 48 N.C. App. 180, 184, 268 S.E.2d 271, 274 (1980) ("As an essential element of plaintiff's cause of action, plaintiff must prove not only a violation of [N.C. Gen. Stat. § 75-1.1] by the defendants, but also that plaintiff has suffered *actual injury* as a proximate result of defendants'

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 5 of 122

misrepresentations." (emphasis added)); see also Bryant v. Eagan, 88 N.C. App. 741, 745, 364 S.E.2d 704, 706 (1988) (noting that plaintiff condominium buyers failed to establish injury in support of their fraud claim against seller where seller admitted deeding the wrong property to buyers but corrected the error without cost to buyers). Therefore, all claims asserted by Simaan, Inc. should be dismissed with prejudice, or, in the alternative, judgment should be entered for BP on such claims.

## II. Plaintiffs' claims are barred by operation of the integration clause in the Purchase and Sale Contract between the parties.

In support of their claims under the unfair and deceptive trade practices statute and for common law fraud, Plaintiffs allege that BP represented that the right of first refusal offered to Simaan, Inc. was on the same terms as the offer by M.M. Fowler, Inc., and that this representation was false. These allegations fail to state a claim as a matter of law by operation of the merger and integration clause in the Purchase and Sale Contract between the parties. "North Carolina clearly recognizes the validity of merger clauses and the state courts have repeatedly enforced such clauses." Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 526 (E.D.N.C. 1985). The merger and integration clause in the Purchase and Sale Contract between BP and Simaan, Inc. states in pertinent part:

> This Contract and Exhibits "A" through "E" attached hereto contain the entire understanding and agreement between the parties hereto relative to the subject matter hereof. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this contract.

(Purchase and Sale Contract, Ex. A at ¶ 18.) Reasonable reliance is an essential element of common law fraud. Ward v. Heath, 222 N.C. 470, 473, 24 S.E.2d 5, 8 (1943). In addition, in order to prove injury as a result of BP's alleged misrepresentation, an essential element of N.C. Gen. Stat. § 75-1.1, Plaintiffs must show that they detrimentally relied on the alleged misrepresentation. See Hageman v. Twin City Chrysler-Plymouth Inc., 681 F. Supp. 303, 308 (M.D.N.C. 1988); Belcher v. Fleetwood Enterprises, Inc., 162 N.C.App. 80, 85-86, 590 S.E.2d 15, 19 (2004) (granting summary judgment where plaintiff did not rely on defendant's recommendation to use alleged defective anchor system in purchasing mobile home).

By agreeing to the merger and integration clause, Simaan, Inc. and its assignee SMS expressly represented that they relied on no representations or statements in entering into the Purchase and Sale

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 6 of 122

Contract except those expressly set forth in the document itself. Nowhere in the Purchase and Sale Contract does BP make the representation that the purchase price is the same price offered by M.M. Fowler, Inc. for BP's interest in the Marketing Premises. Therefore, Plaintiffs cannot now claim that they reasonably relied on such alleged misrepresentation in an attempt to vitiate the Purchase and Sale Contract. Thus, Plaintiffs' claims in Count 3 for violations of N.C. Gen. Stat. § 75-1.1 and in Count 4 for common law fraud fail as a matter of law.

### III. Plaintiffs' allegations regarding BP's intent or motive in offering Plaintiff Simaan a right of first refusal should be stricken under Fed. R. Civ. P. 12(f).

In an attempt to raise claims already rejected by this Court, Plaintiffs allege in paragraphs 17, 18 and 31 that BP offered Simaan, Inc. a right of first refusal on the Marketing Premises because it subjectively believed that the PMPA required such an offer. (3rd Am. Compl. ¶¶ 17-18, 31.) These allegations are immaterial and impertinent to Plaintiffs' claims under N.C. Gen. Stat. § 75-1.1 and common law fraud and will cause prejudice to BP during this litigation. Therefore, BP respectfully requests that this Court strike such allegations from the Third Amended Complaint.

"Upon motion made by a party . . . or upon the Court's own initiative at any time, the Court may order stricken from any pleading any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[C]ourts are granted considerable discretion to determine motions to strike, especially if the allegations in the complaint will cause prejudice at a later date in the litigation." Xerox Corp. v. Inatek, Inc., 220 F.R.D. 241, 243 (D.Md. 2003). In this case, Plaintiffs' allegations that BP believed it was required to offer Simaan, Inc. a right of first refusal under the PMPA are irrelevant to the claims asserted and will cause prejudice to BP. Under N.C. Gen. Stat. § 75-1.1, BP's subjective intent in offering the right of first refusal is irrelevant as a matter of law. Chastain v. Wall, 78 N.C. App. 350, 356, 337 S.E.2d 150, 154 (1985) ("Intent of the defendant and good faith are irrelevant [to a claim under N.C. Gen. Stat. § 75-1.1]."). BP's subjective reasoning for offering the right of first refusal is also irrelevant to Plaintiffs' fraud claim because intent is relevant in a fraud claim only to the extent a defendant intended the plaintiff to rely on the alleged misrepresentation. Ragsdale, 286 N.C. at 138, 209 S.E.2d at 500. BP's

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 7 of 122

alleged belief that a right of first refusal was required under the PMPA in no way relates to its alleged intent to deceive Simaan, Inc. about the basis for the right of first refusal price. Therefore, allegations to that effect are irrelevant to Plaintiffs' fraud claim.

Plaintiffs' allegations that BP believed it was required to offer the right of first refusal under the PMPA are also prejudicial to BP. In making these allegations, Plaintiffs attempt to revive their PMPA claim by insinuating that BP owed Simaan, Inc. some heightened duties under the PMPA in connection with the right of first refusal. At the January 5, 2005 status hearing, this Court expressly rejected Plaintiffs' argument that the PMPA applied to the transaction at issue because BP believed that it did and couched the right of first refusal in terms used under the PMPA. (Transcript of January 5, 2005 Proceedings, **Exhibit B** at 62-63.) The Court subsequently held that the PMPA did not require BP to extend a right of first refusal to Simaan, Inc. (January 20, 2005 Memorandum Order at 2.) Allegations that BP subjectively believed it was required to offer a PMPA-compliant right of first refusal but failed to do so cannot form the basis of a claim for relief if objectively the PMPA did not require a right of first refusal in the first instance. Therefore, Plaintiffs should not be allowed to imply that the PMPA created duties on the part of BP that differ from the duties of any party in an arms-length commercial transaction.

The allegations in paragraphs 17, 18 and 31 regarding BP's subjective intent in offering the right of first refusal are irrelevant to Plaintiffs' claims of unfair and deceptive trade practices and fraud, and are prejudicial to BP. Therefore, such allegations should be stricken from the Third Amended Complaint.

### IV. Plaintiffs' allegations relating to BP's offer of rights of first refusal to dealers other than Simaan, Inc. should be stricken under Fed. R. Civ. P. 12(f).

BP also moves under Fed. R. Civ. P. 12(f) to strike allegations regarding BP's dealings with independent dealers other than Simaan, Inc., including its offers of rights of first refusal to those dealers, in paragraphs 14, 16, 18, 19 and 35 of the Third Amended Complaint. These allegations are irrelevant to Plaintiffs' claim that BP made material misrepresentations *to Simaan, Inc.* or otherwise acted unfairly or deceptively *with respect to Simaan, Inc.*, in offering Simaan, Inc. a right of first refusal of M.M. Fowler, Inc.'s offer to purchase the Marketing Premises. In addition, the allegations prejudice BP because

8

Plaintiffs attempt to base their own recovery under N.C. Gen. Stat. § 75-1.1 on alleged wrongful conduct by BP and M.M. Fowler, Inc. towards these other dealers. (See 3rd Am. Compl. at ¶ 35.) Allowing Plaintiffs to rely on such allegations as a basis for recovery against BP contradicts the generally-accepted rule that one cannot recover for injury allegedly suffered by a third party. See Allen v. Ferrera, 141 N.C. App. 284, 290, 540 S.E.2d 761, 766 (2000) (noting the general rule that neither a shareholder nor a guarantor of a corporation's debts may recover individually for injury to a corporation). Therefore, BP respectfully requests that this Court strike Plaintiffs' allegations regarding BP's dealings with dealers other than Simaan, Inc., from paragraphs 14, 16, 18, 19 and 35 of the Third Amended Complaint.

### V. Plaintiffs' allegations in Count 3 of the Third Amended Complaint should be stricken under Fed. R. Civ. P. 12(f), or, in the alternative, should be made more definite and certain.

In paragraph 35, Plaintiffs make vague and conclusory allegations that BP acted improperly in connection with its negotiations with jobber M.M. Fowler, Inc. for the sale of BP's retail interests in the Greensboro area in support of their claim for unfair and deceptive trade practices. (3rd Am. Compl. at ¶¶ 32-35.) These allegations are irrelevant, however, to the only unfair and deceptive trade practices claim for which the Court granted leave to amend. At the January 5, 2005 status conference, this Court granted Plaintiffs leave to assert a claim for unfair and deceptive trade practices based on alleged intentional misrepresentations by BP relating to the right of first refusal price, explaining that:

> I am not inclined to allow you to amend to list a series of claims, however, if you know and can persuade me at this very moment of any other claim, other than unfair and deceptive trade practice through a misrepresentation or other misrepresentation basis, which would be two claims; one just a straight tort claim for intentional misrepresentation, *the second claim that that activity violates the Unfair and Deceptive Trade Practice Act*, I will hear you. . . .

(Transcript of January 5, 2005 Proceedings at 57-58 (emphasis added).) Thus, the only issue in Plaintiffs' unfair trade practices claim is whether BP did in fact have an offer from M.M. Fowler, Inc. to purchase BP's interest in the Marketing Premises at the same price and on the same conditions offered to Simaan, Inc. in the right of first refusal. Plaintiffs' allegations that BP and M.M. Fowler, Inc. "manipulated the property values and prices offered to the dealers" and kept details of their own transaction secret are

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 9 of 122

simply irrelevant to that issue. Therefore, BP respectfully requests that such allegations in paragraph 35 be stricken from the Third Amended Complaint.

In the alternative, BP respectfully requests that Plaintiffs be ordered to make their allegations in paragraph 35 more definite and certain to make clear what conduct by BP is alleged to be unlawful under N.C. Gen. Stat. § 75-1.1. BP also requests that Plaintiffs be ordered to make their allegations of damage in paragraph 36 more definite and certain to specifically identify the actual injury sustained by Plaintiffs as a result of BP's alleged intentional misrepresentation. A motion for more definite statement is generally left to the district court's discretion. Gleichauf v. Ginsberg, 859 F. Supp. 229, 233 (S.D.W.V. 1994). "The standard for determining whether to grant a Rule 12(e) motion is whether it is reasonable to require defendants to respond to the . . . complaint." Id. (internal quotes omitted). In this instance, it is unreasonable to require BP to frame a response to the allegations in paragraph 35 because such allegations do not identify the specific conduct by BP that allegedly violated the unfair and deceptive trade practices statute.

Plaintiffs make vague and ambiguous allegations in paragraph 35 regarding conduct by BP and M.M. Fowler, Inc. and conclude that such conduct violates N.C. Gen. Stat. § 75-1.1. Plaintiffs fail, however, to make clear how these allegations relate to Plaintiffs' claim that BP's alleged misrepresentations regarding the basis for the right of first refusal price constitute unfair and deceptive practices. In addition, the allegations are so vague and ambiguous that BP cannot know what specific actions are at issue. In paragraph 35, Plaintiffs allege that BP, in conjunction with M.M. Fowler, Inc., acted to manipulate the property values and prices offered to the dealers. (3rd Am. Compl. at ¶ 35.) It is entirely unclear how this allegation relates to the alleged misrepresentation by BP regarding the right of first refusal price or what actions *by BP* are even at issue. Plaintiffs also allege that "action by BP in conjunction with [M.M. Fowler, Inc.] . . . to keep secret, conceal and not disclose the true facts related to the BP-Jobber transaction . . . constituted unfair and deceptive acts and practices. . ." but fail to identify what, if anything, about BP's transaction with M.M. Fowler, Inc. was kept secret. (3rd Am. Compl. at ¶ 35.) BP cannot reasonably be required to frame a response to such allegation without any indication as to

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 10 of 122

what "true facts" about the BP-Jobber transaction should have been disclosed to Plaintiffs and how such non-disclosure relates to Plaintiffs' claims of intentional misrepresentation by BP. In addition, Plaintiffs allege that the right of first refusal offer contained in the February 7, 2002 letter and the Purchase and Sale Agreement was not a "legitimate and truthful right of first refusal of the Jobber's offer" but once again fail to allege any facts identifying what a "legitimate and truthful right of first refusal" would entail. Finally, BP cannot determine how Plaintiffs' allegation that BP sold the Marketing Premises to plaintiff SMS at a "false and inflated price" relates to the alleged misrepresentation by BP regarding the offer price when Plaintiffs do not state how it was false and inflated and what the true price should have been.

It is important for a plaintiff to clearly articulate what conduct or actions by a defendant are alleged to be at issue because a jury must decide whether a defendant committed the acts or engaged in the conduct alleged in the complaint. South Atlantic Limited Partnership of Tennessee, LP v. Riese, 284 F.3d 518, 534 (4th Cir. 2002) ("In an action for unfair or deceptive trade practices under [N.C. Gen. Stat. § 75-1.1], the occurrence of the alleged conduct, damages, and proximate cause are fact questions for the jury, but whether the conduct was unfair or deceptive is a legal issue for the court."); see also N.C.P.I. Civil 813.21 ("The only question of fact to be determined by the jury in connection with this issue is whether the defendant actually did what he is alleged to have done. Special interrogatories should be submitted to the jury on each of these questions of fact."). In Keener Lumber Co., Inc. v. Perry, 149 N.C. App. 19, 560 S.E.2d 817 (2002), the North Carolina Court of Appeals reversed a judgment for the plaintiff on an unfair trade practices claim because the special interrogatories to the jury did not conform to the allegations in the complaint. The jury concluded that the defendant had not obtained lumber from the plaintiff without intending to pay, but had made preferential payments to other creditors, and the trial court subsequently concluded that the making of preferential payments constituted an unfair and deceptive practice under the statute. Id. at 35-36, 560 S.E.2d at 828. The Court of Appeals reversed, finding that the plaintiff did not allege preferential payments as a basis for relief under the statute in its complaint and, therefore, submission of that issue to the jury was improper. Id. "[B]ecause the jury answered "no" to [the question regarding defendant's intent to pay for lumber obtained], the jury's verdict

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 11 of 122

amounts to a determination that plaintiff did not prove the allegations set forth in its complaint in support of the unfair and deceptive practice claim." Id.

Thus, it is imperative that a plaintiff clearly articulate in the complaint what specific actions by a defendant allegedly violate the statute. Without this clarity, it is impossible for the parties, as well as a jury, to join issue as to the alleged illegal conduct. Moreover, specificity with respect to the alleged illegal conduct is especially important where, as here, extensive discovery regarding the transaction at issue has already been conducted, and the time period to pursue additional discovery related specifically to the unfair and deceptive trade practices claim is limited. Therefore, BP respectfully requests that this Court order Plaintiffs to make paragraph 35 of the Third Amended Complaint more definite and certain to identify whether and how the allegations relate to Plaintiffs' claim of intentional misrepresentation and to specifically identify what conduct by BP violates North Carolina's unfair and deceptive trade practices statute.

Finally, Plaintiffs' allegations of damage in paragraph 36 are likewise insufficient under the N.C. Gen. Stat. § 75-1.1 because they fail to specify what actual injury was proximately caused by BP's alleged illegal conduct. In paragraph 36, Plaintiffs generally conclude that they have been injured as a direct and proximate result of unfair and deceptive practices by BP. (3rd Am. Compl. ¶ 36.) Plaintiffs nowhere, however, specify what injury they are alleged to have suffered other than the general conclusion that they paid an "inflated price." In Coley v. Champion Home Builders Co., 162 N.C. App. 163, 590 S.E.2d 20 (2004), the North Carolina Court of Appeals concluded that the plaintiffs adequately alleged injury in support of an unfair and deceptive trade practices claim based on a mobile home manufacturer's recommendation of a defective anchoring system by requesting reimbursement of either the costs incurred in purchasing the alleged defective system or the costs to retro-fit their mobile home with a non-defective anchor system. 162 N.C. App. at 166-67, 590 S.E.2d at 22. In a companion case, Belcher v. Fleetwood Enterprises, Inc., 162 N.C. App. 80, 590 S.E.2d 15 (2004), while the court ultimately granted summary judgment on the grounds that plaintiff had suffered no injury, it expressly noted that the specific damages allegations found in the Coley complaint were absent in the Belcher complaint. 162 N.C. App. at 85-86,

590 S.E.2d at 19. In this case, Plaintiffs allege no specific injury that they have suffered as a result of BP's alleged misconduct. Therefore, BP respectfully requests that Plaintiffs be ordered to make their damage allegations in paragraph 36 of the Third Amended Complaint more definite and certain by specifically identifying how they were allegedly injured by BP's unfair and deceptive actions in connection with the right of first refusal.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion to Dismiss or, in the Alternative, Motion for Judgment on the Pleadings and Motion to Strike or, in the Alternative, Motion to Make More Definite and Certain.

Dated: February 16, 2005                    Respectfully submitted,


                                            By: _____
                                                One of their attorneys

**HAMILTON GASKINS FAY & MOON, PLLC**
Richard C. Gaskins, N.C. Bar # 12407
Keith J. Merritt, N.C. Bar # 17523
2020 Charlotte Plaza
201 South College Street
Charlotte, NC 28244-2020
(704) 344-1117

Of Counsel:
**GREENSFELDER, HEMKER & GALE P.C.**
David M. Harris, Mo. Bar # 32330
Dawn M. Johnson, Mo. Bar #41991
Sandra B. Gallini, Mo. Bar #53902
10 South Broadway, Suite 2000
St. Louis, MO 63102
(314) 241-9090
(314) 241-9745 (facsimile)

**Attorneys for Defendants BP Products North
America Inc. and BP Oil & Exploration Inc.**

<u>CERTIFICATE OF SERVICE</u>

I, Keith J. Merritt, hereby certify that on this date I served the foregoing **DEFENDANTS'
MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE,
MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO STRIKE OR, IN THE
ALTERNATIVE, MOTION TO MAKE MORE DEFINITE AND CERTAIN** upon the parties and
counsel of record by depositing a copy thereof in the United States mail, postage prepaid and
addressed as follows:

> Thomas A. Worth
> The Worth Law Firm
> 301 South Greene Street, Suite 300
> Greensboro, NC 27401
>
> Harry C. Storm
> Lerch, Early & Brewer, Chartered
> 3 Bethesda Metro Center
> Suite 460
> Bethesda, MD 20814

This the 16th day of February, 2005.

By: _____
Keith J. Merritt
Attorneys for Defendants

HAMILTON GASKINS FAY & MOON, PLLC
2020 Charlotte Plaza
201 South College Street
Charlotte, North Carolina 28244-2020
Telephone: 704/344-1117

CHLT 108521v.1

Case 1:03-cv-00127-NCT    Document 101    Filed 02/16/05    Page 15 of 122

# ATTACHMENT/EXHIBIT_____A_____

## PURCHASE AND SALE CONTRACT
## (SALE TO DEALER)

THIS PURCHASE AND SALE CONTRACT ("Contract") is made and entered into by and between **BP PRODUCTS NORTH AMERICA INC.**, a Maryland corporation, with offices at 2475 Northwinds Parkway, Suite 400, Alpharetta, Georgia 30004, (hereinafter "Seller"), and **SIMAAN, INC.**, with an address of 801 East Market Street, Greensboro, North Carolina 27401 (hereinafter "Purchaser"), effective as of the last date executed by the parties ("Effective Date").

### WITNESSETH:

That in consideration of the mutual covenants and agreements herein contained, Seller hereby agrees to sell, and Purchaser hereby agrees to purchase, for the price of One Million Fifty-two Thousand Six Hundred Eighty-four and no/100 Dollars ($1,052,684.00) ("Purchase Price"), and upon the terms and conditions hereinafter set forth, the real estate described in Exhibit "A" attached hereto and made a part hereof, (the "Property"). The Property shall also include all buildings erected on the real estate, the pump-island canopy, underground storage tanks and lines (subject to Paragraph 10), and the equipment set forth in Exhibit "B." Said equipment shall be conveyed by separate Bill of Sale in the form attached as Exhibit "C."

Seller hereby agrees, subject to the conditions hereinafter set forth, to convey title to the Property to Purchaser by Special Warranty Deed, subject to:

1. Existing easements, sidetrack and license agreements, if any, whether of record or not.
2. Covenants and conditions of record, if any.
3. Taxes and special assessments against the Property, if any.
4. Zoning laws and municipal regulations, if any; environmental laws and regulations, if any; building line restrictions, use restrictions and building restrictions of record, if any; and any party wall agreements of record.
5. Encroachments, overlaps and other matters which would be disclosed by an accurate current survey.
6. The following covenants and agreements of the Purchaser:

Purchaser covenants and agrees that no water wells other than those needed for remediation or Environmental compliance will be constructed on the Property, and, if Purchaser removes any soil from the Property, or causes any soil to be removed from the Property, that Purchaser will be responsible for proper disposal in accordance with all applicable laws and the costs therefore,

1

BP 000001

**Plaintiff's Depo
Exhibit 34**

that Property will not be used or occupied for residential purposes, and that any structures constructed on the Property will have slab-on grade foundation above surface level.

