IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SIMAAN, INC. and<br>SIMAAN MARKET STREET, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BP PRODUCTS NORTH AMERICA, INC. and<br>BP OIL AND EXPLORATION, INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:03CV00127 |

MEMORANDUM OPINION

TILLEY, Chief Judge

This case arises out of Plaintiffs' Simaan, Inc. ("Simaan") and Simaan Market Street, LLC ("SMS") purchase of a retail gasoline station from Defendants BP Products North America, formerly BP Oil and Exploration, Inc., who is also a Defendant (collectively "BP"). This case is before the Court on Defendants' Motion to Dismiss or, in the Alternative, for Judgment on the Pleadings and Motion to Strike or, in the Alternative, to Make More Definite and Certain [Doc. #100]. For the reasons set forth below, the Defendants' Motion is DENIED.

I.

The allegations of the Complaint, stated in the light most favorable to the Plaintiffs, are as follows: BP is engaged in the business of refining, marketing, and selling petroleum and other products. At all times relevant to this case, BP marketed its petroleum products in the Greensboro, North Carolina area, in part,

through a franchise distribution system. Under that system, BP entered into franchises with independent retail dealers through Dealer Lease and Service Agreements ("DLSA") that required BP to lease retail station premises to the independent dealers, or "franchisees," who then purchased motor fuel from BP for resale to the motoring public under the "BP" or "Amoco" trademark. BP also operated its own retail service stations in the Greensboro area.

Simaan is a North Carolina corporation owned by members of the Simaan family. Simaan became a BP-franchised dealer in 1996 when it entered into a three-year DLSA for the operation of a motor fuel station and convenience store located at 801 East Market Street in Greensboro. BP and Simaan subsequently renewed the franchise by executing a new three-year DLSA on August 1, 1999.

Late in 2000 or early in 2001, BP made a business decision to divest certain retail markets, including the Greensboro area market. The thirteen BP-branded retail locations in the Greensboro area were offered as a package to certain BP distributors, or "jobbers," who were identified as having an interest in those locations. Three of the thirteen locations, including Simaan's retail station, were leased and operated by BP franchisees, nine were operated directly by BP, and one was owned and operated by an independent BP dealer.

BP received several bids for the thirteen stations in the Greensboro area and ultimately accepted the offer of jobber M.M. Fowler, Inc. ("Fowler"). Fowler offered to purchase the thirteen locations in Greensboro for a total package amount

2

of $10,450,000. On June 25, 2001, a Draft Agreement of Purchase and Sale ("Draft Agreement") was created. This Draft Agreement assigned a value of $430,000 to Simaan's location, which was based upon an appraisal BP had conducted on the property. Similarly, prices were assigned to the other franchisee locations consistent with values identified in appraisals that BP had previously obtained.

BP determined that the transfer of Greensboro retail stations to Fowler required BP to comply with the Petroleum Marketing Practices Act ("PMPA"), and in accordance with the PMPA, Simaan and the owners of the other franchisee-operated retail stations would have to be granted rights of first refusal to purchase their station properties. BP informed Fowler that the sale of the three franchisee-operated stations was contingent on BP's offer of rights of first refusal to the franchisees. However, BP and the Jobber proceeded to undermine the franchisees' exercise of any such right of first refusal to assure that either the right would not be exercised, or if exercised, would be based on false and inflated prices. First, BP and Fowler provided in the Final Agreement of Purchase and Sale ("Final BP/Fowler Agreement") that the three franchisees including Simaan would not be provided with a copy of the Final BP/Fowler Agreement upon which the right of first refusal would purportedly be based. Next, BP and Fowler modified the values assigned to the properties in the package so as to inflate the values assigned to the three franchisee locations and reduce the values assigned to the company-operated

3

locations. Thus, while the total purchase price between BP and Fowler remained at $10,450,000, the value assigned to Simaan's station increased to $900,000, up from $430,000 in the Draft Agreement. The other two franchisee-operated locations were similarly inflated.

