IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SIMAAN, INC. and ) | |
| SIMAAN MARKET STREET, LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 1:03CV00127 |
| ) | |
| BP PRODUCTS NORTH AMERICA, INC. and ) | |
| BP OIL AND EXPLORATION, INC. ) | |
| ) | |
| Defendants. ) | |
| ) | |

MEMORANDUM OPINION

TILLEY, Chief Judge

This case arises out of Plaintiffs' Simaan, Inc. ("Simaan"[1]) and Simaan Market Street, LLC ("SMS") purchase of a retail gasoline station from Defendant BP Products North America, formerly BP Oil and Exploration, Inc., who is also a Defendant (collectively "BP"). This case is before the Court on Defendants' Second Motion for Summary Judgment [Doc. #111]. For the reasons set forth below, the Defendants' Motion will be DENIED.

I.

A.

The facts in the light most favorable to the Plaintiff are as follows: BP is engaged in the business of refining, marketing, and selling petroleum and other

---

[1] Simaan, Inc., will be referred to as "Simaan," while the owners of Simaan and SMS will be referred to either by name or by "Mr. Simaan."

products.  At all times relevant to this case, BP marketed its petroleum products in the Greensboro, North Carolina area, in part, through a franchise distribution system.  Under that system, BP entered into franchises with independent retail dealers through Dealer Lease and Service Agreements ("DLSA") that required BP to lease retail station premises to the independent dealers, or "franchisees," who then purchased motor fuel from BP for resale to the motoring public under the "BP" or "Amoco" trademark.  BP also operated its own retail service stations in the Greensboro area.

Simaan is a North Carolina corporation owned by members of the Simaan family.  Simaan became a BP-franchised dealer in 1996 when it entered into a three-year DLSA for the operation of a motor fuel station and convenience store located at 801 East Market Street in Greensboro (the "Retail Station").  BP and Simaan subsequently renewed the franchise by executing a new three-year DLSA on August 1, 1999.  As recognized in the 1999 DLSA, the relationship between Simaan and BP was governed by the Petroleum Marketing Practices Act ("PMPA").

Late in 2000 or early in 2001, BP made a business decision to divest certain retail markets, including the Greensboro area market.  The thirteen BP-branded retail locations in the Greensboro area were offered as a package to certain BP distributors, or "jobbers," who were identified as having an interest in those locations.  Three of the thirteen locations, including Simaan's Retail Station, were leased and operated by BP franchisees, nine were operated directly by BP, and one

2

was owned and operated by an independent BP dealer.

BP received several bids for the thirteen locations in the Greensboro area and ultimately accepted the offer of jobber M.M. Fowler, Inc. ("Fowler"). Fowler offered to purchase the thirteen locations in Greensboro for a total package amount of $10,450,000 in cash plus additional consideration, including an additional fuel volume commitment above and beyond the volume commitment under its current jobber agreement and the total volume currently generated by the Greensboro stations. After the package price was agreed upon, BP and Fowler executed a letter of intent on June 22, 2001. (Ex. 11.) The letter of intent stated that Fowler intended to purchase the Greensboro locations for $10,450,000 in cash and as additional consideration Fowler agreed to purchase 165,000,000 gallons of BP gasoline over the next fifteen years in addition to any current volume commitments to BP. On June 25, 2001, a Draft Agreement of Purchase and Sale ("Draft Agreement") was created by BP. (Ex. 12.) This Draft Agreement assigned a value of $430,000 to Simaan's location, which was based upon an appraisal BP had conducted on the property. Prices were assigned in a similar manner to the other franchisee locations consistent with values identified in appraisals that BP had previously obtained.

BP and Fowler continued to negotiate the details of the deal from the summer of 2001 through January 2002. At some point during these negotiations, BP determined that the transfer of Greensboro retail stations to Fowler required BP

3

to comply with the PMPA, and in accordance with the PMPA, Simaan and the owners of the other franchisee-operated retail stations would have to be granted rights of first refusal to purchase their station properties. BP informed Fowler during these negotiations that the sale of the three franchisee-operated stations was contingent on BP's offer of rights of first refusal to the franchisees.