The foregoing covenant shall run with the land and be binding on said Purchaser, its heirs, executors, grantees and assigns, and inure to the benefit of the Seller herein, its successors and assigns.

It is further agreed between Seller and Purchaser that:

1.   Payment of Purchase Price.

        Purchaser has deposited in escrow with the title company providing the preliminary title report or Seller's closing attorney, as the case may be, the sum of Forty Thousand and no/100 Dollars ($40,000.00), (hereinafter "Earnest Money") to be applied against the Purchase Price, subject to Paragraph 4.  On the date of closing as set forth in Paragraph 12 (the "Closing Date"), Purchaser agrees to pay to Seller the balance of the Purchase Price in the amount of One Million Twelve Thousand Six Hundred Eighty-four and no/100 Dollars ($1,012,684.00).

2.   Title and Survey.

        (a)  Seller agrees to furnish to Purchaser at Purchaser's expense within thirty (30) days from the date hereof a preliminary title report or commitment to insure title to the Property issued by a responsible title insurance company, or the equivalent under the Torrens Act in the event that the Property is registered under the Torrens System, showing title in Seller subject only to the exceptions above specified and the usual exclusions and exceptions contained in standard title insurance policies.

        (b)  During the same thirty (30) day period as set forth in subsection (a) above, Purchaser may obtain a survey of the Property.

3.   Title and Survey Objections.

        Purchaser shall, within thirty (30) days after receiving said title report or commitment and survey, if applicable, deliver to Seller a written statement of any objection to the title or a written statement to the effect that the title is satisfactory.  In the event Seller does not receive Purchaser's written statement of objections within such thirty (30) day period, it shall be conclusively presumed that Purchaser has waived all objections to title.  In the event there are objections to the title, Seller shall be allowed twenty (20) days to cure the same, and should such objections be not cured or waived within such period, then Purchaser may terminate this Contract by notice to Seller within five (5) days after the expiration of the twenty (20) day cure period, and Seller agrees in such event to refund the Earnest Money, and this Contract shall thereafter be inoperative and void and neither Seller nor Purchaser shall have further liability hereunder.  In the event Purchaser does not terminate this Contract in the manner and within the time period specified above, Purchaser shall be deemed to have waived the right to terminate this Contract for any title and survey defects.

2                                                BP 000002

4. <u>Inventory</u>.

    Any inventory shall be transferred in accordance with the attached Exhibit "D".

5. <u>Inspection Period</u>.

    Purchaser's obligation to close hereunder shall be subject to the right of Purchaser, at
Purchaser's sole cost and expense within thirty (30) days after the Effective Date, to inspect or to
cause an inspection to be made by qualified professionals on Purchaser's behalf of the Property,
including at Purchaser's option, environmental inspections or tests for hydrocarbons or for any
toxic or hazardous substances. Purchaser, his agents or employees may enter upon the Property
for the purpose of making such inspections and tests, provided, however, that Purchaser shall
schedule such inspections and tests with Seller upon at least three (3) days advance notice, who
shall have the right to have a representative present at all times during inspections and tests
performed by Purchaser and who shall also have the right to split samples with Purchaser; that
Purchaser shall provide to Seller complete copies of the results of all such inspections and tests
within five (5) days of receipt of same; that the results of such tests shall be confidential and shall
not be reproduced or disclosed by Purchaser to anyone without written consent of Seller except
for consultants and lenders engaged by Purchaser with respect to this Contract, but who shall
agree to hold said results as confidential as well; that Purchaser shall promptly repair any and all
damages to the Property caused by that such activities and in this event Seller shall have the right
to limit the scope or location of such tests; shall restore the property to the same condition as
before the inspections or tests to the satisfaction of Seller; that such inspections and tests shall
not be conducted in such a manner as to interfere with business operations conducted on the
Property; and that Purchaser shall indemnify and hold Seller harmless from and against any and
all claims arising from or by reason of Purchaser's entry upon the Property. In the event such
inspections disclose conditions unsatisfactory to Purchaser in Purchaser's sole discretion ("Test
Objections"), and Purchaser so notifies Seller in writing on or before thirty (30) days from the
Effective Date (the "Inspection Period"), then the Seller shall have twenty (20) days to cure the
Test Objections ("Cure Period"). In the event Seller is unable or elects, in its sole and exclusive
discretion, not to cure such Test Objections with said twenty (20) day period, then Purchaser may
terminate this Contract by written notice received by Seller within five (5) days after the end of
the Cure Period, this Contract shall become null and void, and Seller shall return the Earnest
Money to Purchaser. In the event Seller does not receive Purchaser's written notice by such date,
it shall be conclusively presumed that Purchaser has satisfied or has waived this contingency.

6. <u>As Is Sale</u>.

    Purchaser expressly acknowledges and agrees (i) that the Property has been used as a
retail gasoline station; (ii) that it has (or will have the opportunity to have) inspected or caused an
inspection to be made on Purchaser's behalf of the Property; (iii) that Purchaser is relying on the
results of his own investigation of the physical and environmental condition of the Property; (iv)
that Purchaser is relying solely on his own judgment in completing the purchase of the Property,
and (v) that Purchaser is acquiring the Property "AS IS" with all faults on the date of conveyance,

3

F:\law\REALWEST\scbu\north carolina\SS# 24195 PS Contr 020307.doc

BP 000003

except as set forth in this Contract. Purchaser expressly acknowledges and agrees that Seller has made no representations or warranties whatsoever regarding the condition of the Property, including but not limited to (i) the economic viability, profitability or business potential of the Property; (ii) the condition or suitability of any assets sold to Purchaser for operating Purchaser's business or for any other use; or (iii) the environmental condition or status of the Property; or (iv) any warranties of merchantability or fitness for a particular purpose. Purchaser, collectively, and jointly and severally, for itself and on behalf of its officers, directors, shareholders, agents, employees, heirs, personal representatives, grantees, successors and assigns, and all persons claiming by, through, or under Purchaser, hereby release and forever discharge Seller, its parent affiliates, and each of their respective agents, employees, officers, directors, shareholders, successors and assigns from all claims, demands, losses, liabilities, judgments, penalties, suits, actions, costs and expenses whatsoever, that may now exist or hereafter accrue with respect to condition of the Property, including but not limited to the environmental condition of the Property, existing at the time of transfer of title except, however, for Seller's obligation to indemnify Purchaser as set forth in Paragraph 9 hereof.

7.  Reports.

Purchaser acknowledges the following ("Disclaimer"): that Seller does not guarantee or represent the accuracy or completeness of any environmental information or reports that may have been or will be provided to Purchaser; and that Purchaser shall rely only upon Purchaser's own tests in deciding whether to purchase the Property.

Seller has previously caused, or prior to Closing shall cause to be performed certain environmental tests of the Property ("Seller's Tests"). Closing shall be postponed until such time as (i) Seller's Tests have been completed to Seller's satisfaction, (ii) a final contractor's report of the results of Seller's Tests ("Report") has been received by Seller, and (iii) the time periods referenced in this Paragraph, have elapsed. If Seller initiated or completed Seller's Tests prior to the date of Seller's acceptance of this Offer, Seller shall have no obligation to initiate or complete additional tests of the Property. If the Tests or Seller's Tests reveal an environmental condition, the associated risks and liabilities of which are unacceptable to Seller in its sole and exclusive discretion, Seller shall have the right, within thirty (30) days after receipt of the Report, to terminate the Contract. If Seller does not terminate the Contract, Seller shall provide Purchaser a copy of the Report. Simultaneously therewith, Seller may, in its sole and exclusive discretion, also provide Purchaser an agreement in the form attached hereto as Exhibit "E" pursuant to which Purchaser agrees to provide Seller access to the Property after Closing in exchange for Seller agreeing to remediate at Seller's expense some or all of the environmental conditions (the "Baseline") disclosed in the Report ("Remediation Agreement"). The Remediation Agreement may also impose upon Purchaser, at Seller's sole and exclusive discretion, conditions restricting the assignment of the Remediation Agreement and Purchaser's use and development of the Property throughout the duration of the Remediation Agreement.

If Purchaser determines within thirty (30) days after its receipt from Seller of the Report that the environmental conditions identified in the Report materially, adversely affect Purchaser's Use,

4

Purchaser may terminate this Contract upon written notice received by Seller within said thirty (30) day period.

If Purchaser should fail to terminate the Contract as set forth above and:

(i) if Seller provided Purchaser a Remediation Agreement, then Purchaser shall be deemed to have accepted the terms set forth in the Remediation Agreement, to have waived any rights it may have to terminate the Contract under this Paragraph 7 and Purchaser shall proceed to Closing in accordance with the terms set forth herein and in the Remediation Agreement. On or before Closing, Purchaser shall execute and deliver to Seller the Remediation Agreement;

(ii) if Seller did not provide Purchaser a Remediation Agreement, then Purchaser shall be deemed to have waived any rights it may have to terminate this Contract under this Paragraph 7 and Purchaser shall proceed to Closing in accordance with the terms set forth herein.

8.    Environmental Considerations.

(a) Miscellaneous.

(i) Definitions. For purposes of this Contract, the term "Hazardous Materials" shall be defined to include flammable explosives, hydrocarbons, and/or petroleum products or fractions thereof, radioactive materials, hazardous or toxic wastes, substances or materials, including but not limited to those materials and substances defined as "hazardous substances", "hazardous materials", "hazardous wastes" or "toxic substances" in the Laws. For purposes of this Contract, the term "Laws" shall be defined to include all federal, state and local statutes, ordinances, rules, regulations or orders, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. 9601, *et seq.*, as amended, and the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.* For purposes of this Contract, the term "Losses" shall be defined to include any and all claims, demands, damages, costs and expenses, including reasonable attorneys' fees, court costs, awards, settlements, judgments, penalties, fines, liens or causes of action, at law or in equity, including without limitation actions under the Laws. For purposes of this Contract, the term "Remediation" shall be defined to include any testing, inspection, monitoring, or remediation that may be required by the Government. For purposes of this Contract, the term "Government" shall be defined to include any federal, state or local governmental agency, entity, body, instrumentality, department or representative. For purposes of this Contract, the term "Petroleum Products" shall be defined to include all motor vehicle fuels, petroleum products and derivatives containing hydrocarbons.

(ii) UST's. Purchaser acknowledges that underground storage tanks and associated product piping systems ("UST's") included in this sale, if any, may contain explosive gases and may have been used for the storage of motor fuels containing tetraethyl lead or other "antiknock" compounds which have made such UST's unfit for the storage of water or any other article or

5

BP 000005

commodity intended for human or animal contact or consumption. Purchaser expressly agrees not to use or permit the use of any such UST's for said purposes.

(iii) "As-Is, Where-Is". Purchaser acknowledges that the Property has been used by Seller and/or its employees, licensees and agents as a service station or for related purposes for the storage, sale, transfer and distribution of Petroleum Products. Purchaser represents and warrants that it is, or shall become prior to Closing, familiar with the condition of the Property and that, except as may later be set forth in a Remediation Agreement, if any, SELLER HAS NOT MADE AND MAKES NO WARRANTIES OR REPRESENTATIONS REGARDING THE PROPERTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ITS HABITABILITY, CONDITION OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE. PURCHASER AGREES THAT THE PROPERTY SHALL BE CONVEYED BY SELLER AND ACCEPTED BY PURCHASER IN AN "AS-IS, WHERE-IS" CONDITION EXISTING ON THE FIRST TO OCCUR OF THE CLOSING DATE OR THE DATE POSSESSION IS TRANSFERRED TO PURCHASER. This Subsection (iii) shall be modified, if at all, only by a Remediation Agreement, if any, and then only to the extent provided therein.

(b) Existing Contamination.

(i) Hydrocarbons. During Seller's use and/or ownership of the Property and prior to the Closing Date, Petroleum Products may have been spilled, leaked or otherwise discharged onto, into or from the Property ("Hydrocarbons"). Purchaser hereby agrees to assume, and hereby waives, releases, and agrees to indemnify, defend and hold harmless Seller and its directors, officers, employees, contractors, agents, representatives, successors and assigns, from and against any and all Losses arising out of or relating to the Hydrocarbons and/or the Remediation thereof. If the parties should mutually execute a Remediation Agreement, then this Contract shall be automatically revised without further action by the parties such that this Paragraph 8, including the definitions contained herein, shall be excised from this Contract and shall be of no further force and effect.

(ii) Other Contamination. The parties acknowledge that Hazardous Materials, other than Hydrocarbons (as defined either in Paragraph 8 hereof, if no Remediation Agreement has been executed by the parties, or in the Remediation Agreement, if executed by the parties) may exist on the Property as of the Closing Date ("Other Contamination"). Purchaser hereby agrees to assume and hereby waives and releases Seller from all liability for the Other Contamination, including the Remediation thereof, Purchaser hereby acknowledging that Seller is not responsible for the Remediation of such Other Contamination and agreeing to seek recourse, if at all, for Purchaser's Losses from the parties who caused the same. Purchaser hereby agrees to indemnify, defend and hold harmless Seller and its directors, officers, employees, contractors, agents, representatives, successors and assigns, from and against any and all Losses arising out of or relating to Other Contamination, the Remediation thereof, or the physical condition of the Property or other property abandoned thereon by Seller.

(iii) Seller's Access. If after Closing, Purchaser should default in its obligation to complete the Remediation of the Hydrocarbons pursuant to Paragraph 8(b)(i) hereof or the Remediation of the Other Contamination pursuant to Paragraph 8(b)(ii) hereof, and if, as a

6

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 22 of 122

consequence, the Government shall notify Seller that Seller must undertake any Remediation of Hydrocarbons or Other Contamination, Seller shall immediately notify Purchaser of same, Purchaser shall promptly undertake same, and Purchaser shall immediately notify the Government that Purchaser shall respond to such notice in the place of Seller.

However, if: (1) Purchaser fails to timely or properly undertake and pursue the Remediation of Hydrocarbons or Other Contamination, or (2) the Government insists that Seller, not Purchaser, undertake or pursue the Remediation of Hydrocarbons or Other Contamination; then Seller shall have the right and authority, but not the obligation, to enter the Property and to conduct the Remediation of Hydrocarbons or Other Contamination, all without trespass. Seller's entry on the Property and activities thereon shall not be deemed an admission of liability for Hydrocarbons or Other Contamination.

While on the Property, Seller shall have the right to install, maintain, operate, store, use and remove equipment, including but not limited to monitoring wells, recovery wells and other assessment or Remediation equipment, to remove, remediate, store and test soils and groundwater therefrom and thereon and to otherwise take all actions required to comply with the Laws. Seller shall exercise its right of entry onto the Property in a manner which does not unreasonably interfere with Purchaser's Use and Seller shall provide Purchaser, within thirty (30) days of its written request, copies of all correspondence between Seller and the Government regarding Seller's activities on the Property. Purchaser shall not interfere with Seller's right of entry or actions taken pursuant thereto, and shall cooperate with Seller in obtaining any permits, consents or approvals necessary for Seller's actions taken with respect to the Property.

If the parties should mutually execute a Remediation Agreement, then this Paragraph 8(b)(iii) shall be automatically revised such that all references to Paragraph 8(b)(i) shall be excised from this Paragraph 8(b)(iii) and shall be of no further force and effect.

(c) Future Contamination. The parties acknowledge that Hazardous Materials may come to exist on the Property after the Closing Date ("Future Contamination"). Purchaser hereby agrees to assume, and hereby waives, releases, and agrees to indemnify, defend and hold harmless Seller and its directors, officers, employees, contractors, agents, representatives, successors and assigns, from and against any and all Losses arising out of or relating to Future Contamination and/or the Remediation thereof.

(d) Survival. The provisions of this Paragraph 8 that are not automatically excised from this Contract by their own terms shall survive Closing. Provisions substantially similar to those in this Paragraph 8 shall be incorporated into the Deed and recorded at Closing. For purposes of this Paragraph 8, the term "Purchaser" shall refer to Purchaser, its heirs, devisees, representatives, successors and assigns.

9.    Indemnification.

For the period of time commencing on the Closing Date, and ending on the Ending Date, Seller agrees to indemnify and hold harmless Purchaser and Purchaser's heirs, legal

7

Case 1:03-cv-00127-NCT    Document 101    Filed 02/16/05    Page 23 of 122

representatives and successors (collectively the "Indemnified Purchaser Parties"), from and against all claims, demands, damages, losses, judgments, penalties and liabilities which arise as a result of any enforcement action resulting from the presence of hydrocarbon contamination on the Property caused by Seller's use thereof prior to the Closing Date; provided, however, that (i) Seller's indemnity shall be limited to remediation costs actually incurred by or imposed upon Indemnified Purchaser Parties as a result of such enforcement action, (ii) Indemnified Purchaser Parties shall promptly notify Seller and provide to Seller copies of all notices received by Indemnified Purchaser Parties pertaining to any such enforcement action, and (iii) Indemnified Purchaser Parties shall incur no costs or expenses for remediation without the prior written consent of Seller, which consent shall not be unreasonably withheld.

10. Tank Testing.

Prior to Closing, Seller shall provide the continuous monitoring records for the UST's identified in Exhibit "B".

11. Personal Property.

Seller shall not transfer or convey to Purchaser at Closing by deed or bill of sale or thereafter by abandonment of same, any interest in Seller's, or its parent's, subsidiaries' or affiliates' advertising, trade names, trade marks, service marks, signs, sign poles, slogans, identifications, copyrights or copyrighted materials ("Trade Marks"), and Seller shall have the full and unrestricted right to enter the Property and to remove same for sixty (60) days after Closing. Title to all trade fixtures, UST's and equipment on the Property ("Personal Property"), shall be conveyed by the form of bill of sale, attached hereto as Exhibit "C" and made a part hereof, and Seller shall transfer same to Purchaser and Purchaser shall accept same at Closing in accordance with the terms thereof. This provision shall survive Closing.

12. Closing.

May 3, 2002 *C.S.*

The Closing Date shall be in no event later than ~~April 17, 2002~~, except as the same shall be extended as provided herein. Closing shall be effected through escrow with the title insurance company acting as escrow agent for both parties. Seller shall deliver to the escrow agent its Limited Warranty Deed, Quit-Claim Deed, any other documents required hereunder, and all customary documents required by the title company not inconsistent with this Contract. Purchaser shall deliver to the escrow agent the balance of the purchase price in cash, certified funds, or wire transfer, any other documents required hereunder, and all customary documents required by the title company not inconsistent with this Contract. The escrow agent shall record the Limited Warranty Deed; shall deliver to Seller its Settlement Statement and a cashier's check for the purchase price less Seller's expenses; and shall deliver to Purchaser its Settlement Statement, the recorded Limited Warranty Deed and the owner's title insurance policy. Seller shall pay the fees for the title insurance premium. Purchaser shall pay the fees for recording the Limited Warranty Deed. Seller and Purchaser each agree to pay fifty percent (50%) of the escrow fee.

8

BP 000008

F:\law\REALWEST\sebu\north carolina\SS# 24195 PS Contr 020307.doc

13. Pro-rations.

Rents and other current charges, if any, shall be adjusted pro rata as of date of Closing. General taxes for the year of closing shall be prorated from January 1st to date of Closing. If the amount of such taxes is not then ascertainable, prorating shall be on the basis of the amount of the most recent ascertainable taxes. Seller agrees to pay any and all Federal, State, and local real estate transfer taxes and documentary stamp taxes applicable to this transaction.

14. No Brokers.

Seller and Purchaser each represent and warrant to the other that no brokers or finders have been involved in this transaction, and that no commissions or fees are due to any broker or to any other party with regard to this transaction. Seller and Purchaser each agree to indemnify, defend and hold the other harmless from any claims, loss, damage, costs and expense arising from any breach hereof by the indemnifying party.

15. Default.

(a) In the event of default hereunder by Purchaser prior to closing, Seller's remedies shall be limited to terminating this Contract upon written notice to Purchaser, in which event Seller may retain the Earnest Money at its option as liquidated damages, and Seller or Purchaser shall thereafter have no further claim against or liability to the other and this Contract shall be inoperative and void.

(b) In the event of default hereunder by Seller prior to closing, Purchaser's remedies shall be limited to terminating this Contract upon written notice to Seller, in which event Seller expressly agrees to refund to Purchaser the Earnest Money, and Seller or Purchaser shall thereafter have no further claim or liability against the other and this Contract shall be inoperative and void.

16. Notices.

All notices required or sent hereunder shall be in writing and delivered in person, by messenger or other express delivery service, or by U.S. Mail Certified, Return Receipt Requested, to the address of the other party as set forth in the first paragraph of this Contract, or to such other address as the parties may from time to time designate. A copy of any notice to Seller shall also be sent to BP Products North America Inc., 2475 Northwinds Parkway, Suite 400, Alpharetta, Georgia 30004, Attention: Manager, Real Estate Legal Services. Each such notice shall be deemed served and effective on the date of delivery or refusal, if delivered personally, on the date of the delivery receipt, if delivered by messenger or express service, or the date of mailing shown on the certified mail receipt, if delivered by certified mail.

17. Assignment.

9

BP 000009

F:\law\REALWEST\sebu\north carolina\SS# 24195 PS Contr 020307.doc

Before Closing, this Contract shall bind and inure to the benefit of the parties hereto only. This Contract shall not be assigned by Purchaser without the prior written consent of Seller. This Contract shall become null and void, at the election of Seller, in the event of any attempted assignment by Purchaser without Seller's prior written consent and any unpermitted assignment shall be considered a default of Contract by Purchaser. Purchaser understands that this transaction is or it may be Seller's intention to include this transaction as one part of a tax-deferred exchange as recognized under Section 1031 of the Internal Revenue Code. Purchaser agrees to execute such documents as may reasonably be required to qualify the transaction for treatment under that section. Purchaser further agrees: (i) that Seller's interests in this Agreement may be assigned to a qualified intermediary or other third party (the Intermediary); and (ii) that Seller will deed the Property as directed by the Intermediary.