On February 7, 2002, BP sent Simaan by certified mail a notice informing Simaan that BP had decided to sell its interest in the Simaan location. The notice further informed Simaan that BP had received an offer from Fowler to purchase Simaan's station for $1,052,684, a price above the allegedly inflated $900,000 price included in the Final BP/Fowler Agreement, and offered Simaan a right of first refusal to purchase the station on the same terms and conditions as Fowler's offer, which included (1) a fifteen year motor fuel purchase commitment of 1,082,389 gallons per year; (2) a fifteen year deed restriction prohibiting, *inter alia*, the sale of motor fuel on the premises unless operated as a BP-branded station; and (3) a right of first refusal to repurchase the station in favor of BP. The notice explained that the parties' franchise relationship would expire by its own terms on July 31, 2002, and that if Simaan did not exercise its right of first refusal, BP would assign its rights and delegate its obligations under the DLSA to Fowler in connection with Fowler's purchase of the station. The notice informed Simaan that the right of first refusal would remain open for forty-five days from the postmark date of the notice.

Upon receiving the February 7 Notice, Simaan's representatives, including its counsel, Thomas A. Worth, communicated with BP's representatives, including

4

BP's counsel, William Kazer, Jr., and BP's real estate representative, William Smith, regarding the purported right of first refusal. Simaan's representatives specifically requested that Simaan be provided with information regarding the alleged jobber contract upon which the right of first refusal was based, including a copy of the contract between BP and Fowler. BP refused to provide any information and also refused to provide a copy of its contract with Fowler.

On March 15, 2002, BP forwarded to Simaan's counsel a proposed Purchase and Sale Agreement ("PSA") based upon the $1,052,684 price that was included in the February 7 Notice. Additionally, BP sent Simaan a copy of its appraisal for the Simaan location. The appraisal revealed that the location had a fair market value of $505,000, less than one-half the price at which the location was offered to Simaan for purchase. Nevertheless, BP continued to claim that the amount offered by Fowler for the Simaan location was $1,052,684 and that Simaan had the right to exercise its right of first refusal at that price.

After receiving the PSA, Simaan attempted to learn from both BP and Fowler what would happen to Simaan's business if it decided not to purchase the property. BP through its counsel claimed that it could not say, and Fowler refused to even talk to Simaan's representatives. Thereafter, in an effort to save its business which it had developed, Simaan executed the PSA "under protest"[1] and

---

[1] Plaintiffs returned the executed PSA with a letter explaining that it was signing the PSA "under protest."

forwarded the contract to BP on April 3, 2002. After executing the PSA, the Simaan family formed plaintiff SMS and assigned all of Simaan's rights in the PSA to SMS. SMS proceeded with the closing and acquired the property at the inflated price of $1,052,684.

Plaintiffs originally filed a Complaint alleging claims under the PMPA on February 5, 2003. BP's Motion for Summary Judgment on Plaintiffs' PMPA claims was granted on January 20, 2005, and Plaintiffs were given leave to amend their Complaint to allege claims based on BP's allegedly deceitful conduct. On February 2, 2005, Plaintiffs filed their Third Amended Complaint alleging claims under the North Carolina unfair and deceptive trade practices statute and common law fraud. On February 16, 2005, Defendant filed the motion currently before this Court seeking to dismiss the Plaintiffs' Complaint, or in the alternative, to dismiss Simaan as a party to the case, and to strike certain allegations of the Complaint, or in the alternative, to make the allegations more definite.

II.

Defendants seek to dismiss the case under Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

A Rule 12(b)(6) motion should be granted only if, after accepting all well-pleaded allegations in the complaint as true, it appears certain that Plaintiffs cannot prove any set of facts in support of their claims that entitles them to relief.

6

Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). The Fourth Circuit has stated that "[u]nder the liberal rules of federal pleading, a complaint should survive a motion to dismiss if it sets out facts sufficient for the court to infer that all the required elements of the cause of action are present." Wolman v. Tose, 467 F.2d 29, 33 n. 5 (4th Cir.1972).