On January 23, 2002, BP and Fowler executed the Final Agreement of Purchase and Sale ("Final Agreement"), under which Fowler agreed to purchase BP's interest in the thirteen retail locations. In Paragraph 2.2 of the Final Agreement the purchase price is listed as $10,450,000, and is allocated as provided in Exhibit C to the Final Agreement. (Ex. H.) The Simaan Retail Station was allocated a value of $900,000 in Exhibit C. In Paragraph 2.7 the Final Agreement states that "as part of the consideration for this transaction" the parties will also enter a Supplemental Agreement where Fowler agreed to purchase an additional 165,000,000 gallons of motor fuel. This Supplemental Agreement to purchase additional fuel was the result of Fowler agreeing to rebrand several Speedway stations that it had recently purchased. Although these terms were consistent with the Draft Agreement, other significant changes were made.

At some point during the negotiations of the Final Agreement the following provision was added: "In no event shall seller [BP] distribute a copy of this Agreement to the Dealers in notifying the Dealers of their right of first refusal and all information of Buyer shall remain confidential unless disclosure is required by

4

court order." (Ex. 2 ¶ 13.1.)  Neither Fowler nor BP admits to having any knowledge of how that provision found its way into the contract or who wanted it included.  However, Fowler's Marvin Lee Barnes, Jr. specifically denies that Fowler was the party requesting such language.  (Barnes, Jr. Dep. at 56-57.)  Plaintiffs tried repeatedly to obtain a copy of the contract between BP and Fowler, but BP refused to provide it.

In addition, Mr. Barnes, Jr., and his father Marvin Lee Barnes, Sr., as representatives of Fowler, changed the allocation of the cash portion of the purchase price among the properties included in the Final Agreement.  The new property allocations inflated the values assigned to the three franchisee locations and reduced the values assigned to the company-operated locations.  Thus, while the total purchase price between BP and Fowler remained at $10,450,000, the value assigned to Simaan's station increased to $900,000, up from $430,000 in the Draft Agreement.  The other two franchisee-operated locations were similarly inflated.  In the Final Agreement the values attributed to the three franchisee stations (at which rights of first refusal would be given) more than doubled, while the values for the other locations decreased including one station that was assigned a value of zero.  BP claims this new allocation was based on Fowler's position of what each of the properties was worth.  However, contrary to Barnes, Jr.'s claim that the franchisee sites had a greater value, his father testified that the franchisee stations "were not as attractive to somebody like us," and agreed that

5

having dealers in the stations would suppress their values. (Barnes, Sr. Dep. at 13.) Knowing that it was going to offer the three franchisees rights of first refusal under the PMPA based upon the Final Agreement, BP approved of the manipulation of the property values[2] and agreed that the prices in the Final Agreement would remain secret pursuant to Paragraph 13.1.

On February 7, 2002, BP sent Simaan by certified mail a notice informing Simaan that BP had decided to sell its interest in the Simaan location. The letter stated, "BP has received an offer from M.M. Fowler, Inc. ("Jobber") to purchase its interest in the marketing premises for $1,052,684." The February 7 letter also offered Simaan a right of first refusal to purchase the station at the price of $1,052,684 and on the same terms and conditions as Fowler's offer, which included (1) a fifteen year motor fuel purchase commitment of 1,082,389 gallons per year; (2) a fifteen year deed restriction prohibiting, *inter alia*, the sale of motor fuel on the premises unless operated as a BP-branded station; and (3) a right of first refusal to repurchase the station in favor of BP. The notice explained that the parties' franchise relationship would expire by its own terms on July 31, 2002, and that if Simaan did not exercise its right of first refusal, BP would assign its rights and delegate its obligations under the DLSA to Fowler in connection with Fowler's purchase of the station. The notice informed Simaan that the right of first refusal

---

[2] Mr. Smith, BP's real estate representative, discussed with Fowler's representatives the fact that the prices of the franchisee locations were being inflated. Mr. Smith also discussed the inflation with BP's legal counsel.

6

would remain open for forty-five days from the postmark date of the notice.