18.    No Waiver.

This Contract and Exhibits "A" through "E" attached hereto contain the entire understanding and agreement between the parties hereto relative to the subject matter hereof. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Contract. No modification, waiver of, addition to, or deletion from the terms of this Contract shall be effective unless reduced to writing and signed by Seller and Purchaser, each of whom expressly waives, releases and forever forswears any right under Georgia law which permits a contract, by its terms amendable only in writing, to be orally amended.

19.    Survival.

Any covenant or provision hereof which by its nature requires observance or performance after the Closing Date shall survive delivery of the deed and shall continue in full force and effect.

20.    Successors and Assigns.

The provisions hereof shall inure to the benefit of and bind the parties hereto, their respective heirs, personal representatives, successors and assigns. Purchaser shall not assign his rights under this Contract without the prior written approval of Seller.

21.    Binding Contract.

It is expressly understood and agreed that this Contract shall not be binding on Seller unless and until it is executed on behalf of Seller by an authorized representative and a signed copy thereof is delivered to Purchaser.

22    Restriction.

The Property shall be conveyed and accepted subject to a restriction and covenant set forth in the Deed or Assignment prohibiting, for a period the earlier of (i) fifteen (15) years from

10

BP 000010

the date the Deed is recorded or (ii) such earlier termination as set forth below (the "Restriction Period"), the use of the Property in whole or in part, directly or indirectly, for automobile service station, convenience store, car wash or automobile repair purposes, or for the sale, offering for sale, storage or distribution of any gasoline, motor vehicle fuels, lubricants, tires, batteries, automotive parts and accessories, other petroleum products or convenience store items. Such restriction and covenant shall run with the Property for the benefit and protection of any Property used or operated by Seller, its parents, affiliates or subsidiaries or their respective representatives for such purposes within a distance of five (5) miles from the Property, whether owned or leased by Seller, its parents, affiliates or subsidiaries or their respective representatives during the Restriction Period. Such restriction and covenant shall not, however, prohibit the storage of motor fuels, lubricants, other petroleum products or convenience store items on the Property solely for the use or consumption by Purchaser or other occupants of the Property. Seller hereby conditionally waives its right to enforce the use restriction contained in this Section 22, but only for so long as the Property is operated as a BP branded location. Notwithstanding anything herein to the contrary, this restriction shall terminate upon a withdrawal by Seller from the marketing of motor fuel though retail outlets in the relevant geographic market in which the Leased Property is located pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. 2801 *et seq.*, as amended ("PMPA"). This provision shall survive Closing for the period set forth herein, and shall be contained in the deed provided to Purchaser.

23.   Refusal Option.

       If, within fifteen (15) years after Closing ("Refusal Term"), Purchaser receives a bona fide offer from a third party to purchase or lease all or part of the Property, which offer Purchaser desires to accept, Purchaser shall within twenty (20) days after receipt of such offer notify Seller by giving Seller notice of the terms of the offer as set forth in a letter of intent or a fully executed copy of the offer. Seller shall have the right and option ("Refusal Option") for thirty (30) days after receipt of such notice to elect to purchase or lease such Property for the same consideration and on the same terms and conditions as contained in such offer, except that the due diligence or inspection period shall be the earlier of thirty (30) days or the due diligence period in such offer and closing shall occur thirty (30) days after seller exercises its Refusal Option. If Seller exercises its Refusal Option, Seller shall give written notice thereof to Purchaser within such thirty (30) day period, failing which Purchaser shall have the right to sell or lease such Property to such third party, but only for the same consideration and on the same terms and conditions as contained in said offer and in such event this Refusal Option shall be null and void as to the Property conveyed; provided, however, if such third-party purchaser is a dealer of Seller operating under the same brand and similar volume as Purchaser, then this Refusal Option shall remain in full force and effect until such time as it would otherwise terminate by a subsequent failure of Seller to exercise this Refusal Option or otherwise. Any sale or lease of such Property by Purchaser shall be null and void unless and until Purchaser has fully complied with the foregoing requirements. Without limiting Seller's rights hereunder, the Refusal Option shall run with the land during the Refusal Term or until earlier terminated as set forth herein. No failure by Seller to exercise its Refusal Option, nor any waiver by Seller thereof, shall in any event be construed to be a waiver or release of any of Purchaser's other obligations to Seller under this Agreement, or any other agreement between Seller and Purchaser. Notwithstanding anything

11

BP 000011

herein to the contrary, this Refusal Option shall immediately terminate upon a withdrawal by Seller from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the Property is located pursuant to the PMPA. This Refusal Option may not be assigned by Seller. This provision shall survive closing for the period set forth herein.

24.    Volume Commitment.

Purchaser agrees that during each one year period following Closing, Purchaser will purchase for sale at the Property a minimum of 1,082,389 gallons of BP-branded gasoline. In any such one year period that Purchaser does not purchase at best the Minimum Volume, Purchaser agrees to pay to Seller the difference between the Minimum Volume and the actual volume purchased times 3.5 cents per gallon.

In Witness Whereof, the parties hereto have duly signed these presents the day and year first above written.

Witness:

~~Barbara Newman~~
Barbara Newman
Print Name

~~W.S. Mann~~
~~W G Hazen~~
Print Name

SELLER:
BP PRODUCTS NORTH AMERICA INC.

BY: _____ WG U
TITLE: Real Estate Manager
DATE: April 9 2002
Taxpayer I.D. No. 36-2440313

Witness:

~~Bonnie Senion~~
Bonnie Senior
Print Name

~~Thomas Worth~~
Thomas Worth
Print Name

PURCHASER:
SIMAAN, INC.

BY: _____
TITLE: Sect
DATE: 4-3-02
Taxpayer I.D. No. 56-1677998

BP 000012

F:\law\REALWEST\sebu\north carolina\SS# 24195 PS Contr 020307.doc

## EXHIBIT "A"

## LEGAL DESCRIPTION

BEGINNING at an iron stake in the northern margin of East Market Street, the point of tangency on the curve to the right from East Friendly Avenue formerly East Gaston Street, to East Market Street, and from said beginning point and with the northern margin of East Market Street as same is laid out and indicated upon the plat of the Cumberland Project hereinafter referred to, North 83°09'30" West 150.00 feet to a stake; thence North 06°50'30" East 173.56 feet to a stake in the southern margin of East Friendly Avenue; thence with the southern margin of East Friendly Avenue, South 54°04'40" East, a chord distance of 128.99 feet and an arc distance of 129.05 feet to an iron pipe in the southern margin of said street, thence continuing with the southern margin of said street, South 50°49' East 69.45 feet to an iron stake; thence with the curve of said street to the right having a radius of 40.00 feet and an arc of 103.00 feet and a chord bearing and distance of South 23°00'30" West 76.83 feet to an iron stake in the northern margin of East Market Street, the point and place of BEGINNING, and being a portion of Tract 6 of Section 2-B of Cumberland Project, a plat of which is recorded in Plat Book 34 at Page 4, Guilford County Public Registry.

F:\law\REALWEST\eebu\north carolina\SS# 24195 PS Contr 020307.doc

BP 000013

# EXHIBIT "B"

## EQUIPMENT LIST

| Quantity | Description |
|----------|-------------|
|  | C-Store Building w/Walk-in Cooler |
|  | Canopy w/light fixtures |
|  | Misc. Yard Lights |
|  | MID & Price Sign |
|  |  |
|  | POS System: Gilbarco G-site |
| 1 | Terminal |
| 1 | Keyboard |
| 1 | Customer Display Unit |
| 2 | Printers |
| 1 | Pinpad |
|  |  |
|  | Electronic Safe |
|  | Intercom |
|  | B/W Camera Monitoring System |
| 4 | 6 Hose Gilbarco Dispensers w/crind |
| 1 | Dual Gilbarco Diesel Dispenser |
| 4 | Underground storage Tanks w/STP's |
|  | Distribution Box |
|  |  |
|  | Misc. Gondolas and Counters |
|  | Misc. Office Furniture and Smallwares |

14

BP 000014

F:\law\REALWEST\sebu\north carolina\SS# 24195 PS Contr 020307.doc

## EXHIBIT "C"

**Bill of Sale**
(Including Tanks)
26-885-IT (3-94) E

Know all men by these presents: That BP Products North America Inc., a Maryland corporation hereinafter called "Seller," for and in consideration of the sum of Ten Dollars and other valuable consideration ($10.00), the receipt and sufficiency whereof being hereby acknowledged, does hereby bargain, sell, transfer, set over, and convey to Simaan, Inc., hereinafter called "Purchaser," all of the following described items of personal property:

All trade fixtures and equipment, including all underground storage tanks, pipes and lines, owned by Seller and located on the premises legally described as set forth in Attachment #1 attached hereto on the date hereof and described in Attachment #2, but expressly excluding: Seller's corporate identification and "image" material (including but not limited to all signs and pedestals), all dispensers and associated above-ground electronics, point of sale equipment, credit processing equipment, observation wells, remediation equipment and any leased equipment.

Seller covenants and agrees with Purchaser that it is the lawful owner of said property and has good right and title to sell and convey the same to Purchaser.

It is expressly understood that this sale is on an "as is" basis and that Seller does not warrant the fitness or condition of said items of property for any purpose whatsoever.

If this sale includes one or more petroleum product storage tanks, vehicles, pumps or other equipment previously used for storage, handling or dispensing of gasoline or other inflammable liquids, Purchaser hereby acknowledges that Seller has so informed Purchaser and that Purchaser understands that said tanks, pumps or other equipment may contain residuals of gasoline or other liquids which are inflammable, toxic and explosive and that said gasoline or other inflammable liquids may be hazardous or poisonous.

Purchaser expressly assumes, as of the date of this sale, all risk of loss, damage, or injury by reason of the aforesaid exposures and otherwise, and Purchaser expressly releases Seller from all claims of every kind or nature arising by reason of, or in connection with, the ownership, possession, handling, or use of said property, including the costs of remediating any soil or ground water contamination required to be performed as a result of the removal of said property.

Purchaser agrees to defend, indemnify and save harmless Seller from and against any claims, demands, causes of action, losses, damages, costs or expenses of any kind whatsoever (including without limitation, attorneys' fees), by any person arising from or in any way connected with the ownership, possession, handling or use of the property subject to this Bill of Sale, including claims for which Seller is held strictly liable and/or claims for which Seller is held partly or wholly at fault, or as a result of the remediation set forth in the preceding paragraph.

If Purchaser enters premises under Seller's control to remove any property sold hereby, Purchaser assumes and agrees, in consideration of the foregoing sale, to indemnify and save harmless Seller from and against any claims, demands, causes of action, losses, damages, costs or expenses of any kind whatsoever (including without limitation attorneys' fees), by any person arising from or in any way connected with removal of said property.

To have and to hold unto Purchaser its personal representatives, successors, and assigns.

In Witness Whereof, the parties hereto have executed this instrument on this the _____ day of _____, 2002.

Witness:

_____

_____

Witness: _Thomas Watt_

BP Products North America Inc.

By:_____

Purchaser _____

Simaan, Inc.

**15**

BP 000015

## EXHIBIT "D"

The following price of the non-fuel Inventory shall be counted and sold to the Purchaser per the following price schedule:

- Cigarettes (no generics) to be sold at cost
- Supplies to be sold at cost
- Convenience store items (less beer, bottled soda, cigarettes, health and beauty aids, recorded music and published media, clothing, hats and pre-pay phone cards) to be sold at 70% of retail
- Bottle soda to be inventoried as packaged and sold at 70% of retail selling price (inventory control prices are not applicable)
- Beer to be counted as packaged and sold at 70% of retail selling price (inventory control prices are not applicable)

The price of the fuel inventory shall be the posted dealer price on the date of Closing.

*Not Applicable - Dealer owns inventory  E.S*

P:\law\REALWEST\scbu\north carolina\SS# 24195 PS Contr 020307.doc

BP 000016

<u>**EXHIBIT "E"**</u>

<u>**REMEDIATION AGREEMENT**</u>

(BP Products North America Inc. to remediate contamination using RBCA Exposure Restriction)

This Remediation Agreement ("Remediation Agreement") is made by and between BP Products North America Inc. ("Seller") and Simaan, Inc. ("Buyer") on the same date and in modification of that certain Purchase and Sale Contract, effective _____

between Buyer and Seller. This Purchase and Salle Contract are sometimes collectively referred to herein as the "Contract". Except as otherwise provided herein, the terms contained herein shall have the same meaning as contained in the Purchase and Sale Contract.

1.      **HYDROCARBONS.** For the purposes of this Agreement, the term "Hydrocarbons" shall be defined as those petroleum hydrocarbons existing on or migrating from the Property as of the Closing Date which Seller and/or its employees, licensees or agents may have caused to be spilled, leaked or otherwise discharged onto, into or from the Property prior to the Closing Date. Hydrocarbons are further described in the Reports, in particular that certain report _____ _____ dated _____.

2.      **ACCESS.** As of the Closing Date, Buyer hereby permits access and entry upon the Property to Seller and/or Seller's designated representatives and contractors as may be necessary to complete the Work, as defined in Section 3 hereof. Seller shall have the right to reserve access to the Property in the Deed.

3.      **WORK.** As used herein, "Work" means the installation, monitoring and maintenance of monitoring wells, recovery wells, assessment, remediation or treatment equipment, and the completion of such additional related activities as may be necessary to test, assess and, if necessary, remediate the Hydrocarbons.

4.      **SELLER'S OBLIGATIONS.** Except as expressly provided herein, Seller shall perform the Work in accordance with the Laws, in a good and workmanlike manner, and shall obtain all required permits and licenses necessary for the same.

5.      **COOPERATION.** Seller agrees that it shall exercise its access onto the Property and complete the Work in a manner which, to the extent practicable, minimizes disruption to the use of the Property by Buyer. Buyer acknowledges that the Work may interfere with or disrupt business activities on the Property and agrees that it shall operate and maintain the Property in a manner which does not interfere with the Work and in a manner which shall not impair Seller's eligibility and/or ability to recover funds from any underground storage tank reimbursement program and/or with Seller's ability to comply with the Laws. Buyer agrees that it will cooperate with and assist Seller in obtaining any approvals, consents or permits required for Seller's performance of the Work.

**17**

BP 000017

6.    **RESTORATION.** Seller shall backfill any area which it excavates in the course of the Work to a grade even with the surrounding area and shall restore the surface of the excavated area to a similar condition which existed prior to Seller's excavation. During Seller's performance of the Work, in the event that Buyer or any of its customers, contractors, tenants, employees, licensees, invitees or agents, should damage or destroy any equipment, material or improvements used in the Work, Buyer shall reimburse Seller upon demand for the cost to replace and/or repair the equipment, materials or improvements.

7.    **DEVELOPMENT OF THE PROPERTY.** Buyer acknowledges that the Work may take at least several years to complete. Buyer further acknowledges that any development and/or change in the use of the Property may have an impact upon the Work and may further require the approval of the Government.

While Seller is performing the Work, Buyer, for itself, its successors, assigns, tenants, agents, licensees, invitees and employees, shall not use or develop the Property in such a manner that prevents or hinders the performance of or increases the cost or scope of the Work, or violates or is inconsistent with the Exposure Restriction, as hereinafter defined. Specifically, Buyer has stated that, for an indefinite period of time, Buyer intends to use the Property for Buyer's Use, as defined in the Purchase and Sale Agreement, and Seller, in reliance thereon, has undertaken or will plan the Work on that basis.

At such time as Buyer, its tenants, successors, assigns or licensees, contemplates developing the Property for Buyer's Use or any future use or changing Buyer's Use, Buyer shall submit to Seller two copies of all plans, specifications, drawings and cost estimates ("Plans") for the proposed development or changes to Buyer's Use. Seller shall have thirty (30) days from its receipt of Buyer's Plans to approve, disapprove or request additional information concerning the Plans. In the event Seller requests additional information, Seller shall have no further obligation regarding the Plans until Buyer submits all requested information to Seller. After receipt of all such additional information from Buyer, Seller shall have thirty (30) days to approve or disapprove the Plans. Seller shall be permitted to disapprove the Plans if the cost of the Work would be increased thereby, the scope of the Work would be changed thereby, the Plans violate or are inconsistent with the Exposure Restriction, or Seller would be impaired in its ability to comply with the Laws.

In the event Seller approves the Plans, said approval shall not be deemed a guarantee or certification by Seller that the Plans conform to any applicable law and Buyer shall remain liable to ensure that the Plans so conform. Buyer shall strictly adhere to all approved Plans without deviation and shall, at no cost to Seller, obtain all required approvals for the proposed changes from the Government. Buyer hereby agrees to assume, and hereby waives, releases, and agrees to indemnify, defend and hold harmless the Seller Entities from and against any and all increased, unanticipated or delay costs associated with: (i) the construction as described in the Plans or otherwise; or (ii) the remediation required and the costs associated with any such construction as a result of the Exposure Restriction or the existence of the Hydrocarbons or any other Hazardous Materials, including but not limited to the cost of disposing of or remediating contaminated soils and/or water ("Assumption"). The Assumption expressly includes any costs to relocate Seller's equipment or improvements on the Property necessitated by any proposed development or change

18

BP 000018

in Buyer's Use. If a Seller Entity should incur any costs which Buyer has assumed under the Assumption, Buyer shall reimburse the Seller Entity upon demand.

8.    **OTHER/FUTURE CONTAMINATION.** With respect to Other Contamination or Future Contamination which Buyer or Seller discovers on the Property, Buyer shall abate same and shall comply with the Laws, all at Buyer's sole cost and expense.

In the event either party shall discover Other Contamination or Future Contamination after Closing, the discovering party shall immediately notify the other by telephone and in writing of such discovery. For purposes of this Section 8, and in addition to the notice requirements contained in the Offer to Purchase, Buyer shall notify Seller at the following address:

> BP Products North America Inc.
> 2475 Northwinds Parkway, Suite 400
> Alpharetta, Georgia 30004
> Attn: Manager, Environmental Remediation
> Telefax: (770) 576-3281
> RE: Site No. 24195

Seller shall analyze the impact of the Other Contamination and Future Contamination upon the scope and costs of the Work with respect to the Hydrocarbons. If the cost to remediate the Other Contamination and Future Contamination is less than the cost to complete the Work, Seller shall expand the scope of the Work to include the remediation of the Other Contamination and Future Contamination, in which event the full cost to Seller to remediate the Other Contamination and Future Contamination shall be paid by Buyer in full upon demand by Seller. If the cost to remediate the Other Contamination and Future Contamination is greater than the cost to complete the Work, Seller may turn over to Buyer the obligation and cost of completing the remediation of the Hydrocarbons as well as the Other Contamination and Future Contamination, in which event Buyer shall automatically assume the obligation and cost of complying with the Laws and Seller shall automatically be released therefrom without further action by either party.

9.    **REPORTS.** During the course of the Work, Seller shall provide to Buyer, within thirty (30) days after Seller's receipt of a written request therefor, a copy of all final reports or notices between Seller and the Government related to the Work. At the same time, in the event that Buyer should receive any notices or correspondence from the Government or any third party relating to the Property, Buyer shall immediately forward a copy of same to Seller. Seller shall have the right to participate with Buyer in negotiations with and submissions of reports and information, including permits, to the Government and Buyer shall not submit reports or information regarding the Hydrocarbons to the Government without Seller's prior written consent, which consent may be withheld in Seller's sole and exclusive discretion.

10.   **SELLER'S INDEMNITIES.** Except as expressly provided in this Addendum, Seller agrees to indemnify, defend and hold harmless Buyer from and against any and all claims, damages, costs, losses, suits or liabilities ("Loss") for personal injury or Property damage caused by Seller's breach of its obligations with respect to the Work. Notwithstanding the foregoing,

19

Case 1:03-cv-00127-NCT   Document 101   Filed 02/16/05   Page 35 of 122

Seller shall not be liable to Buyer or its successors, assigns, tenants, agents, licensees, invitees or employees, for any diminution in the value of the Property, lost profits or rents, or any other loss of business damages, nor for any Loss which Buyer would have suffered notwithstanding the presence of the Hydrocarbons on the Property. Moreover, this indemnity does not protect Buyer from any Loss caused by the acts, omissions, negligence or willful misconduct of Buyer or its customers, contractors, employees, agents, licensees, invitees, successors or assigns, or by use of the Property which is in violation of or inconsistent with the Exposure Restriction. Buyer shall not be entitled to make a claim against Seller under this indemnity unless and until: (a) Seller shall be in default hereof; (b) Buyer shall have provided Seller written notice of such default; and (c) Seller shall have failed to cure such default within thirty (30) days after Seller's receipt of Buyer's notice, or if the default cannot reasonably be cured within such period of time, Seller shall have failed to cure such default within a reasonable period of time.

11.     **BUYER'S INDEMNITIES.** In addition to the indemnities provided in the Offer to Purchase, Buyer shall indemnify, defend and hold harmless the Seller Entities from and against any Loss for personal injury or Property damages caused by Buyer's breach of its obligations as set forth in this Addendum, and any Loss caused by the use of the Property which is in violation of or inconsistent with the Exposure Restriction. This indemnity does not protect a Seller Entity from any Loss caused by its negligence. A Seller Entity shall not be entitled to make a claim against Buyer under this indemnity unless and until: (a) Buyer shall be in default hereof; (b) the Seller Entity shall have provided Buyer written notice of such default; and (c) Buyer shall have failed to cure such default within thirty (30) days after Buyer's receipt of notice, or if the default cannot reasonably be cured within such period of time, Buyer shall have failed to cure such default within a reasonable period of time.