Similarly, in considering a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), facts presented in the pleadings and the inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. Edwards v. City of Goldsboro, 178 F.3d 231, 248 (4th Cir. 1999). A motion for judgment on the pleadings is determined by the same standard applied to a motion to dismiss for failure to state a claim. Id. at 243. Furthermore, as with motions for summary judgment, a party is entitled to judgment on the pleadings when no genuine issues of material fact exist and the case can properly be decided as a matter of law. Davenport v. Davenport, 146 F. Supp. 2d 770, 783 (M.D.N.C. 2001).

The essential elements of common law fraud are well established in North Carolina: A plaintiff must prove (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive; (5) resulting in damage to the injured party. Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).

The essential elements of a claim under the General Statutes of North

7

Carolina § 75-1.1, the Unfair and Deceptive Trade Practices Act, requires a plaintiff to show (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused actual injury to plaintiffs. Belcher v. Fleetwood Enters., Inc., 162 N.C. App. 80, 85, 590 S.E.2d 15, 18 (2004). Therefore, to succeed on such a claim, a plaintiff must prove its actual injury occurred as a result of defendant's unfair or deceptive activity. In a case involving an alleged misrepresentation, a plaintiff must show that he or she relied on the misrepresentation to his or her detriment. 162 N.C. App. at 85-86; 590 S.E.2d at 19.

A.

Defendants first argue that Plaintiffs' claims are barred by operation of the merger and integration clause contained in the PSA.[2] North Carolina state courts recognize and enforce merger clauses. Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 526 (E.D.N.C. 1985).

The merger and integration clause states in pertinent part:

> This Contract and Exhibits "A" through "E" attached hereto contain

---

[2] Because the PSA is referred to in Plaintiffs' Complaint and is central to Plaintiffs' claims, even though it was not attached to Plaintiffs' Complaint, the PSA is considered a part of the pleadings and can be considered when ruling on Defendants' motion to dismiss. See, e.g., Venture Assocs. Corp. v. Zenith Data Sys., 987 F.2d 429, 431-32 (7th Cir. 1993) (holding that, on a motion to dismiss, a court is permitted to consider documents that are referred to in the plaintiffs' complaint and central to the plaintiffs' claims, even if not attached to the complaint); N.C. Motorcoach Ass'n v. Guilford County Bd. of Educ., 315 F. Supp. 2d 784, 788 (M.D.N.C. 2004).

> the entire understanding and agreement between the parties hereto relative to the subject matter hereof. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this contract.

(Ex. A ¶ 18.) Defendants rely on this clause in claiming that Plaintiffs cannot prove reliance on BP's alleged misrepresentations to their detriment – an essential element of both their fraud and unfair and deceptive trade practices claims. BP argues that by agreeing to the merger and integration clause, Plaintiffs expressly represented that they relied on no representations or statements in entering into the PSA except those statements expressly set forth in the PSA. The PSA contains no representations by BP that the purchase price is the same price offered by Fowler. Therefore, BP argues Plaintiffs cannot prove an essential element of both claims.

BP's argument is baseless under North Carolina law. Although North Carolina generally upholds integration clauses that prevent the introduction of extrinsic evidence to alter the terms of the contract, the law is equally clear that extrinsic evidence is admissible "to prove that a written contract was procured by fraud because the allegations of fraud challenge the validity of the contract itself, not the accuracy of its terms." Godfrey v. Res-Care, Inc., 165 N.C. App. 68, 78, 598 S.E.2d 396, 403 (2004). Because Plaintiffs' claims of fraud and deceptive trade practices both arise from allegations that BP fraudulently induced Plaintiffs to enter the contract, the merger and integration clause does not prevent Plaintiffs from introducing evidence of representations made by BP outside of the PSA.