The $1,052,684 price BP quoted in its letter was the result of adding the present value of the Simaan Retail Station's proportionate share of Fowler's Supplemental Volume Agreement to the $900,000 property value allocation of the Retail Station.[3] Mr. Smith calculated the present value of the Retail Station's proportionate share of the Supplemental Volume Agreement using his own formulas and present value reductions that did not appear in the Final Agreement. However, the letter never made any attempt to explain the $1,052,684 figure.

This offer to Simaan of a right of first refusal was made to sound as if it were made pursuant to the PMPA by tracking the statutory language of 15 U.S.C. § 2802(b)(3)(D)(I). Furthermore, BP provided a copy of the PMPA summary statement with the February 7 letter. Upon receiving the February 7 letter, Simaan's representatives, including its counsel, Thomas A. Worth, communicated with BP's representatives, including BP's counsel, William Kazer, Jr., and BP's real estate representative, William Smith, regarding the purported right of first refusal. In response to direct questions from Mr. Worth, BP represented that its offer was

---

[3]The Final Purchase Agreement provided that if a franchisee exercised a right of first refusal, the total fuel volume Fowler was required to purchase would be reduced by the number of gallons generated at the station at issue multiplied by 1.5. The 1.5 multiple was used because the Supplemental Volume Agreement equaled roughly half of the volume being generated by the Greensboro locations. Thus, any reduction of the total volume would reflect the volume already generated by the individual station plus a proportional amount of the Supplemental Volume Agreement.

7

made in compliance with federal law. Simaan's representatives specifically requested that Simaan be provided with information regarding the alleged jobber contract upon which the right of first refusal was based, including a copy of the contract between BP and Fowler. BP refused to provide any information and also refused to provide a copy of its contract with Fowler. Plaintiffs were suspicious of the price and the right of first refusal and believed that BP was trying to prevent them from buying the property. Mr. Simaan believed that the property price was too high; however, he believed that he had to trust BP to comply with the federal requirements in making a bona fide right of first refusal under the PMPA. Mr. Simaan told his BP representative, Deborah Rogers, that he was afraid he would lose the station if he did not buy it. Ms. Rogers responded by telling him that the process BP was using was "fishy," or words to that effect. When Mr. Simaan told her that he intended to take action against BP after the sale, Ms. Rogers encouraged him to do so.

By letter dated February 28, 2002, Simaan notified BP of its intention to exercise the right of first refusal and purchase the Retail Station. On March 15, 2002, BP forwarded to Simaan's counsel a proposed Purchase and Sale Agreement ("PSA") based upon the $1,052,684 price that was included in the February 7 Notice. Additionally, BP sent Simaan a copy of its appraisal for the Simaan location. The appraisal revealed that the location had a fair market value of $505,000, less than one-half the price at which the location was offered to

8

Simaan for purchase. After excluding the value of the service station business, the appraisal estimated the value of the Retail Station property at $430,000, or the original value allocated to the Retail Station by BP in its Draft Agreement. Nevertheless, BP continued to claim that the amount offered by Fowler for the Simaan location was $1,052,684 and that Simaan had the right to exercise its right of first refusal only at that price.

After receiving the PSA, Simaan again attempted to learn from both BP and Fowler what would happen to Simaan's business if it decided not to purchase the property. BP through its counsel claimed that it could not say, and Fowler refused to even talk to Simaan's representatives. Thereafter, in an effort to save its business which it had developed, Simaan executed the PSA "under protest"[4] and forwarded the contract to BP on April 3, 2002. After executing the PSA, the Simaan family formed plaintiff SMS and with BP's consent assigned all of Simaan's rights in the PSA to SMS. SMS proceeded with the closing and on April 17, 2002, acquired the property at the inflated price of $1,052,684.

Fowler also closed on its purchase transaction on April 17, 2002, and at the closing Fowler received a credit of $900,000 on its cash purchase price. In addition, the total volume of fuel Fowler was required to purchase from BP was reduced by 32,723,752 gallons as a result of Simaan's exercise of its right of first

---

[4] Plaintiffs returned the executed PSA with a letter explaining that it was signing the PSA "under protest."