12.     **TERMINATION.** Seller's obligations and liabilities contained herein shall terminate upon the completion of the Work in accordance with the Laws as signified by the earlier to occur of the following ("Termination Date"): (a) an acknowledgment from the Government that Seller has completed the Work as previously submitted to and approved by the Government; (b) one year following the submission to the Government by Seller of a request for an acknowledgment that Seller has completed the Work as previously submitted to and approved by the Government, provided that the Government has not responded to Seller during that one year period; or (c) the written opinion of an independent environmental consultant retained by Seller at Seller's sole cost and expense stating that Seller has completed the Work as previously submitted to and approved by the Government. Within thirty (30) days after the Termination Date, Seller shall execute a recordable release of its rights under Sections 2 and 13 hereof.

13.     **ASSIGNMENT.** If, during the course of the Work, Buyer shall convey to any third party any interest in the Property or, if Buyer shall be a corporation or partnership, Buyer shall convey any interest in the corporation or the partnership ("Transfer"), then the obligations and liabilities of Seller as set forth in this Addendum shall not extend to such transferee unless and until the following shall occur: (a) Buyer has given Seller at least forty-five (45) days prior written notice of its intent to Transfer; (b) the transferee has a creditworthiness equal to or greater than Buyer had as of the date of Seller's acceptance of the Offer to Purchase; (c) the transferee has executed a written agreement agreeing to be bound by the obligations, duties, restrictions and liabilities of

20

BP 000020

F:\law\REAL WEST\sebu\north carolina\SS# 24195 PS Contr 020307.doc

Buyer as set forth herein; and (d) the transferee has submitted to Seller a copy of any Plans for the transferee's intended use of or changes to the Property, or in the alternative, the transferee has signed a statement under oath acknowledging that the transferee may not develop the Property or change Buyer's Use without Seller's prior written consent to the Plans pursuant to Section 7 hereof. Seller shall have the right to include this restriction in the Deed.

14.    **EXPOSURE CONTROLS.** The parties acknowledge that in its performance of the Work, Seller may propose Remediation of the Hydrocarbons applying corrective action standards (including without limitation risk-based corrective action standards) and/or the use of exposure controls, which is predicated upon the use of the Property for non-residential purposes and based upon the assumptions that no water wells used to supply water for human consumption, farming or irrigation will be installed or used upon the Property and that any building constructed on the Property will have a slab-on-grade foundation with the top of the slab at or above surface level. As part of the consideration for Seller's undertaking to perform the Work in accordance with the Contract, Buyer hereby agrees to the covenants and restrictions set forth in Section 4 of the Deed ("Exposure Restriction"). The Exposure Restriction shall run with the land for the benefit of Seller, its successors and assigns, and shall bind Buyer, its successors, assigns and all future owners of the Property, and their respective directors, officers, employees, contractors, agents, representatives, lessees, licensees, invitees, and any user or occupant of all or any portion of the Property, and shall continue after the Termination Date unless and until released as set forth in the Deed.

15.    **SURVIVAL.** This Agreement shall survive the Closing of the transaction.

16.    **CONFLICT.** In the event of a conflict between this Agreement and the Assignment and Assumption of Lease Agreement, the terms of this Agreement shall control. Except as modified hereby, the Assignment and Assumption of Lease Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have set their hands on the dates written below, having first read and understood the terms contained herein and the purpose, intent and effects hereof.

SIGNATURE LINES ON THE FOLLOWING PAGE

BP 000021

Case 1:03-cv-00127-NCT    Document 101    Filed 02/16/05    Page 37 of 122

WITNESSES:

SELLER:
BP PRODUCTS NORTH AMERICA, INC.

By:_____

By:_____

Print:_____

Its:_____

By:_____

Date:_____

Print:_____


WITNESSES:

BUYER:
SIMAAN, INC.

By Bonnie Senior

By:_____

Print Bonnie Senior

Date:_____4-3-02_____

By: Thomas Worth

Print: Thomas Worth

22

BP 000022

## SUPPLEMENTAL AGREEMENT

Pursuant to that certain Purchase and Sale Contract effective April 3, 2002, (the "Contract") between **BP PRODUCTS NORTH AMERICA INC., as "SELLER"** and **SIMAAN, INC., as "PURCHASER"**, covering that certain property known as 801 East Market Street, Greensboro, North Carolina, Purchaser and Seller wish to confirm that Paragraph 24 of the Contract shall survive Closing for a period of fifteen (15) years. SIMAAN ~~EAST MARKET~~ *STREET* LLC, joins in this Supplemental Agreement as the ASSIGNEE OF PURCHASER'S interest under the Contract.

**BP PRODUCTS NORTH AMERICA INC.**
**SELLER**

BY: _Willie Ihy_

ITS: _Attorney-in-fact_

**SIMAAN, INC.**
**PURCHASER**

BY: _[signature]_

ITS: _Secretary_     _[signature] President_

SIMAAN ~~EAST~~ MARKET, LLC *STREET*
**PURCHASER'S ASSIGNEE**

BY: _[signature]_

ITS: _manager_

BP 000023

## SUPPLEMENTAL AGREEMENT

Pursuant to that certain Purchase and Sale Contract effective April 3, 2002, (the "Contract") between **BP PRODUCTS NORTH AMERICA INC.**, as **"SELLER"** and **SIMAAN, INC.**, as **"PURCHASER"**, covering that certain property known as 801 East Market Street, Greensboro, North Carolina, Purchaser and Seller wish to confirm that Paragraph 24 of the Contract shall survive Closing for a period of fifteen (15) years. SIMAAN EAST MARKET LLC, joins in this Supplemental Agreement as the ASSIGNEE OF PURCHASER'S interest under the Contract.

**BP PRODUCTS NORTH AMERICA INC.**
**SELLER**

BY: _____

ITS: _____

**SIMAAN, INC.**
**PURCHASER**

BY: _____

ITS: _____

**SIMAAN EAST MARKET LLC**
**PURCHASER'S ASSIGNEE**

BY: _____

ITS: _____

BP 000024

ATTACHMENT/EXHIBIT_____B_____

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3

4  SIMAAN, INC., et al.,              Civil Action
                                      No. 1:03CV127
5          Plaintiff,

6  vs.                                Greensboro, North Carolina
                                      January 5, 2005
7  BP PRODUCTS, NORTH AMERICA,        2:05 p.m.
   INC., et al.,
8
           Defendants.
9  _____/

10

11

12                 TRANSCRIPT OF PROCEEDINGS

13       BEFORE THE HONORABLE N. CARLTON TILLEY, JR.

14             UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25         Proceedings reported by stenotype reporter.
           Transcript produced by computer-aided transcription.

```
 1   APPEARANCES:

 2   For the Plaintiffs:      HARRY C. STORM, ESQUIRE
                              Lerch Early & Brewer
 3                            3 Bethesda Metro Center
                              Suite 4600
 4                            Bethesda, Maryland 20814
                 and
 5                            THOMAS ALLEN WORTH, ESQUIRE
                              301 South Green Street
 6                            Suite 300
                              Greensboro, North Carolina 27401
 7

 8   For the Defendant:       KEITH J. MERRITT, ESQUIRE
                              Hamilton Gaskins Fay & Moon
 9                            2020 Charlotte Plaza
                              201 South College Street
10                            Charlotte, North Carolina 28244-2020

11                 and        DAVID M. HARRIS, ESQUIRE
                              DAWN M. JOHNSON, ESQUIRE
12                            Greensfelder Hemker & Gale
                              10 South Broadway
13                            2000 Equitable Building
                              St. Louis, Missouri 63102-1747
14

15   Court Reporter:          Jane F. Calhoun, RPR
                              Room 101, U.S. Courthouse Building
16                            324 West Market Street
                              Greensboro, North Carolina 27401
17                            (336) 332-6033

18

19

20

21

22

23

24

25
```

1          (THEREUPON, the following proceedings were had:)

2          THE COURT:  Good afternoon.  First of all, I

3    appreciate you being here this afternoon.  I think it is

4    important that we spend time determining exactly where we are in

5    this case, and exactly where it is that we may go in this case.

6          I will first define a word for you that should we have

7    a trial, you will hear me use in preparation for the trial and

8    during the trial from time to time as we discuss ideas and

9    applications of the law, and that is an inclination.  If I say I

10   am inclined to do something, it means that at this moment, my

11   analysis and assessment of the facts or the law is that a

12   certain result would be the proper application.  It is not a

13   finding, if I use the word inclination.  If I use the word

14   strong inclination, that is a pretty definite indication to you

15   of what I am thinking at the present time.

16         Now with regard to Judge Sharp's recommendation, I

17   will say that I have a strong inclination at this point, an

18   accedingly strong inclination to find that the waiver is at

19   least a jury question.  I am not convinced at this point that

20   there was sufficient consideration for the waiver, so perhaps it

21   would not even be a jury question, but it would be to -- my

22   strong inclination is to not accept Judge Sharp's

23   recommendations with regard to the validity of the release.

24   That doesn't mean I will not hear you further on that, but that

25   is my present position.

1    If, however, you accept that the release is not

2  binding, then the next question is, where are we?  And I would

3  like to hear from each of you with regard to where you say we

4  would be if the release is held not to be effective with regard

5  to presenting this to a jury or further consideration about

6  where we are in the case.  Then I would like to talk with you a

7  little bit -- I did receive today the Defendant's objections to

8  the Plaintiff's pretrial disclosures.  I have not yet received

9  any objections from the Plaintiff to the Defendant's pretrial

10  disclosures.  Perhaps there are none.  But in looking at the

11  Defendant's objections, it occurs to me, that one pretrial day

12  does not look nearly sufficient to determine these issues.  Now

13  my time problem is this, that I am, from this point on,

14  scheduled for court probably every day until we're scheduled for

15  the one day pretrial session in this case.  We're scheduled for

16  a two week trial that is to begin on the 18th, but there are so

17  many objections to evidentiary matters in that case, that I am

18  having those people come in starting tomorrow and then again

19  next Monday, and we're going to spend the week pretrying that

20  matter with regard to ruling on objections, jury instructions

21  and things of that nature.

22    If that case should settle, then I would like to spend

23  the week of the 25th with you folks working on the pretrial

24  motions and objections in this case.  If that case does not

25  settle, and I have no indication at this point that it's going

1  to, then what I would like to do is spend the week of February

2  the 7th working on pretrial motions in this case, and we will

3  start the trial on the following Monday on the 14th.  I will

4  certainly hear your thoughts about that, but I think it's

5  obvious that if this matter does go forward, then we need to

6  spend substantially more than a day talking about the evidence

7  and the issues that are going to be present hear.  The 24th, not

8  the 25th.

9           Let me sort of give a little structure to what we're

10 doing right now.  Mr. Storm, by asking you what section of the

11 PMPA you are making claims under and whether or not you're

12 making any claims under the laws of any state.

13           MR. STORM:  Your Honor, the claims fall under 15

14 U.S.C. 2802(b)(3)(D), which is the section of the PMPA that

15 deals with the requirement of offering a valid right of first

16 refusal upon the sale of the property, and that's the primary

17 section that's implicated in terms of the substantive section of

18 the Act.  I believe that's the section that's been argued

19 throughout.

20           THE COURT:  Okay.

21           Anything else?  What portions of D, Subsection D are

22 you claiming, under what subsections?

23           MR. STORM:  Well, it's the subsection that deals with

24 upon the sale of the property, that the franchisor either has to

25 make a valid -- make a bona fide offer or offer a valid right of

1    first refusal, and of course in this case we have alleged that

2    that was not complied with.

3              THE COURT:  Is it your position that under the PMPA

4    the Defendant was obligated to make an offer of right of first

5    refusal?

6              MR. STORM:  Yes, sir.

7              THE COURT:  Okay.

8              MR. STORM:  And that that was the -- if you look at

9    the notice of nonrenewal or the notice, the February 7th notice

10   that was issued, BP in that notice tracked the language of that

11   section of the PMPA, when it notified the Simaans and made the

12   purported right of first refusal.

13             THE COURT:  I'm not exactly sure I understand the

14   significance whether they -- let's say they were under the

15   impression, mistakenly at that time, that there was an

16   obligation to offer a right of first refusal and track the

17   language of the statute in doing so, but they were mistaken in

18   that view.  Are you saying that they become obligated under the

19   PMPA because of that mistake, to abide by any of the terms of

20   the PMPA?

21             MR. STORM:  Well, we've alleged that if you look at

22   the relationship, the relationship that BP had with the Simaans

23   was clearly going to end as --

24             THE COURT:  Answer my question, please.

25             MR. STORM:  Well, first of all --

```
 1              THE COURT:  That's a question of law.  And my question

 2    of law is, if BP mistakenly offered a right of first refusal,

 3    thinking that they were required under the terms of the PMPA to

 4    do so, is it your position they become obligated otherwise to

 5    follow the terms of the PMPA and their conduct is circumscribed

 6    by the provisions of the PMPA?

 7              MR. STORM:  I believe that they would be.

 8              THE COURT:  Give me some authority for --

 9              MR. STORM:  I don't think this has ever come up, Your

10    Honor, to my knowledge.

11              THE COURT:  But it is your position -- and I wasn't

12    able to tell that.  I know it's alleged sometimes in the

13    complaint, but in some of your briefs I have not been able to

14    tell whether it was your position that there was a legal

15    obligation under the PMPA to offer a right of first refusal or

16    not.

17              MR. STORM:  Well, yes.  I think that we've clearly

18    stated that there was, that when BP issued -- and I understand

19    Your Honor's question with respect to if BP believed that they

20    had to do it but they were mistaken in that belief.

21              We don't believe they were mistaken in that belief,

22    because we believe that there was to be clearly an ending of the

23    relationship that BP had with the Simaans that would have

24    triggered the obligations under the PMPA, and that's why -- BP

25    has never really been able to explain why it issued what
```

1   otherwise appeared to be an PMPA notice of nonrenewal, other

2   than that --

3           THE COURT:  Isn't that irrelevant?  The question is

4   whether the law applies to that, not whether they thought the

5   law applied to that.  They don't have to explain what they did;

6   either the law applies to them or it doesn't apply in this

7   circumstance.

8           MR. STORM:  Well, we believe that the law does apply

9   to them.

10          THE COURT:  Okay.  Now I would like to hear from you

11  with regard to why you say the law does apply to that, but if I

12  accept Judge Sharp's recommendation that it does not because

13  actually this was not a termination of the franchise and that

14  you had not offered anything to show that it was a termination

15  of the franchise, that there is nothing to show that you would

16  not have the right to use the trademarks or the premises or have

17  a supply of motor fuel under the same terms that the franchise

18  applied with BP, then are you not out?

19          MR. STORM:  I don't believe so, because the --

20          THE COURT:  What is left, if I accept that

21  recommendation?

22          MR. STORM:  Well, certainly that was Judge Sharp's --

23  Magistrate Judge Sharp's --

24          THE COURT:  Think through this with me.  If I accept

25  that recommendation -- I understand that you say I should not --

1    but if I do, then what else is left in your case?

2          MR. STORM:  Well, if you accept that finding and that

3    recommendation, and you find that there was no PMPA termination

4    or nonrenewal, that is certainly a requirement in order for us

5    to have a PMPA claim, that there be a termination or a

6    nonrenewal, either actual or constructive.

7          THE COURT:  Everything hinges on that in the PMPA

8    claim?

9          MR. STORM:  Yes, sir.  And I think that in this case

10   you can find that there was either an actual nonrenewal or a

11   constructive nonrenewal, given the facts and circumstances.

12         BP itself obviously felt that there was going to be a

13   nonrenewal, because it issued its -- it issued the notice

14   tracking the statute and offering a right of first refusal that

15   but for the obligation under the PMPA, it wouldn't have been

16   required to offer.  So what we have claimed is, that at a

17   minimum, the relationship -- when BP stepped out of the

18   relationship, the relationship between BP and the Simaans was

19   going to come to an end at that time, and that that was going to

20   result in the termination nonrenewal of that relationship, and

21   that that, of course, triggers the PMPA obligation which BP

22   recognized in offering the right that it did.

23         THE COURT:  Okay.  Moving back to my question.  We can

24   return to this.  Let me make a note.  Moving back to my

25   question, if I should accept Judge sharp's recommendation, what

1    claims would you have left in the case?

2          MR. STORM:  Short of asking the Court for leave to

3    amend the complaint to allege perhaps a contract claim under

4    state law, if the Court found there was no PMPA termination --

5          THE COURT:  And I would be greatly disinclined to

6    allow you to do that.

7          MR. STORM:  I understand.  I mean, our claim related

8    to the inflated price of the property was clearly a claim that

9    arises under the PMPA, so if the PMPA claim is not there because

10   there is no termination of nonrenewal, then that's problematic

11   for us.

12         THE COURT:  Well, when you say problematic, that

13   indicates maybe, yes; maybe, no.  I would like you to tell me

14   what possible claims you would have left.

15         MR. STORM:  I don't think there is any other claim

16   alleged, Your Honor.

17         THE COURT:  Okay.  All right.

18         Now, in spite of my great disinclination to allow you

19   to amend the complaint, talk to me about -- if you were allowed

20   to amend the complaint, what that amendment would entail.

21         MR. STORM:  Well --

22         THE COURT:  What would your claim be as a contract

23   claim?

24         MR. STORM:  Well, I guess the claim would have to be

25   related to -- it would have to be almost an estoppel type of

1  claim in that -- or a fraud, even, that BP is presenting this

2  right of first refusal --

3          THE COURT:  You are moving into tort there, are you

4  not?

5          MR. STORM:  Well, that's true.  BP is presenting this

6  right of first refusal to the Simaans and representing that this

7  is the offer that they have from this third party and that they

8  are offering this because certainly they believe that they are

9  obligated under a federal statute to make this right of first

10 refusal, and the Simaans are relying on that representation in

11 terms of going forward with purchasing the property, only to

12 discover later what they believed to have been the case from the

13 beginning, that the purchase price was inflated.  Now whether

14 it's a misrepresentation claim and tort based or whether it's a

15 contract based claim of some kind, I hadn't --

16         THE COURT:  Would it be your position, that the law of

17 North Carolina would apply to that claim?

18         MR. STORM:  Perhaps it would.  I mean, if there is no

19 PMPA claim that would otherwise preempt a North Carolina state

20 law claim, whether it be under the North Carolina -- I know you

21 all have a fairly broad Unfair Trade Practices Statute here, and

22 perhaps there would be a basis under that statute to assert a

23 claim as well.

24         Our position had always been that this was a PMPA

25 claim, and that because of that, state law claims that would

1   arise out of a termination or nonrenewal, would otherwise be

2   preempted.  If we're not dealing with a PMPA claim, then I think

3   at that point a state law claim would be available.

4           THE COURT:  And then my question is, what that claim

5   would be, and you say fraud.

6           MR. STORM:  Well, Mr. Worth is also helping me out

7   here a little bit.

8           THE COURT:  That's permissible.

9           MR. STORM:  A claim under Unfair Trade Practices Act,

10  looks like 75-1.1.

11          THE COURT:  Well, what would that be other than fraud?

12  What would the elements be?  And, Mr. Worth can field this

13  question on your behalf, if you would like for him to.  I mean,

14  we're here to help educate me on exactly what the structure is.

15          MR. STORM:  Well, and I do think that even under that

16  statute, as I recall that statute, that it is a

17  misrepresentation type -- or misrepresentation based claim, as I

18  recall under that.

19          THE COURT:  Well, it could be.  I mean, that's a

20  common means by which that statute is violated.

21          What contractual claims do you think you might have?

22          MR. STORM:  There is something about the way that this

23  whole thing evolved with the representation that this is a right

24  of first refusal that we're offering to you on a contract that

25  we're not going to give to you, but you take our word for it

1    that this is what this third party has offered, and given

2    what -- it's almost that you have to have an appreciation for

3    what the Simaans had -- the position that the Simaan family was

4    in, and that is, that they had been through something similar

5    with a transaction involving an Exon, and they had seen the Exon

6    stations here in Greensboro, including their's, sold to a

7    distributor, with all of those Exon dealers eventually being out

8    of business and the distributor eventually operate those

9    locations itself.

10         THE COURT: Let me ask. I understand what you are

11   saying with regard to their subjective thoughts about this, but

12   with regard to what parties reasonably could have thought

13   objectively about this, isn't that what we're talking about?

14         MR. STORM: Well -- and so that takes us then to, they

15   received a notice from BP that says we're selling the station to

16   M.M. Fowler, and that M.M. Fowler has offered us $1,050,000 for

17   the property and we're going to give you a right of first

18   refusal, and all of this looks and smells like a PMPA

19   nonrenewal, because we're attaching the PMPA summary to it, and

20   the Simaans, believing that the price is inflated, but really

21   believing that they have no other option at that point other

22   than to buy the property because they were afraid that they are

23   going to lose the business if they don't buy the property, and

24   at least relying on the fact that BP has represented this as

25   being what the offer is from the jobber, there is something

1  inherently unfair in terms of allowing BP to represent this

2  right of first refusal, even if they have no obligation under

3  the PMPA, but present this and say this is what this jobber has

4  offered us for the property, it's 1,050,000, if you want to buy

5  it, you buy it and pay us that and then having all of that turn

6  out to be false.