9

BP argues that the fraud in the inducement exception cannot apply in this case "because Plaintiffs do not seek to vitiate the contract itself, but rather to renegotiate the purchase price." (Defs.' Reply Br. at 3.) BP argues that Plaintiffs seek to modify the price term in their favor which "is exactly the type of case that integration clauses are intended to preclude." (Id. at 4.) Despite BP's arguments to the contrary, the damages sought in this case are clearly allowed in a fraud in the inducement case. The North Carolina Supreme Court has addressed the issue of damages in a fraudulent inducement case:

> When a person discovers that he has been fraudulently induced to purchase property he must choose between two inconsistent remedies. He may repudiate the contract of sale, tender a return of the property, and recover the value of the consideration with which he parted; or, he may affirm the contract, retain the property, and recover the difference between its real and represented value.

Bruton v. Bland, 260 N.C. 429, 430, 132 S.E.2d 910, 911 (1963). Plaintiffs are not required to repudiate the PSA, but clearly are allowed under North Carolina law to affirm the PSA and seek monetary damages representing the difference between the real value of the property and the price paid by Plaintiffs.

Therefore, BP's motion to dismiss Plaintiffs' Complaint on the basis of the merger and integration clause of the PSA is DENIED.

B.

BP also moves to dismiss Simaan's claims as a matter of law arguing that SMS is the only party to have suffered injury as a result of the alleged misrepresentations. Certain torts require as an essential element that a plaintiff

10

incur actual damages. In North Carolina claims of fraud and unfair and deceptive trade practices require actual damages. Piedmont Inst. of Pain Mgmt. v. Staton Found., 157 N.C. App. 577, 589-90, 581 S.E.2d 68, 76-77 (2003). BP argues that because SMS purchased the retail station and not Simaan, Simaan did not suffer an actual injury and therefore has no claims.

The Complaint alleges that the injury suffered by both Simaan and SMS is a result of paying an inflated purchase price because of BP's misrepresentations. Although BP does not question SMS's fraud claim, to adequately address Simaan's fraud claim, SMS's claim must also be closely scrutinized. BP made misrepresentations to the officers of Simaan before SMS was organized to purchase the retail station. Thus, if Simaan is dismissed, SMS would be vulnerable to an assertion that it has no cause of action because no representations were made to it, or relied upon by it, in connection with the purchase of the retail station. Therefore, an issue exists whether either of the Plaintiffs may maintain an action under these circumstances.

It would be unfortunate if the law allowed BP to avoid the consequences of its conduct simply due to Simaan's independent business decision to purchase the retail station via a holding company. Although North Carolina courts have not addressed this situation, the reasoning of other courts is persuasive in determining that both Simaan and SMS are proper parties in this action.

A defendant is liable to a business entity for fraudulent representations made

11

to a party which induce the formation of a business entity and that entity then does the very things the representations were designed to promote such as the purchase of a piece of property pursuant to a contract. See Nationwide Motorist Ass'n of Mich. v. Freeman, 405 F.2d 699, 701-02 (6th Cir. 1969) ("We find no merit to appellants' argument that the corporate plaintiff could not recover because many of the misrepresentations were made and were relied on by the individuals who formed the corporation prior to incorporation."); Crystal Pier Amusement Co. v. Canaan, 25 P.2d 839,841-42 (Cal. 1933) (finding that a holding company could sue for misrepresentations made to another business entity because the defendant induced the formation of the holding company to purchase the property at issue); 8 William Meade Fletcher et. al., Fletcher Cyclopedia of the Law of Private Corporations § 3758.10 (2004) (stating that a third person may be liable to a corporation for a fraudulent representation that induced the formation of the corporation). Because both the party forming the holding company and the holding company are parties to which the misrepresentations are considered to have been made and relied upon, the apportionment of the damages between them is a matter with which the defendants have no concern. Crystal Pier Amusement, 25 P.2d at 842. A joint judgment for both parties does not prejudice the defendant in any way.

The facts as alleged in the Complaint provide that BP made misrepresentations to Simaan with the intent to deceive Simaan, knowing that they

12

were false and knowing that Simaan would act on the misrepresentations to its detriment. Thus, BP intended Simaan to purchase the retail station at an inflated price. After signing a contract to sell the retail station to Simaan, Simaan chose to form a holding company, SMS, that would close on the retail station. BP signed off on Simaan's assignment of its contract rights to its new holding company, SMS. Although Simaan assigned its rights to purchase the retail station to SMS, Simaan remained liable to BP if SMS failed to close on the property. Plainly, BP intended its representations to Simaan to be received and relied upon by SMS. SMS is a proper party even though the representations were made to Simaan.