9

refusal. This reduction in total volume included a decrease in volume under the Supplement Volume Agreement. However, even though Fowler's fuel volume requirements were decreased, in reality BP lost none of the supplemental volume that Fowler was bringing to BP because Fowler's recently purchased Speedway stations were still rebranded as part of the deal, and the amount of fuel they purchased from BP was unaffected. Fowler's attorney in charge of closing this transaction also confirmed that the recordation taxes were paid on each retail station values assigned in Exhibit C of the Final Agreement and not on some other adjusted amount.

B.

Plaintiffs originally filed a Complaint alleging claims under the PMPA on February 5, 2003. BP's Motion for Summary Judgment on Plaintiffs' PMPA claims was granted on January 20, 2005, and Plaintiffs were given leave to amend their Complaint to allege claims based on BP's allegedly deceitful conduct. On January 28, 2005, Plaintiffs filed their Third Amended Complaint alleging claims under the North Carolina unfair and deceptive trade practices statute and common law fraud. Defendants' motion seeking to dismiss the Plaintiffs' Complaint, or in the alternative, to dismiss Simaan as a party to the case, and to strike certain allegations of the Complaint, or in the alternative, to make the allegations more definite was denied on May 2, 2005. On April 6, 2005, Defendants filed the motion currently before this Court, Defendants' Second Motion for Summary

10

Judgment.

## II.

Summary judgment is proper only when there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e). The material facts are those identified by controlling law as essential elements of claims asserted by the parties. In other words, the materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). An issue is genuine as to such facts if the evidence is sufficient for a reasonable trier of fact to find in favor of the nonmoving party. Anderson, 477 U.S. at 248. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In evaluating a motion for summary judgment, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. See Fed. R. Civ. P. 56(e). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. Anderson, 477 U.S. at 249. In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at

11

251-52. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data General Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993).

III.

Defendants first move for summary judgment against Plaintiff Simaan arguing that Simaan cannot establish that it suffered injury as a result of BP's alleged wrongful conduct. This argument has already been rejected in this Court's Memorandum Opinion denying Defendants' Motion to Dismiss [Doc. #117]. Therefore, Defendants' motion for summary judgment against Plaintiff Simaan for failure to prove injury will be DENIED.

IV.

Defendants next move for summary judgment on Plaintiffs' fraud and deceptive trade practices claims. First, Defendants argue that Plaintiffs cannot prove that BP misrepresented a material fact or engaged in any deceptive or unfair conduct. BP next argues that Plaintiffs cannot prove actual reliance on the alleged misrepresentations in deciding to exercise their right of first refusal. Finally, BP asserts ratification as an affirmative defense to Plaintiffs' claims.

The essential elements of common law fraud are well established in North Carolina: A plaintiff must prove (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive; (5) resulting in damage to the injured party.

12

Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).

The essential elements of a claim under the General Statutes of North Carolina § 75-1.1, the Unfair and Deceptive Trade Practices Act, requires a plaintiff to show (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused actual injury to plaintiffs. Belcher v. Fleetwood Enters., Inc., 162 N.C. App. 80, 85, 590 S.E.2d 15, 18 (2004). An unfair or deceptive act is defined as activity that amounts to an inequitable assertion of power or position. Morgan v. AT&T Corp., 608 S.E.2d 559, 564 (N.C. Ct. App. 2005). Proof that a party made material misrepresentations is one method of proving an inequitable assertion of power. Id. In addition, to succeed on such a claim, a plaintiff must prove its actual injury occurred as a result of defendant's unfair or deceptive activity. In a case involving an alleged misrepresentation, a plaintiff must show that he or she relied on the misrepresentation to his or her detriment. 162 N.C. App. at 85-86, 590 S.E.2d at 19.

### A.

BP argues that Plaintiffs fail to provide sufficient evidence to allow a jury to find that BP either misrepresented a material fact or concealed a material fact. BP presented Simaan with a letter that stated, "BP has received an offer from M.M. Fowler, Inc. ("Jobber") to purchase its interest in the marketing premises for $1,052,684." BP then proceeded to offer Simaan a right of first refusal pursuant

13

to the PMPA.[5] This statement was a material misrepresentation of fact. BP never received an offer to purchase the Retail Station for $1,052,684. The undisputed facts show that BP received an offer to purchase thirteen Greensboro BP retail stations for a package price of $10,450,000 plus a Supplemental Volume Agreement. There is no evidence that Fowler ever offered to pay BP the sum of $1,052,684 for the Simaan Retail Station. Instead, Fowler allocated a value of $900,000 to the Retail Station. The remaining $152,684 of the price is a result of BP's own personal computation of the lost value from the decrease in fuel volume Fowler would have to purchase under the Supplemental Volume Agreement if Simaan exercised its right of first refusal.[6] Therefore, BP's description of Fowler's offer was a material misrepresentation of fact.