7        THE COURT:  What was the contractual nature of that --

8  what was the agreement that would give rise to a breach claim?

9        MR. STORM:  Well, jumping back to tort theory for a

10  second --

11        THE COURT:  Are you saying you can't really think of a

12  contractual theory?

13        MR. STORM:  Well, I'm still thinking about that.  I

14  wish -- maybe I should have been thinking about that as I was

15  coming down here today.  It's almost like a fraudulent

16  inducement type of analysis that -- or theory, that you have BP

17  representing that this is our offer from this third party, and

18  if you want to buy it, you have to pay us that, and the Simaans

19  rely on that, they enter into the contract and then find out

20  later that wasn't the case.

21        THE COURT:  But you are not seeking to rescind the

22  contract.  Wouldn't that be what a fraudulent inducement would

23  relate to, rescinding the contract instead of getting damages?

24        MR. STORM:  I think that would be one remedy, but

25  you --

1          THE COURT:  If you moved into fraudulent inducement

2    for damages wouldn't that sound in tort?

3          MR. STORM:  Right.  That's correct.  But I think the

4    contract based theory would have to be on a detrimental reliance

5    type of theory, because there wouldn't have been a contract in

6    place at that point, when at the time that -- well, the contract

7    that was in place was the lease and supply agreement, but there

8    was no obligation that arose out of that contract to make this

9    right of first refusal.  So that's why making the right of first

10   refusal didn't make any sense unless they believed that there

11   was a PMPA termination of nonrenewal involved, because that's

12   the only place that that right of first refusal comes from, is

13   from the PMPA.

14         THE COURT:  Well, that's not necessarily so.  And I'm

15   certainly not saying this is what happened, but let's imagine a

16   scenario that could show that's not what was going on.  You

17   could imagine a scenario, and I'm not saying this is what BP

18   did, but let's talk about an imaginary company in the position

19   of BP and a different imaginary company in place of Fowler, and

20   let's say the imaginary defendant, wanting to sell the property,

21   especially to a specific distributor, determines to enter into

22   an agreement with that distributor to provide to the distributor

23   perhaps ten pieces of property, perhaps 12, at a reduced price,

24   total price, because they could get the franchisee to pay a

25   greater portion for one property than they otherwise could get,

1 saving the distributor money for the remainder of the properties

2 by getting twice as much from one franchisee, and so there was

3 an agreement to misallot values for that purpose, and it was not

4 that they thought the PMPA governed at all, but that was perhaps

5 a way to entice a franchisee to come in and purchase at an

6 inflated rate, therefore, assisting this imaginary distributor,

7 whom they, for whatever reason, were trying to assist.

8         I mean, that certainly is a scenario that would remove

9 valid considerations or we're governed by the PMPA from the

10 case.  That certainly would sound in tort.

11         MR. STORM:  Right.

12         THE COURT:  Talk to me, if you would, about what there

13 was under the facts of the case that would support a finding

14 that a termination letter should have been sent, when on

15 February the 7th, the right of first refusal letter was sent.

16 Is there any indication that if the sale had been made to

17 Fowler, Fowler would not comply with all of the obligations that

18 BP had to comply with under the original franchise agreement?

19         MR. STORM:  Well, from our perspective, we believe

20 that BP didn't think so, because --

21         THE COURT:  Well, don't go -- I don't want to hear

22 that with regard to this.  I'm not persuaded at this point by

23 what BP did or did not think.  That may relate, if you should

24 ever get to a state tort claim, but as it relates to whether or

25 not they were obligated to send you a letter of termination

1    under the PMPA, then I don't believe their subjective intent is

2    relevant, so talk to me about the objective criteria that would

3    say they should have sent that letter.

4             MR. STORM:  Based upon what Fowler --

5             THE COURT:  Based upon any evidence in the case,

6    that's evidence in the case now, not something that has not been

7    presented or argued.

8             MR. STORM:  Well, we believe that the decision to sell

9    the property under the circumstances as they existed, trigger

10   the PMPA obligation to offer the right of first refusal.  Now

11   when you look at these assignment -- these jobber assignment

12   cases --

13            THE COURT:  Do you have any cases that say just that;

14   a decision to sell the property triggers the right of a first

15   refusal?

16            MR. STORM:  Well, that's 2802(b)(3)(D), if there is a

17   nonrenewal and you're nonrenewing the relationship on the

18   grounds of a sale, that triggers the right of first refusal.

19            THE COURT:  Right.  But that supposes there is a

20   nonrenewal.  But if there is not a nonrenewal involved --

21            MR. STORM:  Of course then why do you send a notice

22   that looks everything like a nonrenewal notice with the

23   exception of that tag line at the very end that suggests that

24   you are going to assign it to Fowler if you don't exercise the

25   right of first refusal.  But these assignment to jobber cases

1    get into -- and as Your Honor is obviously aware, from the three

2    elements of what constitutes PMPA franchise; the lease, the

3    supply of motor fuel and the trademark, but the cases have found

4    in the Fourth Circuit decision in <u>Barnes versus Gulf</u> --

5         THE COURT:  That was a higher price case, though, was

6    it not?

7         MR. STORM:  Right.  But that case found there can be a

8    constructive termination.

9         THE COURT:  When the price --

10        MR. STORM:  Even if the three elements of the

11   franchise are not disturbed, if as a result of the assignment

12   the assignment results in increase risks and burdens under state

13   contract law, that that can also result in a constructive

14   termination of the franchise.

15        THE COURT:  What were those increased risks that were

16   apparent in this case?

17        MR. STORM:  Well, first we have the -- we have the

18   fact that Fowler, for the most part, and there is evidence in

19   the record of this, operates its own stations.  We have the

20   increased risk of now dealing with a small provincial

21   distributor, as opposed to a multinational oil company.  Those

22   are just a couple that immediately come to mind in terms of

23   increase risks.

24        THE COURT:  For Fowler to change the terms of the

25   franchise between BP and the Simaans, would they not have to

1 comply with provisions of the PMPA?

2         MR. STORM:  At renewal time they would, yes.

3         THE COURT:  But they couldn't change anything until

4 renewal time, can they?

5         MR. STORM:  Well, under the -- the problem with these

6 contracts is, that these contracts leave so much to the

7 discretion of the one party, the one party being the oil

8 company; so rather than BP being the party exercising that

9 discretion, now Fowler exercises that discretion, and Fowler

10 exercises that discretion in a different way, perhaps.

11         THE COURT:  What discretion are you talking about?

12         MR. STORM:  Well, pricing is certainly one of the

13 issues, and that's probably the foremost issue where these

14 matters come up is in terms of changes in the price of the motor

15 fuel.

16         THE COURT:  In the contract that was existing between

17 the Simaans and BP, BP had the discretion to change pricing

18 when?

19         MR. STORM:  Well, the price term under the contract is

20 an open price term governed by the Uniform Commercial Code, open

21 price term provision, and what that provision basically says is,

22 the price will be set in good faith, and good faith is defined

23 by -- under the UCC as honesty in fact and the observance of

24 reasonable commercial standards of fair dealing in the trade.

25 And Mr. Harris and I have spent a lot of time arguing over what

1  exactly that means.  But the price term in the BP franchise

2  agreement essentially says that BP can set the price and change

3  the price any time it wants, and but for -- however, its

4  discretion to do that is tempered by its obligations under the

5  UCC.

6        THE COURT:  Okay.  Fowler would have the same

7  obligation and the same tempering by the UCC?

8        MR. STORM:  Yes, sir.  But it would be a different

9  party exercising that discretion.

10        THE COURT:  But the same law that would temper the

11  exercise by each?

12        MR. STORM:  Yes, sir.

13        THE COURT:  Now what else would have been

14  discretionary?

15        MR. STORM:  The rent is another issue.  There was only

16  three months left on the lease, so that would have created

17  another whole issue in terms of the rent that Fowler could have

18  charged under any new contract that it would have offered.

19        THE COURT:  Now tell me how that worked.  Tell me how

20  they could have changed the rent under the new contract.

21        MR. STORM:  Well, once the existing contract expired,

22  Fowler -- I don't know what rent Fowler would have charged.

23        THE COURT:  Could they have charged anything they

24  wanted to?

25        MR. STORM:  Well, governed only by the PMPA, whatever

1   PMPA standard would have applied in terms of the renewal

2   obligations at that point.

3           THE COURT:  But there is a PMPA standard that would

4   apply to that?

5           MR. STORM:  Well, the PMPA standard in rent cases only

6   comes into play when -- the obligation at renewal time is that

7   you can make changes or additions to the terms of the franchise,

8   if those changes are made in good faith, normal course of

9   business, and not for the purpose of preventing a renewal

10  relationship, but again, it comes back to the fact that you are

11  dealing with a different party in terms of the discretion that's

12  being exercised to, you know, to set these different terms, so

13  it's going to be a completely different relationship that you

14  have with the distributor than you had with the refiner.

15          THE COURT:  Is it at that time not entirely

16  speculative to anticipate that the price will be raised for the

17  property more than BP would have raised it or that the price for

18  fuel would be greater?

19          MR. STORM:  As we stand here right now, there is no

20  way for me to answer that.

21          THE COURT:  And there was no way on February the 9th,

22  or whenever that letter was received --

23          MR. STORM:  Well, other than, again, what information

24  we had, which was that the information that -- what the Simaans

25  had already experienced, together with the efforts that were

1    made to contact Fowler and to discuss with Fowler what was going

2    to happen, and no one from Fowler would talk to the Simaans and

3    no one from BP would answer any of their questions.  That's

4    really what -- the factual context in which all of this was

5    working.

6            THE COURT:  Okay.  What else comes to your mind under

7    your argument of constructive notice that we have not touched

8    on?

9            MR. STORM:  On a constructive termination theory?

10           THE COURT:  Yes.

11           MR. STORM:  I'm not sure there is anything else that

12   we haven't touched on.

13           THE COURT:  Thank you.  I'll come back to you.

14           Let me hear from Ms. Johnson or Mr. Harris.

15           MR. HARRIS:  Thank you, Your Honor.  If I can just --

16   I assume that you would like me to address the same set of

17   questions basically that you addressed?

18           THE COURT:  Surely.  And I will interrupt and ask

19   questions that come to mind as you do.

20           MR. HARRIS:  The question that you posed was the one

21   that we had discussed in anticipation of this hearing is, well,

22   what would be the consequence if the Court finding, as the Court

23   alluded to in the meeting in December, that you were

24   disinclined, or strongly disinclined to recognize the waiver

25   that had been relied upon by the magistrate.

1          I also understood at that time that the Court, in

2     other -- found the magistrate's report and recommendation

3     persuasive, if I could use that term, with respect to the issues

4     he did consider, and that -- I, therefore, asked myself the

5     question:  Well, what happens if not only do we recognize that

6     there has been no waiver of the fraud argument, but let's assume

7     that the arguments that we've set forth in our opposition to the

8     objections to the magistrate's report about the invalidity of

9     the fraud defense here, assume we lose those as well, what

10    happens to this case, what are we going to try.  And I asked

11    myself the same question, the beginning touchstone of this case

12    then comes down to the following:  First, Simaan Market Street

13    shouldn't be a party to this case at all, because it was not a

14    franchisee within the meaning of the PMPA, and should be

15    dismissed from the case, at least a partial summary judgment

16    should be issued.

17         THE COURT:  And I don't know just how persuasive that

18    argument is, or at least how persuaded I am by that argument at

19    this point.  It was substituted with permission of BP, and I'm

20    not sure that I agree that argument is controlling.

21         MR. HARRIS:  Well, I'm just sort of walking through

22    kind of how we were looking at it.

23         THE COURT:  I understand your position on it.

24         MR. HARRIS:  I'm looking at it in the sense of what

25    PMPA rights are therefore implicated, and beginning with the

1  touchstone that Your Honor alluded to, that in order for there

2  to be any PMPA claim assertable in this case, by whomever,

3  whether it is Simaan Market Street or Simaan, Inc. it has to be

4  associated with the termination of nonrenewal, and that the

5  February 7th letter, which contained the right of first refusal,

6  was found by the magistrate and by its express terms is not a

7  termination, it does not terminate the dealer lease and supply

8  agreement, it does not terminate or end any supply of motor fuel

9  trademark or any other of the three indicia of a PMPA

10  relationship.

11         THE COURT:  Do you agree with the magistrate judge's

12  recommendation for the very reasons set out there --

13         MR. HARRIS:  Yes.

14         THE COURT:  -- or do you have additional reasons to

15  support that?

16         MR. HARRIS:  No.  And I won't repeat them, Your Honor.

17  I think on Page 23 and 24 of his report he has got his finger on

18  top of the issue there by saying that there was -- that letter

19  was not a termination or nonrenewal.  This lease still had six

20  months left on it.  There was no obligation to send any notice,

21  which was a question you asked, is there any other event that

22  would have triggered or obligated under the PMPA, BP to send any

23  kind of notice of termination or nonrenewal, and there wasn't,

24  because the contract didn't expire or come up for renewal of its

25  own terms until July, and under the PMPA, our duty would have

1  been to tender a contract or provide notice of nonrenewal 90

2  days before July, which would have been, you know, I think if my

3  math is right, somewhere in late April or beginning of May.

4  So the things that I heard the Court inquiring of

5  Mr. Storm is, well, should I be construing that February 7th

6  letter as a constructive termination, because on its face it

7  doesn't look like it's a termination, and on that regard,

8  Mr. Storm alludes to two factors, and I just want to address

9  those very briefly.

10  The first is, I think we all recognize in the Fourth

11  Circuit it's the <u>Barnes</u> decision that sets the controlling law

12  on constructive termination, and the <u>Barnes</u> decision says, that

13  in order for an assignment to a jobber to constitute

14  constructive termination, the assignment itself must result in

15  some kind of loss of one of the three indicia of a PMPA

16  relationship. And particularly, I do take exception with what

17  Mr. Storm said, it's not just additional burdens under common

18  law or other contractual burdens, the <u>Barnes</u> case says that the

19  increase in price that was the consequence of the assignment to

20  the jobber, in that particular case, abridged one of the three

21  because it was an abridgement of the gasoline supply agreement

22  that had been entered into between the dealer and Gulf Oil at

23  that time. And so the Court appropriately kept its focus on

24  those three characteristics.

25  So Mr. Storm says, well, you know, there is two things

1  of discretion that could be implicated here.  I mean, Your

2  Honor, there is no suggestion, pleading or evidence to show that

3  M.M. Fowler would have priced differently or charged rent any

4  differently than BP was obligated to, and in fact did under the

5  dealer lease and supply agreement.

6       I do have to correct one thing on the record.  I agree

7  with Mr. Storm that the price term for the purchase of motor

8  fuel in the dealer supply agreement says that BP is going to

9  charge its price in effect at its terminal at its delivery point

10 and that's an open price term, but I also agree with Your

11 Honor's observation, that the legal matrix that would apply to

12 BP's pricing obligation under that term would be identical to

13 M.M. Fowler.  M.M. Fowler steps in our shoes.  They have PMPA

14 duties, and they also have the UCC duties, because they become

15 the seller of the product for purposes of the Uniform Commercial

16 Code on that open price term.

17      The second thing that Mr. Storm alluded to was

18 facility rent, and while it's true in many BP leases facility

19 rent is left to the discretion to be set, it wasn't so in this

20 one.  The dealer lease and supply agreement was actually entered

21 into between Mr. Simaan, Simaan, Inc. and BP, at Paragraph 3 of

22 the lease and supply agreement, actually set forth specific

23 monthly rent for each of the three years of the dealer lease and

24 supply agreement term.

25      This is an exhibit to -- I think it was Exhibit 9 or

1  one.  I apologize, Your Honor.  It was Exhibit B to Defendant's

2  Motion for Summary Judgment.  It's at Page 2 of the lease at

3  Paragraph 3A, and it says, we're going to charge $3,773 a month

4  for rent for all three years of the dealer lease and supply

5  agreement.  So in this particular instance, there would be no

6  discretion with respect to the charges for rent that would be

7  applicable here.

8         And so for that reason, Your Honor, I think that there

9  hasn't been a PMPA termination associated with the right of

10 first refusal.  I mean, in stripping away the right of first

11 refusal from a PMPA termination means that BP is free to go out

12 and market its property to whomever it sees fit, and if it

13 elects to offer Mr. Simaan a right of first refusal at a

14 particular price or under particular terms and conditions, it

15 has the right to negotiate that, so long as it doesn't terminate

16 or nonrenew his franchise, and the restrictions that Mr -- the

17 Plaintiffs rely upon in this particular case arise only from the

18 PMPA and, therefore, are required to be tethered to either a

19 termination or nonrenewal, because otherwise we have a plain old

20 arm's length contract between the parties.  And on that score, I

21 would like to say, I don't believe there is a contract claim

22 here.

23        The parties negotiated and it's an exhibit to

24 everybody's summary judgment and is an undisputed document in

25 this case, a purchase and sale agreement.  This is a fully

integrated contract. There are no representations or warranties
in here of any sort that Mr. Storm was alluding to, and we would
look under the four corners of the agreement to determine what
its meaning and effect would be, and what the deal of the
parties would be, because since we're outside of the PMPA realm,
we would be dealing like any other vendor/purchaser on a
contract for the sale, and of course in those circumstances, the
seller is trying to get as much money as they can out of the
buyer, and the buyer is trying to get it for as little as they
want it.

Now on the point of there being some kind of fraud or
misrepresentation claim, I think it is important for the Court
to understand, and it's stated as an undisputed fact in this
case, that the Simaans never believed that the property was
worth the million dollar price tag that had been put on it and,
in other words, they never relied on the $1 million figure as
being a bona fide price for the property. They always believed,
and that's why they were writing all of these complaint letters
from the very git-go and throughout the process, that they
thought it was exaggerated.

Now, BP did not hide the ball here, because BP, before
the contract was signed, gave its own in-house appraisal of the
property to the Simaans that said it was worth $505,000 for the
station. So clearly the Simaans had in front of them at the
time that they made the decision to buy the station, evidence

1  that BP itself didn't value it at a million dollars, and yet
2  that was the price tag that was being presented to them, and
3  they clearly had the choice to either buy it or not buy it.

4          THE COURT:  Well, there was a representation that they
5  had an offer to purchase by Fowler in an amount over a million
6  dollars, and certainly the good faith offer in that amount was
7  subject to question, and BP's representation, if it was not
8  burning, certainly had a lot of smoke coming off of it.

9          MR. HARRIS:  Well, let me talk -- if I may respond to
10 that particular point, Your Honor.

11         What's not in dispute about that is, Fowler offered BP
12 900,000 bucks for that particular location.  That was Fowler's
13 number, that was not BP's number.  Fowler also had a fuel
14 guarantee that was associated with it, and it's absolutely true,
15 we did an economic calculation of what that fuel guarantee was
16 that we had to reduce to Fowler if the station was sold, and we
17 assigned a dollar figure to it of $152,000, to end up with the
18 1,052,000.

19         Now, our position is, if there was -- what I think
20 we're being tarred with here is, the fact that there is a lot of
21 intimation that Mr. Fowler, or M.M. Fowler may have been trying
22 to discourage the Simaans from buying the station by jacking up
23 the price, and --

24         THE COURT:  Or BP was trying to discourage, or BP was
25 trying to minimize the cost to Fowler of the package by having

1   the Simaans pay more than the reasonable price for that

2   property.  All of those are reasonable inferences, Mr. Harris.

3           MR. HARRIS:  Well, I might take exception with that on

4   this score, Your Honor, is that we had one set price.  We had a

5   contract for that price before we ever started, before any

6   offers were made to Mr. Simaan, and that was the $10,450,000.

7   That was all we were going to get for these stations.  Whatever

8   Mr -- and we knew we had a binding contract from Fowler before

9   we ever started talking to Mr. Simaan for that $10 million price

10  tag for the whole kitten caboodle, so when we say, please price

11  out, Mr. Fowler, what you think this station is worth so we will

12  extend a right of first refusal to them him, he gives us a

13  number which is subtracted from what we're going to get from

14  M.M. Fowler --

15          THE COURT:  Your in-house appraisal said $500,000 --

16          MR. HARRIS:  That's absolutely right, Your Honor.

17          THE COURT:  And you took -- that changed for over

18  $900,000, knowing that that was an inflated price.

19          MR. HARRIS:  It was absolutely more than we thought

20  the property was worth.  There is no question about that.

21          THE COURT:  And so there had to be a basis for

22  questioning whether that was a good faith offer when the letter

23  of first refusal was sent.

24          MR. HARRIS:  The point I wanted to get at, though, was

25  your discussion of what the motive would be of BP in doing that,

1    because BP gets paid the same amount of money no matter where it

2    comes from.

3          If Mr. Simaan accepts the offer, then the total amount

4    we get for the sale of the market in Greensboro is $10,450,000,

5    so there is no advantage to BP, because we would get that same

6    amount of money from one buyer or the other buyer.  We have no

7    dog in that fight as to who buys.

8          THE COURT:  Then why would you not tell the Simaans

9    about that?

10         MR. HARRIS:  Tell the Simaans about what?

11         THE COURT:  About Fowler's changing the price.  It

12   seems to me, that BP did have a stake in this, because BP knew

13   the property was not worth what it represented to the Simaans it

14   had an offer to purchase it for.

15         MR. HARRIS:  And we told the Simaans that.  We gave

16   them the appraisal, and we said this is what Fowler offered.