Although BP's false representations were made to a business entity, in truth all the representations were made to the Simaan family who owns both Simaan and SMS. Simaan is a proper party because the injury that was suffered by BP's misrepresentations is shared between Simaan and SMS, and a joint judgment for both parties will not prejudice BP.

Therefore, the facts in the Complaint support an inference that both SMS and Simaan are proper parties. BP's motion to dismiss Simaan is DENIED.

### III.

BP next moves to strike portions of the Complaint under Federal Rule of Civil Procedure 12(f). The rule states that a court "may order stricken from any pleading any insufficient defense or any redundant, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The purpose of a Rule 12(f) motion to strike is to

13

avoid the waste of time and money that arises from litigating unnecessary issues. Buser v. Southern Food Serv., Inc., 73 F. Supp. 2d 556, 559 (M.D.N.C. 1999). Courts have broad discretion in disposing of motions to strike, but such motions are "generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 348 (4th Cir. 2001). Moreover, a motion to strike on the basis of irrelevancy should only be granted when it is clear that the material in question can have no possible bearing upon the subject matter of the litigation and the material may prejudice the other party. Moore v. Prudential Ins. Co. of Am., 166 F. Supp. 215, 217 (M.D.N.C. 1958).

A.

BP first seeks to strike paragraphs 17, 18, and 31 of the Complaint, which allege that BP initially offered a right of first refusal to Simaan because it subjectively believed that the PMPA required such an offer. BP argues that these allegations are irrelevant to the claims of fraud and deceptive trade practices and are only raised by Plaintiffs in an attempt to raise claims already rejected by this Court. BP also claims these allegations will cause prejudice by insinuating that BP owed Simaan "some heightened duties under the PMPA." (Defs.' Br. at p. 8.)

Plaintiffs are allowed to present their case of fraud in the context of their business relationship with BP. Although Plaintiffs' PMPA claims have been

14

dismissed, the remaining claims of fraud and deceptive trade practices still involve the same transaction and Plaintiffs are permitted to provide evidence of all the intricacies and details of this complex business transaction between the parties. See Roboserve, Inc. v. Kato Kagaku Co., 78 F.3d 266, 273 (7th Cir. 1996) (finding that fraud evidence should not be limited, but that juries should see the entire picture of complex transactions including evidence of all negotiations and maneuverings between the parties); Total Petroleum, Inc. v. Davis, 788 F.2d 476, 484 (8th Cir. 1986) (allowing evidence of the business relationship between the parties to allow the jury to determine if the plaintiff's reliance was reasonable).

The context in which BP offered a right of first refusal to the Plaintiffs is not irrelevant to the case. The business relationship between BP and Simaan is vital to a jury's understanding of this complex transaction. Furthermore, the use of PMPA language in offering the right of first refusal is probative in determining whether Plaintiffs reasonably relied on the price representations. Finally, BP's claims that the allegations create prejudice by insinuating the PMPA placed heightened duties upon BP is completely without merit. Plaintiffs' allegations provide context to the transaction at issue and never mention any additional duties imposed upon BP.

Therefore, BP's motion to strike paragraphs 17, 18, and 31 is DENIED.

B.

BP next moves to strike paragraphs 14, 16, 18, 19, and 35, which describe BP's dealings with its franchisees other than Simaan including BP's offers of rights

15

of first refusal to those dealers. BP argues that these allegations are irrelevant to Plaintiffs' claim that BP misled Simaan and that these allegations prejudice BP because Plaintiffs would be basing their recovery on BP's wrongful conduct towards these other dealers.