Furthermore, BP's February 7 letter concealed material facts from Simaan. The implication of the description of Fowler's offer in the February 7 letter was that BP had received a good faith, arms length bid to purchase the Simaan Retail Station for $1,052,684. BP never revealed that the offer from Fowler was a result of BP soliciting bids to buy its thirteen Greensboro retail locations. BP did not explain that after Fowler and BP had negotiated the details of the package price,

---

[5] Although this Court has determined that the PMPA did not apply to this transaction, the right of first refusal was still offered to Simaan under the auspices that the protections of the PMPA would apply to the offer.

[6] Although Fowler's contractual liability for fuel volume decreased when Simaan exercised its purchase right, the facts reveal that Fowler did not actually adjust the amount of fuel volume it had agreed to purchase from BP.

14

Fowler was allowed to rearrange BP's property value allocations to inflate the values of the locations that were to be offered rights of first refusal while deflating the values of the other locations. In addition, BP never explained that the $1,052,684 offer price was actually a combination of an inflated cash purchase price and a present value computation of lost fuel volume that would result from Simaan's exercise of its first refusal right.

Finally, BP failed to reveal material facts in response to direct requests by Simaan. Simaan's representatives requested information regarding the alleged jobber contract upon which the right of first refusal was based, including a copy of the contract between BP and Fowler. BP never provided the requested information, and BP also failed to reveal that a part of the contract it signed with Fowler prevented the disclosure of the details of the transaction.

BP's brief relies on a Massachusetts state court case, Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957 (Mass. 2004), to argue that its conduct did not amount to concealing or making false statements. This Massachusetts case is easily distinguished. In Uno Restaurants, the seller fully disclosed the details of the transaction and provided a copy of the underlying purchase agreement to its tenant Uno Restaurants. BP failed to provide material information about its transaction with Fowler in addition to failing to provide a copy of the purchase agreement. In Uno Restaurants, the offer to purchase was unsolicited, and the seller had not done an initial fair market value allocation of the

15

purchase price among the different properties. In contrast, BP solicited offers for the package of Greensboro service stations. After negotiating the package deal, BP assigned fair market values to each location based upon property appraisals. BP then signed a Final Agreement which had vastly different property value allocations and included a confidentiality clause that prevented BP from showing the contract to Simaan. Finally, in <u>Uno Restaurants</u>, there was no relationship between the seller and the buyer, and the relationship between the seller and the owner of the right of first refusal was not regulated under federal law. In contrast, BP sold the package of service stations to a jobber with whom it had a business relationship, and Simaan, the owner of the right of first refusal, was led to believe that the entire transaction was within the protections of the PMPA. Therefore, the analysis of the Massachusetts state case is inapplicable to this transaction.

Under North Carolina law, fraud can be practiced by silence as well as by a positive misrepresentation, if a duty to speak exists. See <u>Setzer v. Old Republic Life Ins. Co.</u>, 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962) (holding that). A legal duty to disclose material information can arise "from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances." <u>Id.</u>, at 399 (quoting 23 <u>Am. Jur.</u>, Fraud & Deceit, § 77). Although there is no fiduciary relationship in the instant case, there are other "attendant circumstances" that could support a jury's conclusion that BP had a duty to disclose the true nature of its assigning an inflated property value to the

16

Simaan station property and its subsequent agreement with Fowler not to communicate the nature of the BP - Fowler assignment of property values. In situations such as this, North Carolina recognizes a common-law duty to correct misleading statements.[7] See Ragsdale v. Kennedy, 286 N.C. 130, 139, 209 S.E.2d 494, 501 (1974) ("[E]ven though a vendor may have no duty to speak under the circumstances, nevertheless if he does assume to speak he must make a full and fair disclosure as to the matters he discusses."); see also Shaver v. N.C. Monroe Constr. Co., 63 N.C. App. 605, 614-15, 306 S.E.2d 519, 525 (1983) (holding that, after a letter to employees impliedly represented that contributions were being made to a pension plan and after an employee was told that the plan was still "intact," the employer could have a duty to disclose the full truth that the plan had been terminated).