17         THE COURT:  But is there not at least an implication

18   in the letter that this was a good faith offer that you had

19   received from the Fowlers, valuing that particular piece of

20   property at over a million dollars?

21         MR. HARRIS:  It just says we received an offer from

22   M.M. Fowler to purchase its interest in the marketing premises

23   of $1,052,000.

24         THE COURT:  Are you saying BP did not know that the

25   Fowlers had changed their valuation of the three dealer operated

1  properties?

2         MR. HARRIS:  I am not.

3         THE COURT:  Excuse me.  Mr. Simaan, I cannot talk with

4  Mr. Harris when --

5         MR. SIMAAN:  I'm sorry, sir.

6         MR. HARRIS:  Your Honor, on that score, there is a

7  little bit of confusion in the papers, because I was reviewing

8  that, you know, on the way down today as to -- this is what we

9  understand the case to be.  We got a flat $10.4 million offer

10 for the bundle of stations.  Then we had, we, BP, had put

11 together a worksheet assigning separate values to the stations,

12 which were below what eventually the Fowlers came up with.  We

13 then said to the Fowlers, you have to tell us how you are

14 allocating between the locations the purchase price, and the

15 Fowlers came back and gave us numbers from -- based on their

16 allocation of the purchase price across the various locations.

17 We were not -- I don't believe we were privy to any of their

18 earlier allocations.

19        The worksheet that is discussed during the context --

20 and please correct me if I'm wrong -- the worksheet that was

21 talked about during the moving papers on the motions and the

22 objections is a worksheet that was put together based upon the

23 appraisals.  So in other words, I believe that was not the

24 Fowler's allocations because those are the BP appraisals.

25        So in other words what happened is, we get one lump

1    sum offer, we go back and say we have to have station by station

2    valuations.  They came back and said 900,000.  We added our

3    fuel, you know, factor to it, and then offered it to them.

4         So I don't know -- I do not believe, Your Honor, and

5    I'll swear that I haven't -- you know, I don't have committed to

6    memory every facet of evidence in this case at this point, but I

7    don't believe that BP knew that Fowler had some earlier or

8    different view of how the station should be valued.

9         THE COURT:  Why would they not, Mr. Harris, when you

10   look, there were three dealer operated stations, and you had

11   your own appraisals, you had your own valuations, and each of

12   these three dealer operated stations is doubled in what Fowler

13   is offering.  You got to know there is something going on that's

14   not right, and when you made that offer, I mean, I certainly

15   can't sit here and say I see anything that implies good faith

16   about that.

17        MR. HARRIS:  Well, then the -- and I understand where

18   you're coming from, Your Honor, in terms of the Fowlers

19   increasing the price as a right of first refusal.

20        THE COURT:  Which affects whether it is a good faith

21   offer they've made.

22        MR. HARRIS:  Okay.  And that's the context I am asking

23   the question is, okay, are we looking at good faith as a concept

24   embodied in the PMPA, or are we talking about a common law

25   concept of good faith that would tie into, for instance, one of

1    the tort claims, and I thought that's what we were talking about

2    is the state law tort claims that Mr. Storm was alluding to.

3              Let's assume it's wrapped up in some kind of estoppel

4    or reliance or something like that.  The eventual point that I

5    come to, assuming that there is hanky-panky going on with the

6    price, the remedy with respect to the Simaans -- first, they

7    knew about the differential between the price before they bought

8    it.  They had the same facts that you're relying on, Judge.

9    They had the appraisal and they had this purchase price that

10   came to them, so they knew of the very disparity that raises red

11   flags in your mind about the good faith basis of this offer, so

12   what BP did, they gave them whatever knowledge they had so that

13   the Simaans could make a decision as to what they wanted to do

14   beforehand.

15             The second thing is, okay, let's assume that there was

16   some kind of inappropriate inducement in order to acquire the

17   station.  Is the remedy then to allow the Simaans to retain the

18   entire benefit of the transaction and try to go back and in

19   effect get a lower purchase price for the station, or having

20   made it a conscious decision that it's worth this much to them

21   that they want this station and they want the benefits of it and

22   they want to be able to make money off of it and operate it and

23   do all of those things, can somebody who accepts the fruit of

24   that transaction now go back and say, I'm going to keep the

25   transaction, but I want to go back and renegotiate terms of the

transaction, because I think as Your Honor noted earlier, the

Simaans' relief here doesn't ask -- doesn't say I want to

repudiate the deal, I want to go back and be a lessee dealer

with BP; it's, no, I want to keep this thing, I just want to

renegotiate a term, which is the price term for the deal. And I

don't believe that that's an appropriate form of relief, even

assuming there would be the kind of cause of action available to

the Plaintiff, and I even think that the magistrate's opinion

addresses that at several points when he talks about the fact

that whether you look at it under the PMPA or general contract

principles, somebody who accepts the fruit of a transaction

can't be heard to repudiate just part of it or reject just part

of it; you either take the whole thing or you don't, and in this

particular case it's undisputed that the Simaans wanted to keep

the station, they wanted to buy the particular station. They

always had the right, they always had the right to say no. They

could have said, we don't want to buy the station, the price is

too much, and they would have retained their ability to stay in

the station and continue to operate it and enjoy the same

benefits that they had before this whole thing came up, but I

think they made their own decision and made a decision which is

undisputed here, that they want to keep the station, and part of

their relief asks for the repudiation of the deal.

So I would harken back to those same general North

Carolina principles that Magistrate Sharp relied upon to say

```
 1   that you can't have your cake and eat it, too; you either take
 2   the contract or you don't.
 3              THE COURT:  That's under contract law.  I don't
 4   believe he discussed it under tort law.
 5              MR. HARRIS:  No, he did not.
 6              THE COURT:  And if he discussed it under tort law, and
 7   the elements of misrepresentation in North Carolina are false
 8   statement, justifiable reliance, and then harm coming from
 9   having relied on the statement, and if the statement in this
10   instance can be seen, we've got a good faith offer of over a
11   million dollars.
12              MR. HARRIS:  The representation in the letter is, we
13   have received an offer from M.M. Fowler to purchase its interest
14   in the marketing premises for 1,052,000 bucks.
15              THE COURT:  And if the reasonable interpretation of
16   that is it's a good faith offer in that amount, then would a
17   jury not -- what they would be considering is whether or not the
18   reliance on that statement would be in good faith.  You would be
19   arguing, no, it's not, because they had a copy of the appraisal,
20   but they would have the right before the jury, would they not,
21   to argue -- if there were a tort claim in the case --
22              MR. HARRIS:  Right.
23              Judge, I agree with you, we would have to take
24   discovery on that kind of a claim.  We would have to probe into
25   it.  I think we would have some defenses to it that might even
```

1    be viable for summary judgment kind of presentation, but you are

2    absolutely right, I mean, there would be disputed issues as to

3    whether or not that was a misrepresentation, whether by

4    operation of an implied covenant of good faith or something else

5    like that, and then we would dispute that, and I agree with you,

6    that those would all be hotly contested, and I think I have my

7    own view of kind of where the evidence would be on that, but

8    nobody really knows, because that's not what the case has been

9    up to this particular point.

10           THE COURT:  Let me talk to Mr. Storm for a few minutes

11   and then I may come back.

12           Mr. Storm, first of all, tell me why you should be

13   allowed -- why you would argue you should be allowed at this

14   late stage to amend the complaint.

15           MR. STORM:  Well, Your Honor, I don't think that --

16   contrary to Mr. Harris' suggestion that if we were allowed to

17   amend the complaint that it in any way changes the nature of the

18   claims, because the claims are -- even the PMPA based claims get

19   into the issues of good faith, the bona fides of the offer, and

20   I don't believe that the issues are really that -- are in any

21   way materially different under the types of theories that would

22   be asserted as a state law claim, so I don't think there would

23   be any prejudice to the Defendant at all in terms of an

24   amendment at this stage, and I think given the liberal amendment

25   provisions of the federal rules, that certainly Your Honor has

the discretion to allow the amendment.

THE COURT: I have the discretion to allow the amendment if the other party is not prejudiced by that amendment. This is a late time in the proceeding. Has there been discovery, ample opportunity for discovery with regard to whether reliance -- what the statement to be relied upon was, whether or not that reliance was reasonable, and has there been ample opportunity for that discovery?

MR. STORM: I absolutely think so.

THE COURT: Who? Where in the record is that?

MR. STORM: Well, there were depositions taken of virtually every conceivable witness in this case, that were very lengthy depositions. The deposition of BP thoroughly examined Lee Simaan, thoroughly examined his brother Ted Simaan, thoroughly examined both lawyers that were present at the closing, examined Mr. Worth, examined the Simaans' banker who provided financing in connection with the transaction.

THE COURT: Well, of all of those people, who would have information with regard to making decisions based upon a reliance that the offer of a million dollars from Fowler was in good faith, other than the Simaans?

MR. STORM: I don't think there would be anybody else.

THE COURT: Were any questions asked of the Simaans with regard to whether or not that was interpreted as a good faith offer?

1          MR. STORM:  I believe there were, Your Honor.

2          THE COURT:  Mr. Worth is trying to point something out

3    to you, I believe.

4          MR. STORM:  Mr. Worth pointed out in his letter of

5    April 3rd of 2002 to BP about -- you know, objecting to the

6    unfair advantage that was exerted in connection with the way

7    that the whole transaction was being presented to the Simaans.

8          THE COURT:  Okay.

9          Now going back to my question, was any question asked

10   with regard to --

11         MR. STORM:  Well, there were questions -- and, Your

12   Honor, again, this is from my recollection.  My recollection is,

13   there were questions asked specifically with respect to the

14   $1,052,000 offer, the knowledge of the Simaans with respect to

15   the $550,000 appraisal that BP had provided, and whether the --

16         THE COURT:  Do you have that there in the deposition?

17         MR. STORM:  I don't have it in front of me, Your

18   Honor.

19         THE COURT:  Does the deposition in front of you have

20   it?

21         MR. STORM:  I don't have the deposition in front of

22   me.

23         THE COURT:  I thought that's what Mr. Worth was

24   showing you.

25         MR. STORM:  No.  This was a letter.

1    Well, one of the other things that was inquired about

2 in Mr. Worth's letter of April 3rd, was the fact that the

3 purchaser hadn't been given the opportunity to review, and

4 hadn't been provided with the Fowler contract that BP was --

5 refused to provide that, despite the request.

6    THE COURT:  Does that letter cut for you or against

7 you?

8    MR. STORM:  I suppose it can be argued either way in

9 terms of the issue, but it was certainly another thing that was

10 inquired about in the depositions, as related to this whole

11 issue of what the knowledge was and, you know --

12    THE COURT:  And this is neither here nor there with

13 regard to that discussion, but what is the value, the legal

14 value of a protest to write that letter and say we're doing

15 this, but we're reserving our rights, what is the legal

16 significance of that?

17    MR. STORM:  Well, that's an excellent question, and

18 there is a split in the authority in PMPA litigation right now

19 over the effect of that, where a dealer signs a contract, for

20 example, under protest, a new franchise agreement is presented

21 at renewal time, the dealer objects to the terms but isn't

22 willing to risk the loss of the franchise by not signing the

23 contract, signs it under protest and then brings an action.

24    Historically, the case law had said that you preserve

25 your right to bring a PMPA challenge by doing that.  There have

1  been a couple recent decisions that have now gone the other way

2  and said that if you sign it -- and whether it's under protest

3  or not, that you've signed it and there is no PMPA nonrenewal so

4  as to create a federal cause of action to bring the PMPA claim.

5  So that issue is unclear, I guess.

6          THE COURT:  That's helpful to know that.

7          With regard to the legal points we've been talking

8  about, Mr. Storm, is there anything that comes to your mind that

9  you would like to talk about?

10          MR. STORM:  Well, a couple of things on that question

11  about what the effect of that letter was, that February 7th

12  letter.  You know, BP -- and we've raised this in our various

13  papers, Your Honor, that when BP originally responded to the

14  complaint with a motion to dismiss, it stated, and I believe it

15  was at Page 17 of its memorandum in support of its motion to

16  dismiss, that BP decided not to renew the relationship with the

17  Simaans, and then provided the -- and then issued that letter

18  and granted the Simaans this right of first refusal.

19          There is also evidence in the record that BP had

20  represented to -- and I believe it was to Mr. Worth, that it was

21  obligated under federal law to make this right of first refusal.

22  Again, the right of first refusal only exists if there's a

23  nonrenewal, but I think that in terms of BP's position that it

24  took in connection with the motion to dismiss, that it shouldn't

25  be allowed to then take the position later that this was not a

1  nonrenewal notice.  In other words, it argued that it was a --

2  that it took the position that it decided not to renew, so it

3  shouldn't be allowed to now say that's not a nonrenewal notice.

4          THE COURT:  Well, when would the nonrenewal notice

5  have been due under the terms, in the timing of this letter?

6          MR. STORM:  The timing was almost exactly right for

7  issuing a nonrenewal notice, because a nonrenewal notice would

8  have to be given at least 90 days before the expiration of the

9  contract.

10         THE COURT:  And the contract expired in July?

11         MR. STORM:  In July, right.

12         THE COURT:  So that would be three months; May, June,

13  July.  June, May, April.  So this was --

14         MR. STORM:  It has to be given at least 90 days

15  before.

16         THE COURT:  This was probably what, 80 or 90 days

17  earlier than it had to be given?  Are you talking basically six

18  months from February the 7th to July the 7th?

19         MR. STORM:  Five months.  That wouldn't be unusual.

20         THE COURT:  But it was not something they would have

21  been obligated to have sent then.

22         MR. STORM:  They would have had to have sent it at

23  least 90 days before.

24         THE COURT:  Right.  But that was not 90 days before.

25         MR. STORM:  Right.

1        A couple of things that -- on this question of -- the
2   Simaans never had the Fowler -- never received the Fowler
3   contract, and the Simaans never knew -- for example, they had no
4   knowledge about the 900,000.

5        THE COURT:  Is it your position that BP knew how the
6   Fowlers had allotted the price for this property prior to the
7   time it was raised to --

8        MR. STORM:  Well, BP had originally made the
9   allocation, and there was no evidence in the record that BP went
10  to Fowler and said, give us an allocation, because BP had
11  already made the allocation, because in the initial draft of the
12  contract, the allocation was made that had the Simaans' property
13  at that time at, I think $450,000.  That was in the initial
14  draft of the contract.  And then this document somehow
15  mysteriously shows up as Exhibit C to the purchase and sale
16  agreement between BP and Fowler that inflates the three dealer
17  properties.

18       There was no evidence -- there is no evidence in the
19  record that I can recall, where there was discussion between
20  BP -- that BP went to Fowler and said, we need you to allocate,
21  because there had already been an allocation based on what BP
22  recognized was a fair market price for the properties, based on
23  the appraisals that they had, and that there is evidence --
24  there are several documents in the record that show that
25  allocation that BP had initially made to the properties.

                THE COURT:  Thank you, sir.

                MR. STORM:  Thank you.

                THE COURT:  Mr. Harris, Ms. Johnson, do you wish to
respond?

                MR. HARRIS:  Your Honor, the effect of the February
7th letter as either a nonrenewal, I don't think I have anything
more to add to that.  I think it's been discussed here and
obviously we agree with Magistrate's Sharp's analysis of that
letter.

                In terms of the appraisal --

                THE COURT:  Let me just interrupt you to say, I would
be much more impressed with your argument if you said Magistrate
Judge Sharp.  I think it is a little demeaning to refer to a
judicial officer as a magistrate.

                MR. HARRIS:  Well, I was admonished in St. Louis by
our magistrate judge to call him magistrate, because he said
only the Article III appointees are entitled to the title judge.
I apologize.  I understand it's different here.

                THE COURT:  He is one of a kind.  When in St. Louis,
but when in Greensboro, and I would suggest everywhere else, I
would accord them the respect of magistrate judge.

                MR. HARRIS:  I appreciate the admonition, Your Honor.

                The only thing I wanted to point out about the
uncontested facts with respect to where did the 900,000 come
from is, at -- I believe it's in Paragraph 9 of our statement of

1  uncontested facts which was cited, I believe, by the magistrate

2  judge in his recommendation, it is laid out exactly where that

3  number came from.  It came from Fowler.  It did not come from

4  BP.  There is no evidence that we gave or gerrymandered the

5  number whatsoever.  Obviously there is -- the Plaintiff is

6  inferring that, but when all the witnesses were asked, nobody

7  said that BP had a conversation with M.M. Fowler and discussed

8  with them the notion of jacking up the numbers for the three

9  dealer locations to any particular figure.

10         The allocation was just a list of our appraised

11 values.  It wasn't a sale price, you know, breaking down the

12 sale price, because if you added up all of our appraised values,

13 it wouldn't have totaled the $10.4 million, anyway.

14         So the list that is being referred to here is BP's own

15 internal list setting its appraised values for each of the

16 stations.  It wasn't part of the sales contract that we got from

17 M.M. Fowler.

18         I just wanted to clarify that for Your Honor.

19         THE COURT:  Thank you for doing that.

20         MR. HARRIS:  Other than that, unless the Court had any

21 questions, I think everything else, I've said my peace.

22         THE COURT:  Well, I would like to ask more about the

23 discovery that you anticipate you would need if I allowed the

24 amendment to the complaint.

25         MR. HARRIS:  Well, we would have a couple of different

1   items that we would -- we were just sort of passing notes here,

2   making sure that we had thought conscientiously about this in

3   the brief amount of time, and a couple of things occurred to us.

4   One is, we have not had the opportunity to depose the Simaans

5   with respect to the issues of their reasonable reliance on these

6   materials, because the case has never been characterized as a

7   fraud case.

8          Likewise, there was a bank involved in the financing

9   here that also gave an appraisal to the Simaans.  We would need

10  to go back and talk to them.  We just basically took a document

11  deposition of them, for the most part.  We did ask a few

12  questions about the documents, but they were involved in the

13  financing and closing on this whole thing, and provided

14  independent information about the value of the station to the

15  Simaans.  We would really need to talk to the Simaans about

16  that.

17         The Simaans also had an independent accountant who was

18  working with them on this, and who did prepare -- help them

19  prepare loan documents, and put together their other financial

20  papers in order to facilitate their acquisition.  We would need

21  to talk about the information and opinions provided by that

22  professional to them.

23         Finally, we would probably need an expert at this

24  point.  Now we did not identify an expert for this case because

25  we viewed it as a PMPA case, pretty straightforward in terms of

```
 1  what we thought the issues were, but if we get into the -- an

 2  argument about what constitutes the objective good faith in

 3  putting together a real estate offer and sale and right of first

 4  refusal within the community of greater Greensboro, I would

 5  expect that he would want to at least explore the possibility of

 6  talking about what the standard of practice is here, because I

 7  assume when Your Honor says good faith, we're not talking a

 8  subjective good faith, we're talking about objective, you know,

 9  good faith standard of practice with respect to the sale of real

10  estate here and where the duties arise and so forth.

11          We did not ask any questions about the effect of the

12  integrated agreement on any claim of misrepresentations; either

13  implied or omissions or anything like that.

14          THE COURT:  What do you mean by the "integrated

15  agreement"?

16          MR. HARRIS:  Well, the purchase and sale agreement,

17  because once signed, that would constitute an integrated

18  agreement reflecting the parties' understandings regarding the

19  purchase and acquisition of the property, and as is common,

20  either by operation of law or by term of contract and, frankly,

21  I haven't read the contract for this term because it wasn't

22  pertinent to this case, is to look at it to see, does that have

23  either the legal effect or the express language to say any prior

24  representations are, you know, are no longer part of this.

25          THE COURT:  I did not see that in the purchase and
```

1   sale agreement.

2          MR. HARRIS:  I'm not aware.  But I also know that in

3   some states, they'll recognize when you have a fully integrated

4   agreement, that that has that same effect, to cutoff prior oral

5   representations that somebody is trying to use to vary it.

6          THE COURT:  That would be under contract law.  It

7   would be parole evidence under the terms of the contract, and

8   that does not apply in the tort misrepresentation.

9          MR. HARRIS:  It may not apply to a tort claim.

10         THE COURT:  It does not.

11         MR. HARRIS:  And then in terms of the reasonableness

12  of reliance, we were noting that what is reasonable in the real

13  estate business for people to rely upon is judged by an

14  objective standard.  That may be a subject matter for some

15  expert testimony as well.

16         THE COURT:  About how much?

17         MR. HARRIS:  The final thing, I really don't know -- I

18  understand what you are saying, Your Honor, because I don't

19  know, I don't want to mislead you into believing that we would

20  forego that without us doing our due diligence to assert whether

21  we would need that.

22         The final thing is, I just don't know what the remedy

23  is, whether it would essentially be a fraud in the inducement,

24  where the Plaintiff wants to hang on to --

25         THE COURT:  Again, that's --

1       MR. HARRIS:  And that's a legal question.

2       THE COURT:  That's contractual.  With regard to the

3   tort of negligent misrepresentation, it would be the Plaintiff's

4   burden to show how they were affected, and to show how they were

5   damaged.  If they can show that there was a fraud, they would be

6   entitled to seek punitive damages or perhaps under the Unfair

7   and Deceptive Trade Practice Act, treble damages, which is sort

8   of basically what the North Carolina Statute limits punitive

9   damages to.

10      MR. HARRIS:  And had the Plaintiff had that claim

11  under the Deceptive Practices Act and dismissed it, I just -- as

12  I'm sure Your Honor has heard lawyers say before, without the

13  benefit of a discerning and careful analysis of what we might

14  think the issues are or not, sitting here and hearing for the

15  first time what Mr. Storm's possible common law claim would be,

16  I don't want to mislead the Court into believing that we have --

17  I don't want you to think that there is just a real narrow

18  universe.