Plaintiffs are allowed to present BP's allegedly fraudulent behavior in its full context. Plaintiffs' Complaint explains that the context of BP's misrepresentation of Fowler's offer involved an offer by Fowler to purchase thirteen locations. According to Plaintiffs' allegations, there never was an offer by Fowler to purchase Plaintiffs' property separate and apart from the offer to purchase all thirteen locations. For the jury to understand this transaction, evidence about properties in addition to the Simaan location is essential. Further, the allegations that BP misrepresented the prices of the locations owned by the independent dealers is probative of both BP's knowledge and intent to mislead Plaintiffs. Because knowledge and intent are elements of a fraud claim, the allegations are relevant. Further, Plaintiffs make no claims in their Complaint that they should recover damages for the misrepresentations made to the other independent dealers. BP's argument of prejudice is without merit.

Therefore, BP's motion to strike paragraphs 14, 16, 18, 19, and 35 is DENIED.

C.

Finally, BP moves to strike the allegations in paragraph 35 of the Complaint,

16

which allege BP and Fowler "manipulated the property values and prices offered to the dealers" and kept details of the transaction hidden from the dealers. BP argues that Plaintiffs were only allowed to raise a deceptive trade practices claim related to BP's misrepresentations and that these allegations are unrelated to a misrepresentation claim.

Again these allegations in the Complaint allow Plaintiffs to provide evidence of the context of the transaction at issue. Claims that BP manipulated the purchase prices between BP and Fowler and concealed the real purchase price paid by Fowler from Plaintiffs are essential to explaining Plaintiffs' belief that BP fraudulently and deceptively misrepresented its offer of a right of first refusal. All of these allegations provide context to whether BP's offer to Plaintiffs contained misrepresentations and are relevant to whether BP acted unfairly or deceptively in its dealings with Plaintiffs. BP provides no evidence of any prejudice that comes from these allegations that are clearly probative of the issues to be tried at trial.

Therefore, BP's motion to strike portions of paragraph 35 is DENIED.

IV.

Finally, BP moves under Federal Rule of Civil Procedure 12(e) to make Plaintiffs' allegations in paragraphs 35 and 36 more definite and certain. The rule provides that if a pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement." Fed. R. Civ. P. 12(e). A motion for a more definite

17

statement is generally left to the court's discretion, but if the complaint is sufficient to reasonably require the defendant to answer, the motion should be denied. Hodgson v. Virginia Baptist Hospital, Inc., 482 F.2d 821, 824 (4th Cir. 1973). Rule 12(e) was not intended as a substitute for discovery, and pretrial discovery is preferable to a motion for a more definite statement. Gilbert v. Bagley, 492 F. Supp. 714, 749 (M.D.N.C. 1980).

BP argues that the allegations in paragraph 35 are so vague and ambiguous that they do not know what specific actions are at issue. However, the allegations detailing Plaintiffs' claim of unfair and deceptive trade practices in paragraph 35 clearly describe BP's wrongful conduct that constituted unfair and deceptive actions: manipulating the property values and prices offered to the dealers; concealing material information about the original offer made to Fowler; and misrepresenting the offer to Simaan as a right of first refusal identical to Fowler's agreement to purchase. The allegations are not so vague and ambiguous that BP cannot be required to respond.

BP next argues that Plaintiffs' claim of damages in paragraph 36 should be made more definite. In paragraph 36 Plaintiffs allege that "[a]s a direct and proximate result of the unfair and deceptive acts and practices and unfair competition, plaintiff and the business of the plaintiffs has been injured." While this statement alone may be vague and ambiguous, when coupled with the remainder of the Complaint Plaintiffs' allegations of damages are not ambiguous.

18

The damages claimed by Plaintiffs result from the alleged overpayment of an inflated price for the property. (Compl. ¶¶ 13, 19.) These allegations are sufficient to allow BP to respond to the Complaint.

Therefore, BP's motion to make Plaintiffs' allegations more definite and certain is DENIED.

V.

For the reasons set forth above, BP's Motion to Dismiss or, in the Alternative, for Judgment on the Pleadings and Motion to Strike or, in the Alternative, to Make More Definite and Certain is DENIED.

This the day of May 2, 2005

                                            /s/ N. Carlton Tilley, Jr.
                                            United States District Judge