The ultimate question for the jury regarding this issue is whether the BP letter stating it had an offer from Fowler for $1,052,684 "under the circumstances existing, . . . amounts to an affirmation that a state of things exist [sic] which does not." Setzer, 257 N.C. at 399, 126 S.E.2d at 137 (quoting 23 Am. Jur., Fraud

---

[7] Other instances in which a legal duty to disclose may arise are: (1) where a fiduciary relationship exists between the parties to the transaction; and, outside of a fiduciary relationship in which the parties are dealing at arm's length, (2) where a party has taken affirmative steps to conceal material facts from the other and (3) where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence. See Harton v. Harton, 81 N.C. App. 295, 297-98, 344 S.E.2d 117, 119 (1986).

17

and Deceit, § 77).

Therefore, BP's motion for summary judgment on the basis that Plaintiffs failed to show a material misrepresentation of fact will be DENIED.

B.

Next, BP argues that Plaintiffs failed to present sufficient evidence to allow a jury to find that Simaan relied upon BP's misrepresentations. BP refers to deposition testimony where Lee Simaan admits that he doubted that Fowler had actually offered to purchase the Retail Station at the same price and on the same terms contained in the right of first refusal. Mr. Simaan also stated that he believed that BP or Fowler was trying to prevent him from exercising his right of first refusal and that he believed the price was inflated and excessive. In addition, BP notes that it is undisputed that a copy of an appraisal listing the value of the retail station at $430,000 was given to Simaan.

However, none of the above testimony prevents a jury from finding that Plaintiffs relied upon BP's representation that the February 7 letter was an offer of first refusal under the PMPA, which represented an arms length negotiated offer from Fowler to purchase the Retail Station for $1,052,684. The Plaintiffs were presented with the right of first refusal in a take it or leave it fashion. Although Plaintiffs may have questioned BP's motives and even doubted the propriety of the offer, the Plaintiffs had no choice but to rely on its veracity and to challenge the

18

facts of the offer at a later time if they then discovered it to be false. [8]

BP's motion for summary judgment on the basis that Plaintiffs failed to provide sufficient evidence of reliance will be DENIED.

C.

Finally, BP asserts ratification as an affirmative defense. "A cause of action premised on fraud or misrepresentation may be waived by affirmative acts taken by a plaintiff that amount to a ratification of the transaction." Neugent v. Beroth Oil Co., 149 N.C. App. 38, 55, 560 S.E.2d 829, 840 (2002). However, an act of the victim of fraud will not constitute a ratification unless at the time of such act, the victim had full knowledge of the facts and was then capable of acting freely. Id.

The defense of ratification does not apply to this case. Plaintiffs did not have full knowledge of the facts when they accepted the right of first refusal. See supra Part IV. A. (discussing evidence that Defendants concealed material facts). Plaintiffs asked repeatedly for a copy of the Final Agreement as well as for other information about how the $1,052,684 price was determined, yet BP refused to provide this material information. Because Plaintiffs did not have full knowledge of the facts of the transaction at the time they accepted the right of first refusal, the defense of ratification is inapplicable.

---

[8]Furthermore, providing a copy of the appraisal while at the same time refusing to provide any information detailing Fowler's "offer" of $1,052,684 does not support Defendants' motion for summary judgment; instead, such information bolsters Plaintiffs' claims that BP was trying to dissuade Plaintiffs from purchasing the Retail Station, so that Fowler could acquire it.

19

BP's motion for summary judgment on the basis of ratification will be DENIED.

V.

For the reasons set forth above, Defendants' Second Motion for Summary Judgment will be DENIED.

This the day of May 6, 2005

                                                              /s/ N. Carlton Tilley, Jr.
                                                              United States District Judge