19      There may turn out to be discovery issues that we

20  would have to explore, but until we do that kind of review, I

21  would hate to have you believe that we are saying, oh, yeah,

22  there is only two or three things that we have to do, because I

23  don't want you to be upset with us when we come back and say

24  there is this and this.

25      THE COURT:  Lawyers do have a way of thinking of

1    additional things.

2            MR. HARRIS:  They do do that, Your Honor, and I'll

3    confess, I've been known to do that once or twice, and I wanted

4    to be candid with you.

5            THE COURT:  Thank you, sir.

6            MR. HARRIS:  Thank you.

7            THE COURT:  We're going to take a normal afternoon

8    recess that we take at 3:30, which will be for about 15 or 20

9    minutes.  During that time, let me ask you to put your heads

10   together and consider what additional discovery you might need

11   if I should allow that amendment, and whether or not if I allow

12   the amendment to be made -- well, I think it's fair just to say,

13   if I allow that amendment to be made, we probably are not

14   talking about a trial during this trial term.  It would have to

15   go over to another, which would be April.  So we're not talking

16   about a long delay.  Let's take a brief recess.

17           (Recess taken from 3:30 p.m. to 3:50 p.m.)

18           THE COURT:  With regard to the release, the question

19   has been raised about what consideration was given that would

20   support the release.

21           Mr. Harris or Ms. Johnson, talk to me about that.

22           MR. HARRIS:  The consideration of what's provided was

23   the consideration, legal detriment that BP agreed to incur or to

24   forego its right to repudiate its right to cancellation in that

25   document -- or its right to rescind its cancellation of the

1  dealer lease and supply agreement.  It is what Magistrate Judge

2  Sharp relied upon.

3          THE COURT:  Well, I'm not sure that I'm far enough

4  along in that line of thought to completely understand that.

5          MR. HARRIS:  Let me back up, Your Honor.  There is two

6  ways to look at the consideration; one is, was this document an

7  integral part of the total deal to allow the closing to go

8  forward on the property.

9          It is a common phenomenon that in business deals

10  involving -- although this was a small business, there were a

11  lot of documents associated with the transactions.  The courts

12  have held that as long as there is consideration to support the

13  totality of the deal, you don't have to parse out articles of

14  consideration for each of subsidiary agreements that go into the

15  overall deal, and that is the authority that we have relied upon

16  in our memorandum.  I believe the Stone Motor versus General

17  Motors is the most recent expression of that, and that would

18  have been a dealership termination of an automobile dealership

19  in the Eighth Circuit, which my partner Dawn Johnson

20  participated in that case, in which the court said -- it was the

21  exact same argument was made, there was a release of the

22  termination of the dealership to bar subsequent claims of the

23  type we had here, and the argument was made by the plaintiff

24  saying that that release document did not specifically recite

25  any particular consideration, and that the recital

1  consideration, which I think was a dollar, was not in fact paid,

2  which was an undisputed fact.  The court found nevertheless that

3  there would have been consideration, because in the totality of

4  the unwinding of the deal, there were a whole host of documents

5  and value given back and forth between the parties so as to

6  provide consideration for the totality of the deal.

7       THE COURT:  I don't know what happened there, but my

8  guess is from what you described, it was a different

9  transaction, a different contract.  It was not a purchase

10  agreement and a closing on a purchase.

11       MR. HARRIS:  It was a sale.  It was a sale of the

12  dealership to another dealer.  Stone Motor, a dealership for GM,

13  sold its interest to another party, and as part of General

14  Motors' consent to that arrangement, they required a

15  cancellation of the dealership agreement and a release, just

16  like we have here.

17       THE COURT:  I think that's different.  It seems to me

18  that here --

19       MR. HARRIS:  The facts may be different, but the

20  principle is the same.

21       THE COURT:  I disagree.

22       MR. HARRIS:  When you have a package of undertakings

23  by both parties, that you don't have to have specific

24  consideration identified, each part of -- and each subsidiary

25  agreement --

1          THE COURT:  General Motors was not the seller there;

2     is that correct?

3          MR. HARRIS:  That's correct.

4          THE COURT:  And here it seems to me the difference was

5     there was a purchase and sale agreement which set out the

6     specific obligations for the Simaans to undertake, none of which

7     was to sign an agreement waiving anything or releasing anybody,

8     and then at closing, here are these different documents that

9     come forward, and it seems to me, that the agreement had already

10    been made with regard to the purchase and sale, and I am left

11    wondering what the additional consideration was.  Do you then

12    just put a lot of other things in an agreement that's already

13    been made and say that's integrated into that agreement?

14         MR. HARRIS:  No, Your Honor, because it's necessary to

15    effectuate the totality of the agreement, because if you did not

16    have the cancellation agreement, you would be having the awkward

17    situation of the Simaans buying a piece of property that they

18    still have a lease obligation to BP, and so I think everybody --

19    it's undisputed that the Simaans wanted to cancel the lease

20    between BP and themselves for the property because they did not

21    want to buy the property subject to the lease obligation.

22         BP is under no obligation to agree to the -- it can

23    always -- under the PMPA, it has the statutory right, when it

24    gives a mutual cancellation agreement, to rescind that, until it

25    becomes effective, and -- or to issue a nonrenewal or a

termination and to rescind that until it becomes effective.  By

signing the mutual cancellation agreement, it surrendered the

right to relinquish any interest in the dealer, with the

continuation of the dealer lease and supply agreement.

This is the forbearance or legal detriment that

Magistrate Judge Sharp pointed to, along with the observation

that we don't weigh the relative amount of consideration, we

look to see if somebody suffered a legal detriment or incurred

some sort of legal obligation, and here he found, and as is the

case we believe under BP's rights, it did not have to cause a

termination of the dealer lease and supply agreement, so it was

giving up a right it had of some value to forego the ability to

continue the dealer lease and supply agreement by mutually

agreeing to cancel the lease, so it incurred a legal detriment

as a product of entering into the mutual release or mutual

cancellation.  And that would support -- that would provide

consideration for that agreement, which embodied as one of its

terms, the release.  There is no dispute that the mutual

cancellation agreement is basically two sentences, first one

cancels the lease, the second one releases any claims arising

out of the lease or the PMPA.

THE COURT:  What agreement cancels the lease?

MR. HARRIS:  The mutual cancellation agreement.

You know, Your Honor, I probably wasn't clear in my

characterization.  The release language, there is not a separate

release agreement.  The release language is one sentence in the

mutual cancellation agreement.  So I'm assuming that when you

ask the question about consideration for the release, you are

looking at the question:  Is there consideration for the mutual

cancellation agreement?  And that's why I was addressing it in

that fashion.  It was Exhibit 14.

I mean, Your Honor if -- you probably have the record

citation for this.

THE COURT:  I have read it.

Mr. Storm, do you wish to be heard on that?

MR. STORM:  Well, Your Honor, I think as a matter of

law, the -- two arguments, and that is, that if you accept our

position, and it is that BP was already obligated through the

notice of -- the February 7th notice to end the relationship, it

had already given the notice of nonrenewal that the relationship

that the relationship was coming to an end.

THE COURT:  If I don't accept that argument?

MR. STORM:  But with respect to the consideration

issue, it was already obligated to sell the property under the

terms of the contract that had been signed, and once there was

going to be a closing on that contract, as a matter of law there

was going to effect a novation of the dealer lease and supply

agreement in any event, because there could no longer be that

relationship, so --

THE COURT:  Practicality of performance or --

1          MR. STORM:  Exactly.  So there was no need for it and

2     there was no consideration given for it.

3          THE COURT:  Thank you.

4          Why would that not be so, Mr. Harris?

5          MR. HARRIS:  It would not be so because the PMPA would

6     preempt a termination on that ground of the dealer lease and

7     supply agreement, because the PMPA is the exclusive law that

8     governs the termination and nonrenewal of any agreement

9     concerning a petroleum franchise.  And so with the effectiveness

10    of the agreement to novate that agreement would be preempted

11    until this there was a cancellation of the dealer lease and

12    supply agreement because you can't -- I mean, that's express

13    Black letter in the PMPA, that it -- one area it doesn't preempt

14    state law is on the question of what constitutes a termination

15    or nonrenewal, and under the PMPA, we could withdraw.

16         THE COURT:  Quite frankly, as I read that -- and Judge

17    Sharp is an excellent judge, he is one of the best judge's I

18    know.  We do read that document a little differently.  And it

19    seems to me -- and I may well be wrong in the way I look at it,

20    but it seems to me, if anybody is entitled to summary judgment

21    on that document, it probably would be the Plaintiff, as a

22    finding that that applies only to the franchise agreement, as I

23    read it.

24         But in any event, with regard to that, we may

25    determine that the reason we did not accept the recommendation

1   is that it should be a jury issue. We may determine that

2   summary judgment on that particular issue should be for the

3   Plaintiff, but with that in mind, then we come back to the

4   question we have been talking about today, whether there is a

5   PMPA claim remaining, and there may not be. It certainly is

6   possible that we would accept Judge Sharp's recommendation with

7   regard to that.

8           The question then becomes whether or not to allow the

9   complaint to be amended. And in spite of the time where we are

10  now, I am inclined to do that. I am not inclined to allow you

11  to amend to list a series of claims, however, if you know and

12  can persuade me at this very moment of any other claim, other

13  than unfair and deceptive trade practice through a

14  misrepresentation or other misrepresentation basis, which would

15  be two claims; one just a straight tort claim for intentional

16  misrepresentation, the second claim that that activity violates

17  the Unfair and Deceptive Trade Practice Act, I will hear you, if

18  you contend there are other claims that are involved here.

19          MR. STORM: Well, Your Honor, I think that the -- and

20  I think we're on the same page on this, but the three claims

21  that would come to mind would be a contract based claim of some

22  kind.

23          THE COURT: And as we've talked about, I do not see a

24  contract based claim.

25          MR. STORM: Okay. The Unfair Trade Practices Act

1  claim, and perhaps whether there is a common law and negligent

2  misrepresentation claim and whether that's subsumed within the

3  unfair and deceptive trade practices, I'm not sure at this

4  point.

5      THE COURT:  I don't know that negligent

6  misrepresentation is.

7      MR. STORM:  But it would certainly be a

8  misrepresentation, any claims would be misrepresentation based.

9      THE COURT:  I do not want to get in a situation where

10 we start all over again with motions for summary judgment,

11 briefs on that.  You all are spending a lot of money on this

12 case, all of you, your client.  So it is a point of diminishing

13 return.

14      I also -- well, I am going to allow you to amend your

15 complaint to make a claim under tort for intentional

16 misrepresentation, and insofar as intentional misrepresentation

17 supports a claim for unfair and deceptive trade practices under

18 North Carolina law, if you contend that the complaint in this

19 case, as well as the facts that have been adduced to this point

20 and argued on summary judgment, presented on summary judgment

21 support any other claim, I will give you a week from today to

22 file a brief which would set forth the basis for that.

23      MR. STORM:  Of any other claims?

24      THE COURT:  Yes.  I will understand that the Defendant

25 objects to that.  I understand the Defendant objects to this,

1  but I understand the Defendant will object to any other claims

2  being added, and the Defendant may respond, if it wishes, within

3  another seven days, but I will look very critically at allowing

4  any other amendments.

5          Basically what you are going to have to do is get the

6  Court's permission to add anything other than those two claims I

7  just specified.

8          Now I asked you all to think about what additional

9  discovery, Mr. Harris, you and Ms. Johnson thought would be

10 necessary.  Have you come up with additional witnesses, other

11 than those that we talked about?

12         MR. HARRIS:  Your Honor, no, I didn't come up with any

13 other witnesses.  I did talk to Mr. Storm during the break about

14 how we might deal with this contingency, and the first thing I

15 said that -- and I did not -- we did not have a -- could not --

16 we didn't come up with a list of people.  What we did come up

17 with was a notion of him getting his amended pleading on file

18 within a specified time, which I think Your Honor is leading up

19 to, that we would have some limited amount of time within which

20 to do discovery for both sides, whatever he would want from me

21 and we would want from him, a limited amount of time for fact

22 based discovery, a very limited amount of time.  I was thinking

23 maybe 90 days.  I don't know what your trial term --

24         THE COURT:  I don't think you need that length of

25 time.  I'm thinking more like 30 days.

1      MR. HARRIS:  Whatever time it ultimately results.  And
2  what I was trying to do was, and neither one of us knew what
3  your trial term was, but we were going to work backwards from
4  that, because we didn't want to create a circumstance where we
5  actually in good faith -- and Mr. Storm and I have generally
6  been able to work in good faith on discovery matters.  I don't
7  think there was any discovery motion in this particular case
8  that I can recall.  But in good faith, we didn't want to have to
9  come back to you and say we need more time to do this, that and
10  the other, and be disruptive to your scheduled.
11      So I'll confess, that what I envisioned was some
12  defined period for discovery.  I didn't know if the Court was
13  willing to entertain a defining period for any summary judgment
14  motion we would choose to file, and then we would be ready for
15  trial, if the Court determined that trial would be appropriate.
16  And then I presumed that we would do all of that before this
17  Court, we would not be before Magistrate Judge Sharp on these
18  matters because that would interject another layer of procedure
19  for us, but I didn't want to presume as to how you would propose
20  to organize that part of the case.
21      THE COURT:  Okay.  Thank you.
22      Okay.  How does the 16th of May strike you all as a
23  trial date?  Then we'll work backwards from there.
24      MR. HARRIS:  Fine for the Defendants.  You made
25  reference -- I think we've only reserved one week for this

```
 1   trail.

 2            THE COURT:  Two weeks for the other trial I had.

 3            MR. HARRIS:  I misunderstood.

 4            THE COURT:  No.  Since this will be a truncated

 5   version any way of --

 6            MR. HARRIS:  I think it can be tried in a week.

 7            THE COURT:  I think a week would be plenty of time.

 8            May 16th.  Okay.  You're going to let us know,

 9   Mr. Storm, by the 12th what other possible claims you contend

10   there could be.

11            Now again, let me set the parameters for this.  It's

12   got to be something from a reading of the facts in your

13   complaint, that a reading of those facts would support, plus any

14   evidence that has been produced during summary judgment, which

15   would be the depositions, answers to interrogatories, requests

16   for admissions, things of that nature.

17            MR. STORM:  Your Honor, how about -- one other thought

18   that occurred to me was equitable estoppel as a potential claim,

19   whether that might be included as one without, because I think

20   that there is reference in the record in different places to

21   that notion of equitable estoppel, or promissory estoppel, I

22   suppose.

23            THE COURT:  I don't see how that fits in this.  Run

24   through your scenario.

25            MR. STORM:  Maybe that's one that we'll have to -- go
```

1    ahead, Mr. Worth.  I'm going to defer to my North Carolina --

2           MR. WORTH:  Equitable estoppel arises here out of the

3    inequity in the bargaining position, first of all.

4           Secondly, it arises out of the fact that the Defendant

5    constructed and contrived a situation here that looked like a

6    PMPA claim, attached a document that looked like a PMPA notice

7    of right of first refusal -- I don't know all the technical

8    terms that Mr. Storm does, and now they are trying to deny that

9    it was.  So, you know, equitable estoppel --

10          THE COURT:  That does not make a case of equitable

11   estoppel.

12          MR. WORTH:  Well, but the result may.  The result is,

13   you know, they tried to avoid this franchise arrangement and a

14   federal statute that intended to apply to this situation, and

15   then they ended up with a situation, you know, as a result of

16   this contrivance, where Mr. Simaan paid more for the property

17   than reasonable market values would suggest.  He was required to

18   enter into a supply agreement with BP, which is the same as a

19   franchise.  He was required to be bound by a restrictive

20   covenant that says he can't sell anything other than BP branded

21   gasoline.  So if that's not like a franchise as the end

22   result -- in this case, they have been able to, by that

23   contrivance, to avoid a federal statute.

24          THE COURT:  What were they equitably estopped to deny?

25          MR. WORTH:  Because of the result and because of the

1  unequitable bargaining position, because of the way this thing

2  was contrived and handled on their part, they should be

3  equitably estopped to deny this is not a PMPA claim.

4  THE COURT: I will deny that specifically. But if you

5  have something else that you can fit into an arguable claim, and

6  in good faith, not some imaginary claim, and I understand the

7  depth of your feeling about this claim, Mr. Worth, but I don't

8  think that's well-grounded in inequitable estoppel law. I don't

9  think you come under the provisions of a federal statute by

10  equitable estoppel, but you are going to let us know in a week

11  what claims there may be.

12  Ms. Johnson and Mr. Harris, you will let us know by

13  the 19th, 5:00 o'clock on the 19th, what if any responses there

14  are.

15  MR. STORM: Your Honor, would you want me to file an

16  amended complaint by that date or is this only as to --

17  THE COURT: No. You just let me know what additional

18  claims other than intentional misrepresentation and unfair and

19  deceptive trade practices you feel that allegations of the

20  complaint evidence adduced on summary judgment would support,

21  and then by January the 26th, I will try to let you all know --

22  may not be by a formal opinion, because I'm still going to be in

23  that other trial, but I will let you know through Ms. Blumke or

24  a fax or something, whether I will allow any other claims to be

25  added to the amended complaint. Then by February the 9th -- I

1  mean the 2nd, you may file your amended complaint.

2          Would you need more than a week to respond, to file an

3  answer?

4          MR. HARRIS:  Your Honor, I take it you're -- Your

5  Honor, I take it that you are asking us to file an answer and

6  not look at any motion practice at that time?

7          THE COURT:  That's correct.

8          MR. HARRIS:  Subject to our right to bring --

9          THE COURT:  If you do want to file a motion, then I

10  will let you file a motion.

11          MR. HARRIS:  I do want to represent to the Court, I

12  understand the Court's desire to get this thing T-ed up for --

13          THE COURT:  This is a special setting.

14          MR. HARRIS:  The May 16th setting, so I would not

15  withhold any -- I would proceed with discovery and so forth,

16  even if we thought we had a viable motion as to some part of the

17  pleading.  I just want the Court to know that we understand that

18  we are expected to proceed with the discovery, notwithstanding,

19  and get ready for trial.

20          THE COURT:  I will tell you, since we're doing it on

21  this basis, if you have a viable motion to dismiss, I will

22  consider it beyond that time.  You will not have to file it with

23  your answer to preserve.

24          MR. HARRIS:  All right.  But we need to file an answer

25  and we would have leave to file a motion to dismiss within?  I

1  don't think it's going to take that long, Your Honor.  We
2  would --
3           THE COURT:  How about by February 16th?
4           MR. HARRIS:  That would be fine.  That would be fine.
5           THE COURT:  Then by Friday, February the 25th,
6  Mr. Storm and Mr. Worth, you may respond to any motions to
7  dismiss.
8           Tell you what I think would be maybe the better thing
9  is, go ahead and open discovery, not make you wait for any of
10  this, but go ahead, and in the meantime, why don't you all let
11  each other know by next week whether you have people in mind.  I
12  understand the claims that are going to be allowed are going to
13  drive some of the witnesses that may be discovered, but why
14  don't you informally let one another know now the people that
15  you know now that you are going to want to depose.  The Simaans,
16  for example, since you know they'll be an intentional
17  misrepresentation claim, you can go ahead on reliance, things of
18  that nature.
19           Mr. Storm, Mr. Worth, let Ms. Johnson and Mr. Harris
20  know also whether there is someone else you wish to depose; BP
21  or Fowler or anyone else.  Of course they have no control over
22  Fowler, but I would suggest that you try to come to a tentative
23  agreement with regard to deposition scheduling.
24           Why don't you complete your discovery by March 23rd.
25  Any motions for summary judgment by April the 6th, and any

response to a motion for summary judgment by April the 20th, and

assume that we will not rule on that until the motion date for

trial, that there will not be an opinion -- if it's something we

can look at and decide immediately, we'll let you know by having

Ms. Blumke contact you as to what the ruling is going to be, but

don't anticipate an opinion on that motion for summary judgment.

Then why don't we set the 11th, 12th and 13th, for

possible pretrial days.  We may not need that much time, but in

the event lengthy objections and evidentiary matters, let's have

that in reserve so we can use those, and then we'll start trial

on the 16th.

Let's pick nine jurors, anticipate it may take a week,

probably longer, we'll pick nine jurors.

Anybody have any further thoughts that you would like

to advance at this time?

MR. HARRIS:  Your Honor, I just wanted to think -- I'm

trying to think through as you were running through the dates

that we were trying to figure out how the pretrial dates are

going to hit vis-a-vis getting you supplementary disclosures,

the jury instructions, objections, the same and what -- I

couldn't think fast enough to really click it in with your

calendar.

THE COURT:  I didn't take that up.

MR. HARRIS:  I don't know if Your Honor wants to just

set dates for us so that it all fits together from your

1 perspective so we know when you will expect those things.

2        THE COURT:  Okay.  What date did I give for finishing

3 discovery?

4        MR. HARRIS:  I believe it was March the 23rd, Your

5 Honor.

6        THE COURT:  Okay.  Then why don't we, by April the

7 13th, why don't you all -- April the 6th, designate your

8 witnesses and your exhibits and trade that.  Also designate, say

9 by April the 20th, deposition testimony.  It may take you that

10 long to get the transcripts.  By the 27th, any objections to

11 both the deposition designations, counter -- make your

12 counterdesignations by then, and I would appreciate a trial

13 brief.

14        I think you may -- it would be as helpful to me when

15 you did do a trial brief, to do it as in a concise fashion as

16 you would like to.  If you just want to make a statement of law

17 and cite a case as authority, that's fine.  Since we're doing

18 this on an abbreviated schedule, let's not be formalistic about

19 your trial briefs.

20        When we start trial, some people want to come in with

21 a new brief on every issue at the start of the next day of

22 trial, and there is no need to do that.  If you have some case

23 that you feel affects whatever our discussion has been, if you

24 want to just make a copy of that case, two copies of the case;

25 one for my law clerk and one for me, just mark the provision

1  that you are talking about, that would be fine.  Don't go to the

2  extent or time in trying to prepare a brief.

3          I do request people to give me disks in WordPerfect

4  format of briefs.  I don't know that I received any of that from

5  you all.  Since this was a standing Rule 30 case, you probably

6  would not have had reason to do that.

7          Any motions in limine, you can file them by the same

8  time, that would be good by May the 4th, let's say at the

9  latest, and I will say, that in looking at your objections to

10 the Plaintiff's pretrial disclosures which I received today --

11 you certainly did nothing improper with regard to this, but this

12 doesn't help me prepare for trial, looking at a document, for

13 example, BP objects to Plaintiff's proposed Exhibit 18.  I don't

14 know what 18 is -- on the basis that it reflects inadmissible

15 hearsay under Rules 801 and 802.  Well, is it the whole thing,

16 is it a part of it?  You know, you did it properly here, but I'm

17 just unable to look at this and tell exactly what the objection

18 is.  So if you can, flesh something like this out just a little

19 bit more so I'll know something specific about your objection.

20 I would appreciate it.

21          Anything else that comes to mind?

22          MR. HARRIS:  Your Honor, any special timing on the

23 jury instructions?  Both sides need a completely new set of jury

24 instructions.

25          THE COURT:  How about by May the 4th?

1      MR. HARRIS:  May the 4th.

2      THE COURT:  With regard to jury instructions, don't

3  worry about the standard type portions of instructions like

4  defining evidence or the burden of proof or anything like that.

5  Unless you feel there is something special that you want me to

6  consider, just concentrate on the substantive parts.  You know,

7  intentional misrepresentation, I've given instructions on that a

8  number of times, I have those.

9      Actually, with regard to the North Carolina Unfair and

10  Deceptive Trade Practice Act, the jury just has to find certain

11  facts with regard to whether it's a transaction in commerce,

12  that affects commerce, and if they find intentional

13  misrepresentation, I think that probably is sufficient then for

14  the Court to make the finding on unfair and deceptive trade

15  practices.  Any amount the jury would return would be

16  automatically trebled, so you really don't need to spend a whole

17  lot of time on jury instructions.

18      Be glad to have whatever you give us, but I don't want

19  you to spend unnecessary time that you don't have to on it.  If

20  we can, let's minimize the cost to your clients and we can talk

21  in those days that we set aside for pretrial about jury

22  instructions.  I could hear you then more at length about

23  whatever you want to be heard on.

24      It is my practice to give preliminary instructions

25  about the substantive aspects of any claim or defenses, and at

1    the conclusion of the trial to give the jury written

2    instructions to take back to the jury room with them.   In

3    complicated civil cases, I have given the jury copies of

4    preliminary instructions, even given them individual copies.   I

5    don't see anything so complex about what is reflected in this

6    case to warrant that.

7          I will allow evidence to be presented, for example,

8    insofar as the Defendants are concerned, it has been normal

9    state practice in North Carolina that Plaintiffs offer evidence

10   during the Plaintiff's case and Defendants wait until the

11   Defendant's case to offer evidence.   Whatever has not been

12   objected to and we have ruled on, can come in during anybody's

13   case.   If the Defendants want to put in evidence during the

14   Plaintiff's case, they can do that.   If the Plaintiffs want to

15   put in evidence during the Defendant's case, they can do that.

16   If we have evidence that has been agreed upon is in, you

17   certainly may refer to that in your opening statements.

18         I don't know how you normally do opening statements,

19   but you may refer during opening to any exhibit that has been

20   approved or has not been objected to.

21         Mr. Harris, I think I went over the normal

22   housekeeping matters for jury trials when the parties were here

23   for the settlement agreement.

24         MR. HARRIS:  Yes, Your Honor.  Ms. Johnson took

25   copious notes for me in that meeting.  We spent a lot of time

1   going over what those rules and protocols are according to how

2   to use -- the manner in which the Court directs impeachment and

3   protocol on standing and sitting and addressing witnesses,

4   approaching with exhibits and the like.

5            THE COURT:  Do you have any questions?

6            MR. HARRIS:  No, Your Honor.  I think they are pretty

7   straightforward, and I think Ms. Johnson was careful to take

8   notes, and we also talked to Mr. Merritt about any questions

9   we've had.

10           THE COURT:  Mr. Merritt was not here.

11           MR. HARRIS:  He was not here, but he's practiced in

12  this court.  He has told us -- advised us as to certain matters

13  regarding conduct before Your Honor.  I think we're

14  well-acquainted.  I looked at your courtroom rules and so forth

15  as well.

16           THE COURT:  Anybody have anything else that you would

17  like to talk about this afternoon?

18           MR. HARRIS:  Your Honor, if I may.  I just want to --

19  I don't know if Your Honor got a vision of how we're going to

20  move procedurally from where we are today.  Is the Court

21  expecting to issue an order on the report and recommendations?

22           THE COURT:  Yes.

23           MR. HARRIS:  Saying this part I'm accepting and this

24  part I'm not, so this disposes of this claim and these claims

25  are going to be permitted to be asserted in an amended pleading?

1          THE COURT:  Yes.

2          MR. HARRIS:  That's what you are envisioning, so we

3     kind of have a record of have we all did here today?

4          THE COURT:  It is.

5          MR. HARRIS:  I appreciate that, Your Honor.

6          THE COURT:  I appreciate each of you being here.  I

7     know some of you traveled extensive distances and had to

8     rearrange schedules to be here, and I appreciate that.  If there

9     is nothing further, you all may be excused.

10         Mr. Merritt, do you wish to address the Court on your

11    absence from the settlement conference?

12         MR. MERRITT:  Your Honor, my understanding is, that

13    during the settlement conference the reasons for my absence were

14    made note of at that point in time.  I don't have any further

15    comment or information to add.  If the Court has specific

16    questions, I'm glad to answer that for you.

17         THE COURT:  What sanction do you think would be

18    appropriate for that?

19         MR. MERRITT:  I cannot say what sanction may be

20    appropriate, Your Honor.  I leave that, obviously, in your

21    discretion.

22         MR. HARRIS:  Your Honor, may I comment?  For whatever

23    it is worth, the reason Mr. Merritt didn't appear was at my

24    instruction, so if there is anybody deserving of sanction, it

25    should be me, not Mr. Merritt.

1        THE COURT:  Okay.  What sanction do you think is

2   appropriate for your advising him about that?

3        MR. HARRIS:  I thought about that, Your Honor.

4   Whether it's a monetary -- you know, I don't have any experience

5   as a judge, so I don't know exactly what works in terms of --

6   with attorneys regarding the application of the local rules.

7   I'm not here to rediscuss what happened at that November 27 or

8   28 conference.  Whether it's a monetary sanction or, you know,

9   don't do it ever again letter of admonition, not let me try at

10  trial, you know, those were some of the things that I think

11  Ms. Johnson reported to me were on the Court's mind is, letting

12  Ms. Johnson try the case by herself instead of me; if I was

13  wasn't going to be at the settlement conference, then I

14  forfeited my right to participate as trial counsel.  I believe

15  that was one of the things the Court was discussing.

16  Ms. Johnson and I were going to divide up the trial anyway.  I

17  want the Court to know we just didn't send somebody --

18  Ms. Johnson has taken more depositions in the case than I have,

19  but that was one thing that occurred.

20        You know, a monetary award to the Court or to the

21  Court's -- you know, the Legal Aid Society, I've seen that done

22  in circumstances like that as well.  It just is -- those are the

23  two things that came to mind.  And like Mr. Merritt, I don't

24  really have any experience in it.  I -- knock on wood, this will

25  be my first time, if it is to be my first time, so I don't have

1  a track record from which to gauge or judge what the Court

2  should do.

3           THE COURT:  All right.  I will tell you what I'm going

4  to do then.  I was going to ask Mr. Merritt to do ten hours of

5  pro bono service as a sanction.  I will transfer that to you;

6  however, because you did have to rearrange your schedule and

7  come here, and because you were cooperative in trying to

8  schedule this case to be heard in May, I will cut that to four.

9           So what I would ask you to do is, to do four hours of

10 pro bono service for somebody you would not ordinarily

11 represent, and in a good cause; somebody who can't afford an

12 attorney or advice, not trying to just do four hours to get rid

13 of some obligation.

14          MR. HARRIS:  Sure.

15          THE COURT:  And would four months be a reasonable time

16 to do that?

17          MR. HARRIS:  Oh, I believe so, Your Honor.  If I could

18 make you -- tell you what I would have in mind in that regard.

19          THE COURT:  Sure.

20          MR. HARRIS:  We have Legal Services of Eastern

21 Missouri, is our Legal Aid Society, and they are always looking

22 for volunteers to come in and either man hotlines or just be the

23 walk-in clinic person, or even go appear in small claims on

24 behalf of some indigent person, and I would be delighted to

25 provide my pro bono services in that regard.

1           THE COURT:  That would be satisfactory to the Court.

2           MR. HARRIS:  What sort of report would the Court like

3    back?

4           THE COURT:  Just your statement that you have done

5    that.

6           MR. HARRIS:  As an officer of the Court?

7           THE COURT:  Yes, sir.

8           MR. HARRIS:  Thank you, Your Honor.

9           THE COURT:  Again, thank you all for being here.

10          (This matter was concluded at 4:40 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, JANE F. CALHOUN, RPR, United States District Court
Reporter for the Middle District of North Carolina, DO HEREBY
CERTIFY:

That the foregoing is a true and correct transcript of
the proceedings had in the within-entitled action; that I
reported the same to typewriting through the use of
Computer-Aided Transcription.

Date: 2-9-05

Jane F. Calhoun, RPR
Official Court Reporter

ATTACHMENT/EXHIBIT_____c_____

LEXSEE 1999 US DIST LEXIS 9721

**CONTINENTAL CLEANING SERVICE, Plaintiff, v. UNITED PARCEL SERVICE, INC., Defendant.**

**1:98CV1056**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

*1999 U.S. Dist. LEXIS 9721*

**April 13, 1999, Decided**
**April 13, 1999, Filed**

**DISPOSITION:** [*1] Defendant's motion for judgment on the pleadings and to dismiss [Pl. no. 6] GRANTED. Action dismissed with prejudice.

**LexisNexis(R) Headnotes**

**COUNSEL:** For CONTINENTAL CLEANING SERVICE, INC., plaintiff: JOHN WILLIAM KIRKMAN, JR., DOTSON & KIRKMAN, GREENSBORO, NC.

CONTINENTAL CLEANING SERVICE, INC., plaintiff, Pro se, LEXINGTON, KY.

For UNITED PARCEL SERVICE, INC., defendant: ANTHONY J. BILLER, KARON BOWLING THORNTON, MAUPIN TAYLOR & ELLIS, P.A., RALEIGH, NC.

For UNITED PARCEL SERVICE, INC., counter-claimant: ANTHONY J. BILLER, KARON BOWLING THORNTON, MAUPIN TAYLOR & ELLIS, P.A., RALEIGH, NC.

For CONTINENTAL CLEANING SERVICE, INC., counter-defendant: JOHN WILLIAM KIRKMAN, JR., DOTSON & KIRKMAN, GREENSBORO, NC.

**JUDGES:** P. Trevor Sharp, U.S. Magistrate Judge.

**OPINIONBY:** P. Trevor Sharp

**OPINION:**

**MEMORANDUM OPINION**

SHARP, Magistrate Judge

This matter is before the court for a ruling on Defendant's Motion to Dismiss and for Judgment on the Pleadings pursuant to *Federal Rules of Civil Procedure 12(b)(6)* and *12(c)*. [Pl. no. 6.] Briefs have been submitted by both parties and oral arguments with respect to Defendant's Motion were heard at the direction of this court on March 29, 1999. The motion is therefore [*2] ripe for disposition.

**ALLEGATIONS OF THE COMPLAINT**

In August or September of 1995, Defendant United Parcel Service, Inc. ("UPS") initiated negotiations with Plaintiff Continental Cleaning Service, Inc. ("Continental") for the acquisition of housekeeping services for certain UPS facilities located in North Carolina. Compl. P3. During these negotiations, UPS stated that Continental was to provide all equipment necessary for performing housekeeping services and further requested that Continental's president personally supervise the provided services. *Id.* at P4. In order to comply with UPS's demands, Continental's president informed UPS that he would relocate from New York to North Carolina to oversee performance of the contract. *Id.* at P5. In order to justify the expenses incurred in purchasing equipment and relocating its president, Continental informed UPS that any contract between the parties would have to be for a three year duration. *Id.* at P6.

In October, 1995, the parties signed a written contract for the provision of housekeeping services in UPS's Greensboro, North Carolina facility. In addition, Continental's president relocated to North Carolina to oversee [*3] performance of the contract as agreed. *Id.* at P7. Following the commencement of performance under the original contract, UPS and Continental

entered into two additional contracts for cleaning services for UPS facilities located in Winston-Salem and High Point, North Carolina. *Id.* at P13. These subsequent contracts contained the same terms and conditions as the original. Continental contends that UPS's evaluations of Continental's performance under the Greensboro contract rated their services "excellent." *Id.* at P12. However, by letters dated 11 March 1998, UPS terminated its contracts with Continental as of 31 March 1998. *Id.* at P15.

## LEGAL STANDARD

A motion for judgment on the pleadings is intended to test the legal sufficiency of the complaint and will operate to dispose of claims "where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noted facts." *Hebert Abstract v. Touchstone Properties, Inc., 914 F.2d 74, 76 (5th Cir. 1990).* On a motion under *Rule 12(c) of the Federal Rules of Civil Procedure*, the court must "accept as true all of the well pleaded facts." [*4] *Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61 (2nd Cir. 1985).*

Furthermore, dismissal of a claim pursuant to a motion to dismiss under Rule 12(b)(6) is proper where, assuming the facts in the complaint are true, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984).* All factual inferences must be made in favor of the plaintiff. *See Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).* Finally, a motion to dismiss under Rule 12(b)(6) and a motion for judgment on the pleadings under Rule 12(c) are considered under a similar standard, with the key difference being that on a 12(c) motion, "the court is to consider the answer as well as the complaint." *Menominee Indian Tribe v. Thompson, 943 F. Supp. 999, 1005 (W.D. Wis. 1996), aff'd, 161 F.3d 449, 455-56 (7th Cir. 1998).*

## DISCUSSION

In the complaint filed in this matter n1, Continental alleges that UPS's termination of the services contract involved "acts of unfairness, duress and deceit, constituting [*5] unfair and deceptive acts and practices" in violation of *N.C. Gen. Stat. § 75-1.1.* Compl. at P18. In support of this allegation, Continental asserts the following:

> a. Defendant willfully and intentionally engaged in unfair and deceptive acts described hereinabove and made repeated unwarranted refusals to resolve the matter which is the subject of this Complaint.
>
> b. The Plaintiff, by and through counsel, wrote to the Defendant outlining the problem and offering to settle. The Defendant has refused to discuss or respond to the offer.
>
> c. Defendant [sic] unfair and deceptive acts described hereinabove had the tendency to mislead Plaintiff.

*Id.* at P18. Continental seeks recovery of alleged damages sustained as a result of "unfair and deceptive *inducement* to contract, in light of contract negotiations and later Defendant conduct," the "unfair and deceptive *nature* of the contract and negotiations," and the *breach* in contract resulting from the aforementioned unfair and deceptive practices." *Id.* at 3.

> n1 Continental originally filed its complaint in the state courts of North Carolina. In December, 1998, UPS timely removed this action to federal court, based upon diversity jurisdiction, and thereafter filed its Answer and Counterclaims thereto.

[*6]

Continental's complaint focuses on alleged oral representations made to its representatives by UPS during contract negotiations to the effect that Continental would be ensured a three year contract term so long as Continental's performance under the contract was satisfactory, *Id.* at P8. Allegedly in reliance upon these representations, Continental proceeded to lease several pieces of necessary equipment and relocated its president. *Id.* at PP 7, 10.

Of critical importance to the disposition of this case are two key paragraphs contained within the parties' contractual agreement. Paragraph 14.01, explicitly titled "CANCELLATION," provides that "it is understood by and between the parties that this Agreement may be canceled by UPS upon seven (7) days' written notice without the need to show cause and with no recourse to damages as a result of cancellation." In addition, Paragraph 15.01, titled "ENTIRE AGREEMENT," states in pertinent part that "this agreement including all of the documents referred to hereof, constitute the only agreement between the parties hereto and supersedes any agreement, understanding, commitments or proposals heretofore had between the parties." In light [*7] of these

provisions, it is clear that UPS did not breach the parties' contract when it elected to unilaterally terminate the contract, without any reliance on "cause," on twenty days written notice. Furthermore, the merger clause included in the contract effectively supports the conclusion that the writing clearly embodies the sum total of the parties' agreement, regardless of any contrary prior oral agreements that may have been reached. n2 "The basic premise behind the law of contracts is to enforce the written agreements of parties." *Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 528 (E.D.N.C. 1985).* The express terms of the contract in the present case are unambiguous and clearly were not violated by UPS. Accordingly, if Continental is to have a remedy, it must be obtained by way of establishing a violation of North Carolina's Unfair and Deceptive Trade Practices Act on the part of UPS.

> n2 North Carolina courts clearly recognize the validity of merger clauses and have repeatedly enforced them. *See Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 526 (E.D.N.C. 1985); Tar River Cable TV, Inc. v. Std. Theatre Supply Co., 62 N.C. App. 61, 65, 302 S.E.2d 458, 460 (1983).*

[*8]

N.C. Gen. Stat. § 75-1.1 provides that "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affective commerce, are" unlawful." To violate § 75-1.1, the act or practice in or affecting commerce must be either deceptive or unfair. In addition, such act or practice must result in injury to the plaintiff. *See Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397 (1981).* According to the North Carolina courts, a trade practice is deceptive if it has the capacity or tendency to deceive. Furthermore, a practice is unfair when it "offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id. at 548; see also Overstreet v. Brookland, Inc., 52 N.C. App. 444, 279 S.E.2d 1 (1981).* Whether a particular trade practice is unfair or deceptive depends on the circumstances of each case and the impact of the practice in the marketplace. *Marshall, 302 N.C. at 548, 276 S.E.2d at 403.*

Continental contends that UPS engaged in unfair and deceptive trade practices in violation of state law by misleading Continental "into believing the contract would [*9] be effective for the three years necessary to justify the expense of equipment and relocation."

Compl. at P9. Moreover, Continental asserts that UPS failed to direct Continental's attention to both the unilateral termination and merger clauses contained within the contract prior to signing. Arguing that such "tactics" can be construed as being "unfair," Continental urges this court to deny UPS's motion.

Allegations of actual fraud are not raised in Continental's complaint, and no evidence of fraud has been shown to this court. *See Gadsden v. Johnson, 261 N.C. 743, 747, 136 S.E.2d 74, 77 (1964)* (noting that an unfulfilled promise alone cannot be made the basis for an action for fraud unless the promise was made fraudulently with no intention of carrying it out). As previously indicated, a claim of unfair and deceptive trade practices requires a showing that "the acts had a tendency or capacity to mislead or created the likelihood of deception." *Spartan Leasing Inc. v. Pollard, 101 N.C. App. 450, 461, 400 S.E.2d 476, 482 (1991).* Both the cancellation and merger clauses were expressly and clearly set forth, in capital letters, in each of the three signed contracts. Even if Continental [*10] failed to read those portions of the contract, or any other part thereof, it is still charged with knowledge of the contents. *See Nationwide Mutual Ins. Co. v. Edwards, 67 N.C. App. 1, 8, 312 S.E.2d 656, 661 (1984)* (stating that "persons entering contracts of insurance, like other contracts, have a duty to read them and ordinarily are charged with knowledge of their contents."). Continental, therefore, could not have been misled or deceived by UPS's alleged failure to specifically point out the two clauses in light of Continental's constructive knowledge of the contract terms.

Even if this court were to consider that UPS's actions could constitute a misrepresentation, under any construction of the pleadings, Continental could not have reasonably relied on that misrepresentation in light of the clear terms of the instrument Continental signed. Continental has not alleged that it was in any way prevented from examining the contents of the contract prior to signing. As such, Continental cannot support a claim for unfair and deceptive trade practices under § 75-1.1. The allegations do not support an inference that UPS's statements or actions were unfair or deceptive in any non-fraudulent [*11] manner. To find a cognizable claim by Continental under § 75-1.1 in this case, the court would have to effectively overwrite contract law that has long been settled in the State of North Carolina. Continental's pleading states no claim under § 75-1.1 and is deficient as a matter of law.

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that Defendant's motion for judgment on the pleadings and to dismiss. [Pl. no. 6] is hereby **GRANTED**. By separate judgment, the court will dismiss this action with prejudice.

P. Trevor Sharp, U.S. Magistrate Judge

April 13, 1999

**JUDGMENT**

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment,

**IT IS HEREBY ORDERED AND ADJUDGED** that this action be, and the same hereby is dismissed with prejudice.

P. Trevor Sharp, U.S. Magistrate Judge

April 13, 1999